# EXHIBIT A

# EXHIBIT A

EXHIBIT A

# EXHIBIT A

STATE OF MICHIGAN

IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM

LINDSEY LEMKE, KYLIE CHESTER, AMANDA SMITH, JANE C1 DOE, JANE C2 DOE, JANE C3 DOE, JANE C4 DOE, JANE C5 DOE, JANE C6 DOE, JANE C7 DOE, JANE C8 DOE, JANE C9 DOE, JANE C10 DOE, JANE C11 DOE by next friend JANE C12 DOE, JANE C13 DOE, JANE C14 DOE, JANE C15 DOE, JANE C16 DOE, JANE C17 DOE, JANE C18 DOE by next friend JANE C19 DOE, JANE C20 DOE, JANE C21 DOE, JANE C22 DOE, JANE C23 DOE by next friend JANE C24 DOE, JANE C25 DOE, JANE C26 DOE, JANE C27 DOE, JANE C29 DOE, JANE C30 DOE, JANE C31 DOE, JANE C32 DOE, JANE C33 DOE, JANE C34 DOE, JANE C35 DOE, JANE C36 DOE, and JANE C37 DOE by next friend JANE C38 DOE,

    Plaintiffs;

v.

USA GYMNASTICS, INC.;
TWISTARS USA, INC. d/b/a GEDDERTS' TWISTARS GYMNASTICS CLUB USA;
JOHN GEDDERT (individually); and
UNITED STATES OLYMPIC COMMITTEE;

    Defendants.

Case No.: 18 – 610      – NO

Hon. JUDGE JAMES S. JAMO

Complaint and Jury Demand



---

A CIVIL ACTION BETWEEN THESE PARTIES OR OTHER PARTIES ARISING OUT OF THE TRANSACTION OR OCCURRENCE ALLEGED IN THIS COMPLAINT HAS BEEN PREVIOUSLY FILED IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, WHERE IT WAS GIVEN CASE NUMBER 1:17-CV-00029-JGQ-ESC AND WAS ASSIGNED TO JUDGE GORDON J. QUIST. THE ACTION REMAINS PENDING.

---

1



**H. James White (P56946)**
**Alexander S. Rusek (P77581)**
**Brittany M. Nichol (P81900)**
White Law PLLC
Attorneys for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: jameswhite@whitelawpllc.com
E: alexrusek@whitelawpllc.com
E: brittanynichol@whitelawpllc.com
E: discovery@whitelawpllc.com

**D. Andrew Portinga (P55804)**
**David J. Gass (P34582)**
**Rebecca L. Strauss (P64796)**
Miller Johnson PLC
Attorneys for Defendant USA
Gymnastics, Inc.
45 Ottawa SW, Suite 1100
P.O. Box 306
Grand Rapids, MI 49501-0306
Ph.: (616) 831-1700
Fax: (616) 988-1772
E: portingaa@millerjohnson.com
E: gassd@millerjohnson.com
E: straussr@millerjohnson.com

**Cameron R. Getto (P57300)**
Zausmer August & Caldwell, P.C.
Attorneys for Defendant Twistars USA,
Inc. d/b/a Gedderts' Twistars
Gymnastics Club USA and John Geddert
31700 Middlebelt Rd., Suite 150
Farmington Hills, MI 48334
Ph.: (248) 851-4111
Fax: (248) 851-0100
E: cgetto@zacfirm.com

**United States Olympic Committee**
Defendant *In Pro Per*
One Olympic Plaza
Colorado Springs, CO 80909
Ph.: (719) 632-5551

## COMPLAINT AND JURY DEMAND

**NOW COME** Plaintiffs, by and through their attorneys, H. James White, Alexander S. Rusek, and Brittany M. Nichol of White Law PLLC, and hereby allege and state as follows:

## I.   PRELIMINARY STATEMENT AND INTRODUCTION

1.   This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs[2] as a result of the acts, conduct, and omissions of USA Gymnastics ("USAG"), and Twistars USA, Inc. ("Twistars"), John Geddert ("Geddert"), the United States Olympic Committee ("USOC"), and their respective employees, representatives, and agents, relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Nassar against Plaintiffs, all female, most of whom were minors when the sexual assaults took place.

2.   Most Plaintiffs are or were young athletes participating in a variety of sports including gymnastics, dance, swimming, figure skating, track and field, field hockey, basketball, and soccer. Other Plaintiffs were patients of Nassar that sought medical treatment for chronic pain or injuries.

3.   Nassar came highly recommended to Plaintiffs as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, specifically in the gymnastics community as the Team Physician for the United States Gymnastics team.

4.   Plaintiffs and their parents had no reason to suspect Nassar was anything other than a

---

[2] References to Plaintiffs (plural) and other named Plaintiffs include Plaintiffs in W.D. Mich. Case Nos. Nos. 1:17-cv-29 and 1:18-cv-172, and 1:18-cv-433, as well as other consolidated and related cases. Further, Plaintiffs intend to seek Orders of this Court for permission to proceed by pseudonyms for those Plaintiffs seeking to proceed anonymously.

competent and ethical physician.

5. From approximately 1996 to 2016 Nassar worked for Michigan State University in various positions and capacities.

6. From 1986 to approximately 2015 Defendant Nassar also worked for USA Gymnastics in various positions and capacities.

7. For over 20 years, Nassar had unfettered access to young female athletes through the Sports Medicine Clinic at MSU, and through his involvement with USAG and Twistars, who referred athletes to his care.

8. To gain Plaintiffs' trust, at appointments, Nassar would give some Plaintiffs gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without.

9. From approximately 1996 to 1999, under the guise of treatment, Nassar sexually assaulted, abused, and molested dozens of Plaintiffs, most of whom were minors, by nonconsensual vaginal and anal digital penetration without the use of gloves or lubricant. In some situations, he also touched and groped their breasts.

10. The Plaintiffs who were sexually assaulted, abused, and molested from 1996 to 1999 were seeking treatment for athletic injuries to their lower backs, shins, hamstrings, hip, tailbone, elbow, groin, foot, and knees.

11. While most of the assaults were carried out at MSU, others were carried out at USAG sponsored events and at Twistars.

12. The ages of the Plaintiffs assaulted during 1996 to 1999 ranged from approximately 6 to 22 years old.

13. In or around 1997/1998, Larissa Boyce[3] reported to Kathie Klages concerns regarding

---

[3] Plaintiff Boyce is a Plaintiff in member case 1:17-cv-222.

Nassar's conduct and "treatment."

14.   Klages dissuaded Plaintiff Boyce from completing a formal report and warned Boyce that the report would have serious consequences for both Plaintiff Boyce and Defendant Nassar.

15.   Around the same time, Plaintiff Jane B8 Does[4] was questioned by Klages regarding Nassar's "treatment" and Plaintiff Jane B8 Doe affirmatively confirmed she had also been sexually assaulted and abused.

16.   Klages told Plaintiff Jane B8 Doe there was no reason to bring up or otherwise report Defendant Nassar's conduct.

17.   In 1999, Christie Achenbach, a MSU student athlete, reported to trainers and her coach Kelli Bert who were employees of MSU concerns about Nassar's conduct and "treatment," yet MSU failed to take any action in response to her complaints.

18.   In 2000, Plaintiff Tiffany Thomas Lopez (formerly Jane T.T. Doe), another MSU student athlete reported to trainers concerns about Nassar's conduct and "treatment," yet again MSU failed to take any action in response to her complaints.

19.   Many Plaintiffs were seen alone with only the individual Plaintiff and Nassar in the room, without chaperones or parents.

20.   At other times, Nassar would position himself in a manner in which parents or chaperones in the room could not see his conduct.

21.   Because MSU took no action to investigate the 1997/1998, 1999, or 2000 complaints and took no corrective action, from 2000 to 2016, Plaintiffs, many of whom were minors, were also sexually assaulted, abused, and molested by Nassar by nonconsensual vaginal and anal digital penetration, nonconsensual sexual touching of the vaginal area without the use of gloves or

---

[4] Plaintiff Jane B8 Doe is a Plaintiff in member case 1:17-cv-222.

lubricant, and by nonconsensual touching and groping of their breasts under the guise of treatment.

22. While most victims were assaulted at MSU, other victims were assaulted at USAG sanctioned events, Twistars, the Suburban Ice Arena, the Michigan Athletic Club, Holt High School, and Nassar's residence in Holt, Michigan.

23. The ages of the Plaintiffs when assaulted ranged from approximately 8 to 34 years old.

24. Additional complaints regarding Defendant Nassar's conduct surfaced in 2014. Plaintiff Amanda Thomashow of Member Case 1:17-cv-254 reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Nassar when he cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.[5]

25. Upon information and belief, MSU investigated the 2014 complaints through their Office of Institutional Equity, and although Plaintiff Amanda Thomashow reported to MSU certain facts, some were omitted from the investigative report including but not limited to the following:

a. Nassar was sexually aroused while touching her;

b. The appointment with Nassar did not end until she physically removed his hands from her body.

26. Three months after initiating the investigation, in July 2014, the victim's complaints were dismissed and MSU issued a report to Plaintiff Amanda Thomashow with conclusions which

---

[5] *See*, At MSU: Assault, harassment and secrecy. Matt Mencarini, December 15, 2016. Available at, http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/. Last accessed January 5, 2017; *See*, Who knew what and when about Larry Nassar at Michigan State University, February 7, 2018. Available at, http://www.mlive.com/news/index.ssf/2018/02/who_knew_what_when_about_larry.html#incart_m-rpt-2. Last accessed February 8, 2018.

stated:

a.   Plaintiff Amanda Thomashow did not understand the "nuanced difference" between

sexual assault and an appropriate medical procedure; and,

b.   Nassar's conduct was "medically appropriate" and "Not of a sexual nature."[6]

27.   Unbeknownst to Plaintiff Amanda Thomashow, a second report was issued by MSU regarding

Plaintiff Amanda Thomashow's complaints with an entirely different conclusion section which

stated:

We cannot find that the conduct was of a sexual nature. Thus, it did not violate the
Sexual Harassment Policy. However, we find the claim helpful in that it brought to
light some significant problems that the practice will want to address.

We find that whether medically sound or not, the failure to adequately explain
procedures such as these invasive, sensitive procedures, is opening the practice up to
liability and is exposing patients to unnecessary trauma based on the possibility of
perceived inappropriate sexual misconduct. In addition, we find that the failure to
obtain consent from patients prior to the procedure is likewise exposing the practice
to liability. If procedures can be performed skin-on-skin or over clothes in the breast
or pelvic area, it would seem patients have a choice between the two. Having a resident,
nurse or someone in the room during sensitive procedures protects doctors and
provides patients with peace of mind. If "touching is what DO's do" and that is not
commonly known, perhaps the practice will want to consider a disclaimer or
information sheet with that information provided to the patient up front.

Finally, we believe that practice should consider whether its procedures for intake of
complaints about physicians' behavior is adequate. [Plaintiff Jane D1 Doe] claims she
tried to file a complaint with the front desk receptionist, telling her that she was
cancelling her appointment because she felt "violated." Whether this triggers a
reporting protocol should be examined by the practice.[7]

28.   Following the investigation, upon information and belief Nassar became subject to new

institutional guidelines as follow:

---

[6] *Id.*

[7] *See,* MSU hid full conclusions of 2014 Nassar report from victim, Matt Mencarini, Lansing State
Journal,        Jan.        26,        2018,        available        at,
https://www.lansingstatejournal.com/story/news/local/2018/01/26/michigan-state-larry-nassar-
title-ix/1069493001/. Last accessed, February 13, 2018.

a.    "We will have another person, (resident, nurse, etc.) in the room whenever we are approaching a patient to preform [sic] procedures of anything close to a sensitive area."

b.    "The procedure which caused [Plaintiff Jane D1 Doe] emotional distress because of her interpretation will be modified in the future to be sure there is little to no skin to skin contact when in these regions. Should this be absolutely necessary, the procedure will be explained in detail with another person in the room for both the explanation and the procedure."

c.    "New people in our practice will be oriented to be sure they understand these requirements."[8]

29.    The guidelines were issued by Strampel to Nassar on or around July 30, 2014.

30.    After issuing these guidelines to Nassar, Defendant Strampel failed to ensure Defendant Nassar was adhering to the guidelines listed above.

31.    In an interview with Strampel on or around March 14, 2017, Strampel told investigators he did not see the need to follow up with Nassar to ensure that he was complying with the guidelines.[9]

32.    New employees at Defendant MSU's Sports Medicine Clinic were not oriented regarding the

---

[8] *See,* The secret Nassar report MSU didn't want his abuse victim to see, Kate Wells, Michigan Radio, January 26, 2018, available at http://michiganradio.org/post/secret-nassar-report-msu-didn-t-want-his-abuse-victim-see, Last accessed February 17, 2018.

[9] *See,* MSU let Larry Nassar see patients for 16 months during criminal sex assault investigation, Matt Mencarini, Lansing State Journal, December 20, 2017, available at https://www.lansingstatejournal.com/story/news/local/2017/12/19/michigan-state-larry-nassar/964034001/, Last accessed February 17, 2018. *See also,* Nassar continued to work during MSU police investigation, victims say assaults continued, Kate Wells, December 20, 2017, available at http://michiganradio.org/post/nassar-continued-work-during-msu-police-investigation-victims-say-assaults-continued, Last accessed February 17, 2018.

guidelines listed above.[10]

33.    Consequently, Nassar continued to treat patients alone.

34.    Nassar continued to perform the "procedure" without gloves.

35.    Nassar did not modify the "procedure" to limit skin-to-skin contact.

36.    Following the investigation, between approximately 2014 and 2016, again, dozens of Plaintiffs were sexually assaulted by Nassar.[11]

37.    Through his position with MSU, his notoriety, and support by Defendants USOC, USAG. and Twistars, Nassar used his position of authority as a medical professional to abuse Plaintiffs without any reasonable supervision by MSU or USAG.

38.    Nassar carried out these acts without fully explaining the "treatment" or obtaining consent of Plaintiffs or their parents.

39.    All of Nassar's acts were conducted under the guise of providing medical care at his office at Michigan State University, at Twistars, or at USAG sanctioned events some with USOC presence.

40.    The failure to give proper notice or to obtain consent for the purported "treatment" from Plaintiffs or their parents robbed them of the opportunity to reject the "treatment."

41.    Nassar used his position of trust and confidence in an abusive manner causing Plaintiffs to suffer a variety of injuries including shock, humiliation, emotional distress and related physical

---

[10] *See e.g.*, Witness: MSU knew Nassar asked her to leave girl's exam, Kim Kozlowski, December 21, 2017, available at http://www.detroitnews.com/story/news/michigan/2017/12/21/msu-nassar-scandal-witness-claims-retribution/108800992/, Last accessed February 13, 2018.

[11] *See*, As F.B.I. Took a Year to Pursue the Nassar Case, Dozens Say They Were Molested, Dan Berry, Serge    F.    Kovaleski,    and    Juliet    Macur,    February    3,    2018,    available    at https://www.nytimes.com/2018/02/03/sports/nassar-fbi.html, Last accessed February 17, 2018 (reporting at least 40 victims were assaulted, abused, and molested between approximately July 2015 and September 2016).

manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

42. Plaintiffs have been forced to repeatedly relive the trauma of the sexual assaults.

43. In approximately 2015, Defendant USOC allegedly became aware of Defendant Nassar's sexual misconduct.

44. Defendant USAG was also made aware of Defendant Nassar's misconduct in or aroud 2015, though they were also made aware as early as 2011, if not earlier.

45. The concerns raised in 2015 were serious enough to warrant a report to the FBI and to ban Nassar from attending future USAG sanctioned events, yet Defendants USAG and USOC concealed their knowledge of said misconduct from Defendants MSU, Twistars, other member gyms and other USAG members, including the Plaintiffs. In summer 2015, USAG relieved Defendant Nassar of his duties after becoming directly aware of concerns about his actions, yet USAG failed to inform it member athletes with whom it shared a fiduciary relationship and Michigan State University of the circumstances regarding his dismissal.

46. In September 2016, a story was published regarding a complaint filed with MSU's Police Department titled "Former USA Gymnastics doctor accused of Abuse," which included Plaintiff Denhollander's allegations against Defendant Nassar.

47. Following the September 2016 publication, other victims began coming forward after recognizing that they were victims of sexual abuse at a time when most of them were minors.

48. As early as 1997, representatives of Michigan State University were made aware of Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of Plaintiffs through approximately 2016.

49. Michigan State University's deliberate indifference before, during, and after the sexual assault, abuse, and molestation of Plaintiffs was in violation of Title IX of the Education Amendments

of 1972, 20 U.S.C. § 1681 *et seq.*, 42 U.S.C. § 1983, as well as other Federal and State laws.

50.     MSU, as well as USAG, the USOC, and Twistars, failure to properly supervise Nassar and
         their negligence in retaining Nassar was in breach of their fiduciary duties to Plaintiff with
         whom they had a special relationship and in violation of Michigan common law.

51.     In late November 2016, Nassar was arrested and charged in Ingham County, Michigan on
         three charges of first-degree criminal sexual conduct with a person under 13, which is a felony
         punishable with a maximum penalty of imprisonment for life without the possibility of
         parole.[12]

52.     In mid-December 2016, Nassar was indicted, arrested, and charged in Federal Court in Grand
         Rapids, Michigan on charges of possession of child pornography and receipt/attempted
         receipt of child pornography.

53.     On February 7, 2017, an additional count was added to Nassar's Federal charges for
         destruction and concealment of records and tangible objects as Nassar "caused a third party
         vendor to permanently delete and destroy all images, records, documents, and drives
         contained on the hard drive of a laptop computer, and [Nassar] threw in the trash a number
         of external hard drives" while under investigation for "his possession of child pornography,
         his receipt and attempted receipt of child pornography, and his sexual exploitation and
         attempted sexual exploitation of children.[13]

54.     On February 22, 2017, Nassar was arraigned on 22 counts of first-degree criminal sexual
         conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual

---

[12] *People v. Nassar*, State of Michigan, Ingham County Circuit Court Case No. 17-143-FC.
[13] W.D. Mich. 1:16-cr-242, ECF 16, PageID.88.

conduct with a person under the age of 13 years old in Ingham County, Michigan[14] and Eaton County, Michigan.[15] Plaintiffs Jane C1 Doe, Jane C4 Doe, and Jane C5 Doe are among the victims identified in the most recent state criminal charges.[16]

55. On July 10, 2017, Nassar plead guilty to the federal charges of possession of child pornography, receipt/attempted receipt of child pornography, and destruction and concealment of records and tangible objects.[17]

56. On November 22, 2017, Nassar plead guilty to 7 counts of first-degree criminal sexual conduct in Ingham County, Michigan.

57. During his Ingham County, Michigan plea, Nassar admitted that his sexual assaults were not done for a medical purpose.

58. On November 29, 2017, Nassar pleaded guilty to 3 counts of first degree criminal sexual conduct in Eaton County, Michigan.

59. On December 7, 2017, Nassar was sentenced to a 720 months (60 years) prison term for the federal child pornography charges.

60. From, January 16, 2018 to January 24, 2018, a sentencing hearing was held in Ingham County, Michigan for the 7 counts of first-degree criminal sexual conduct to which Nassar pleaded guilty.

---

[14]*People v. Nassar*, Ingham County District Court Case No. 17-00425-FY, *see also*, http://www.michigan.gov/documents/ag/Nassar affidavit Ingham County charges Feb. 2017 5 52531 7.pdf

[15]*People v. Nassar*, Eaton County District Court Case No. 17-0318-FY, *see also*, http://www.michigan.gov/documents/ag/Nassar affidavit Eaton County charges Feb. 2017 55 2536 7.pdf

[16] Member Case No.: 1:17-00257.

[17] 1:16-cr-00242, Page ID.114, 119.

61.  Dozens of Plaintiffs and many others provided victim impact statements at the Ingham County Sentencing and some of the Plaintiffs who were seeking to proceed anonymously in this litigation chose to publicly identify themselves at the sentencing hearing.

62.  On January 24, 2018, Nassar was sentenced to a 40 to 175 year prison terms for the Ingham County charges.

63.  From January 31, 2018 to February 5, 2018, a sentencing hearing was held in Eaton County Michigan for the 3 counts of first degree criminal sexual conduct to which Defendant Nassar pleaded guilty.

64.  Again, dozens of Plaintiffs and many others provided victim impact statements at the Eaton County Sentencing and some of the Plaintiffs who were seeking to proceed anonymously in this litigation chose to publicly identify themselves at the sentencing hearing.

65.  On February 5, 2018, Nassar was sentenced to a 40 to 125 year prison term for the Eaton County charges.

66.  Ultimately, the acts, conduct, and omissions of the MSU, Defendants USA Gymnastics, Twistars, and the USOC, and their employees, representatives, and agents, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiffs and an unknown number of individuals, and have resulted in repeated instances of sexual assault, abuse, and molestation of Plaintiffs by Nassar, which has been devastating for Plaintiffs and their families.

67.  This action arises from Defendants' blatant disregard for Plaintiffs' federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient/physician-on-student sexual assault, abuse, and molestation.

## II.   JURISDICTION AND VENUE

68.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous

paragraphs.

69.   The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq.*, and under Michigan Law.

70.   All or part of each of the causes of action arose in Ingham County, Michigan.

71.   This Honorable Court has jurisdiction over all parties pursuant to MCL 600.701, MCL 600.705, MCL 600.711, MCL 600.715, MCL 600.721, MCL 600.725, MCL 600.731, and MCL 600.735 and based upon the allegations contained within this Complaint which are realleged and incorporated by reference into this paragraph.

72.   Venue is appropriate for all parties in Ingham County, Michigan pursuant to MCL 600.1621, MCL 600.1627, and MCL 600.1629 and based upon the allegations contained within this Complaint which are realleged and incorporated by reference into this paragraph.

73.   The amount in controversy exceeds $25,000.00, exclusive of interest, costs, and attorney fees.

## III.   PARTIES AND KEY INDIVIDUALS

74.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

75.   With the exception of certain Plaintiffs who have agreed to be publicly identified, the names of the Plaintiffs have been withheld from this Complaint to protect their identities as some are currently minor children, or some were minor children at the time the sexual abuse occurred.[18]

76.   Plaintiff Lindsey Lemke ("Lemke") is an adult female and is a resident of Michigan.[19] Plaintiff

---

[18] Plaintiffs will seek an Order of the Court regarding disclosure of Plaintiffs' identities and all conditions for disclosure.

[19] Plaintiff Lindsey Lemke was previously identified as Intervenor-Plaintiff Jane Y. Doe in *Denhollander v. Mich. State Univ.*, No. 1:17-cv-00029 (W.D. Mich.).

Lemke was a minor for the majority of the times she was sexually assaulted, abused, and molested by Defendant Nassar.

77.   Plaintiff Kylie Chester ("Chester") is an adult female and is a resident of Michigan. Plaintiff Chester was a minor for the majority of the times she was sexually assaulted, abused, and molested by Defendant Nassar.

78.   Plaintiff Amanda Smith ("Smith") is an adult female and is a resident of Michigan. Plaintiff Smith was a minor for the majority of the times she was sexually assaulted, abused, and molested by Defendant Nassar.

79.   Plaintiff Jane C1 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C1 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[20]

80.   Plaintiff Jane C2 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C2 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[21]

81.   Plaintiff Jane C3 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C3 Doe was a minor for some of the time she was sexually assaulted, abused, and molested by Defendant Nassar.[22]

82.   Plaintiff Jane C4 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C4 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[23]

---

[20] Plaintiff Jane C1 Doe was previously identified as Jane L.B. Doe in other proceedings.
[21] Plaintiff Jane C2 Doe was previously identified as Jane A.P. Doe in other proceedings.
[22] Plaintiff Jane C3 Doe was previously identified as Jane S.M. Doe in other proceedings.
[23] Plaintiff Jane C4 Doe was previously identified as Jane B.M. Doe in other proceedings.

83.    Plaintiff Jane C5 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C5 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[24]

84.    Plaintiff Jane C6 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C6 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[25]

85.    Plaintiff Jane C7 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C7 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[26]

86.    Plaintiff Jane C8 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C8 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[27]

87.    Plaintiff Jane C9 Doe is an adult female and is a resident of Michigan.[28]

88.    Plaintiff Jane C10 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C10 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[29]

89.    Plaintiff Jane C11 Doe is a minor female and is a resident of Michigan.[30]

90.    Jane C12 Doe is an adult female, the mother of Plaintiff Jane C11 Doe, and a resident of

---

[24] Plaintiff Jane C5 Doe was previously identified as Jane L.A. Doe in other proceedings.
[25] Plaintiff Jane C6 Doe was previously identified as Jane H.H. Doe in other proceedings.
[26] Plaintiff Jane C7 Doe was previously identified as Jane W.N. Doe in other proceedings.
[27] Plaintiff Jane C8 Doe was previously identified as Jane H.B. Doe in other proceedings.
[28] Plaintiff Jane C9 Doe was previously identified as Jane L.K. Doe in other proceedings.
[29] Plaintiff Jane C10 Doe was previously identified as Jane J.S. Doe in other proceedings.
[30] Plaintiff Jane C11 Doe was previously identified as Jane R.E. Doe in other proceedings.

Michigan.[31]

91.     Plaintiff Jane C13 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C13 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[32]

92.     Plaintiff Jane C14 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C14 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[33]

93.     Plaintiff Jane C15 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C15 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[34]

94.     Plaintiff Jane C16 Doe is an adult female and is a resident of North Carolina. Plaintiff Jane C16 Doe was a minor for the majority of the times she was sexually assaulted, abused, and molested by Defendant Nassar.[35]

95.     Plaintiff Jane C17 Doe is an adult female and is a resident of Cabo San Lucas, Mexico. Plaintiff Jane C17 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.[36]

96.     Plaintiff Jane C18 Doe is a minor female and is a resident of Michigan.

97.     Jane C19 Doe is an adult female, the mother of Plaintiff Jane C18 Doe, and is a resident of Michigan.

---

[31] Jane C12 Doe was previously identified as Jane R.L. Doe in other proceedings.
[32] Plaintiff Jane C13 Doe was previously identified as Jane B.A. Doe in other proceedings.
[33] Plaintiff Jane C14 Doe was previously identified as Jane H.T. Doe in other proceedings.
[34] Plaintiff Jane C15 Doe was previously identified as Jane M.W. Doe in other proceedings.
[35] Plaintiff Jane C16 Doe was previously identified as Jane Y.A. Doe in other proceedings.
[36] Plaintiff Jane C17 Doe was previously identified as Jane S.J. Doe in other proceedings.

98.     Plaintiff Jane C20 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C20 Doe was a minor for the majority of the times that she was sexually assaulted, abused, and molested by Defendant Nassar.

99.     Plaintiff Jane C21 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C21 Doe was a minor at the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

100.    Plaintiff Jane C22 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C22 Doe was a minor for the majority of the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

101.    Plaintiff Jane C23 Doe is a minor female and is a resident of Michigan.

102.    Jane C24 Doe is an adult female, the mother of Plaintiff Jane C23 Doe, and is a resident of Michigan.

103.    Plaintiff Jane C25 Doe is an adult female and is a resident of Michigan.

104.    Plaintiff Jane C26 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C26 Doe was a minor the majority of the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

105.    Plaintiff Jane C27 Doe is an adult female and is a resident of North Carolina. Plaintiff Jane C27 Doe was a minor at the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

106.    Plaintiff Jane C28 Doe is an adult female and is a resident of Michigan.

107.    Plaintiff Jane C29 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C29 Doe was a minor at the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

108.    Plaintiff Jane C30 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C30 Doe

was a minor for the majority of the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

109. Plaintiff Jane C31 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C31 Doe was a minor for the majority of the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

110. Plaintiff Jane C32 Doe is an adult female and is a resident of Ohio. Plaintiff Jane C32 Doe was a minor at the time that she was sexually assaulted, abused, and molested by Defendant Nassar.

111. Plaintiff Jane C33 Doe is an adult female and is a resident of Michigan.

112. Plaintiff Jane C34 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C34 Doe was a minor for a majority the time she was sexually assaulted, abused, and molested by Defendant Nassar.

113. Plaintiff Jane C35 Doe is an adult female and is a resident of North Carolina. Plaintiff Jane C35 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.

114. Plaintiff Jane C36 Doe is an adult female and is a resident of Michigan. Plaintiff Jane C36 Doe was a minor at the times she was sexually assaulted, abused, and molested by Defendant Nassar.

115. Plaintiff Jane C37 Doe is a minor female and is a resident of Michigan.

116. Jane C38 Doe is an adult female, the mother of Plaintiff Jane C37 Doe, and a resident of Michigan.

117. Defendant Lawrence "Larry" Nassar, was a Doctor of Osteopathic Medicine, and was a resident of Michigan at all relative times. Upon information and belief, Defendant Nassar is currently an inmate in the custody of the Federal Bureau of Prisons.

118. Michigan State University (hereinafter, "MSU") was at all relevant times and continues to be

a public university organized and existing under the laws of the state of Michigan.

119.   MSU receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

120.   The Board of Trustees of Michigan State University (hereinafter, "MSU Trustees") is the governing body for Defendant MSU.

121.   John M. Engler is the former Governor of the State of Michigan and is currently serving as interim President of Defendant MSU.

122.   Lou Anna K. Simon is the immediate past President of Defendant MSU, appointed in approximately January 2005. Prior to her appointment as President, Ms. Simon held several administrative roles including assistant provost for general academic administration, associate provost, and provost and vice president for academic affairs during her career with MSU.

123.   M. Peter McPherson is a Past President of Defendant MSU and served as President from approximately 1993 to 2004.

124.   Mark Hollis is the immediate past Athletic Director of Defendant MSU. Bill Beekman was hired as the Athletic Director of Defendant MSU on July 16, 2018.

125.   William D. Strampel, D.O. was the Dean of the College of Osteopathic Medicine at Michigan State University and served as Dean beginning in approximately April 2002 and as Acting Dean between December 2001 and April 2002. Defendant Strampel resigned as Dean in or around December 2017.

126.   Jeffrey R. Kovan, D.O. is or was the Director of Division of Sports Medicine at Michigan State University.

127.   Douglas Dietzel, D.O. is or was the Clinical Director of MSU Sports Medicine serving in that capacity since approximately 2004 and has also served as Team Orthopedic Surgeon for MSU Department of Intercollegiate Athletics.

128.   Gary Stollak, Ph.D., is or was a Michigan State University clinical psychologist and Professor of Psychology.

129.   Kathie Klages was the Head Coach of Defendant MSU's Gymnastics Team/Program and conducted classes and programs for children and young adults who were not members of the MSU Gymnastics Team/Program.

130.   Destiny Teachnor-Hauk is or was an athletic trainer for Defendant MSU for various sports including, but not limited to, softball, track and field, gymnastics, rowing, and volleyball.

131.   MSU, MSU Trustees, Strampel, Kovan, Dietzel, Stollak, Klages, Teachnor-Hauk, and Nassar are hereinafter collectively referred to as MSU.

132.   Lianna Hadden is or was an athletic trainer for MSU for various sports including, but not limited to softball, track and field, gymnastics, rowing, and volleyball.

133.   Kelli Bert is or was the Head Coach of MSU's Track and Field Team/Program.

134.   Brooke Lemmen, D.O. is or was a practicing physician with MSU's Sports Medicine Clinic from approximately 2010 to 2017.

135.   Defendant United States of America Gymnastics (hereinafter "Defendant USAG") was and continues to be an organization incorporated in Indiana, authorized to conduct business and conducting business throughout the United States, including but not limited to Michigan.

136.   USAG and its agents transact business in the State of Michigan and acted to cause, and the consequences of those actions to occur, the causes of action set forth in this Complaint in the State of Michigan.

137.   USAG advertises on its website: "Since 1990—prior to almost all other National Governing Bodies—USA Gymnastics has provided awareness, prevention and reporting information

regarding sexual misconduct to professional members, athlete members and their families."[55]

138. Kerry J. Perry is the immediate past President and Chief Executive Officer of Defendant USAG and has held that position from approximately December 1, 2017 to September 4, 2018, and during that time was responsible for the overall management and strategic planning of Defendant USAG.

139. Prior to Ms. Kerry J. Perry, Steve Penny is the past President and Chief Executive Officer of Defendant USAG, and held that position from approximately April 2005 to March 16, 2017, and during that time was responsible for the overall management and strategic planning of Defendant USAG.

140. Robert Colarossi is a Past President of Defendant USAG and held the position from approximately 1998 to 2005, and during that time was responsible for the overall management and strategic planning of Defendant USAG.

141. The entire board of directors of Defendant USAG resigned in or about January 2018.

142. Bela Karolyi is a former Romanian gymnastics coach who defected to the United States in the early 1980's, previously served as National Team Coordinator for Defendant USAG, and trained elite level USAG member gymnasts at a facility operated in the State of Texas.

143. Marta Karolyi, the wife of Bela Karolyi who also defected to the United States in the early 1980's, assisted in the operation, management, control, and supervision of the facility operated in the State of Texas where she and her husband trained elite level USAG member gymnasts.

144. Marta Karolyi is a former National Team Coordinator for the USAG Women's Gymnastics Team.

---

[55] *See*, https://usagym.org/pages/education/safesport/, Last accessed, February 28, 2018.

145.  Valeri Liukin is the immediate past National Team Coordinator for the USAG Women's Gymnastics Team.

146.  Rhonda Faehn is the former senior vice-president for Defendant USAG.

147.  The Karolyi Ranch as referenced herein refers to the facility located in Huntsville, Texas also known as the USAG National Team Training Center and/or any of the following business entities believed to be incorporated in the state of Texas: Karolyi Training Camps, LLC; Karolyi World Gymnastics, Inc.; and/or, Karolyi's Elite.

148.  The United States Olympic Committee (hereinafter, "USOC") is a federally chartered corporation and serves as the National Olympic Committee for the United States of America.

149.  The USOC has its principal place of business in the State of Colorado and is headquartered in Colorado Springs, Colorado.

150.  The USOC, established under the Ted Stevens Olympic and Amateur Sports Act (36 U.S.C. §220501, *et seq.*, formerly the Amateur Sports Act of 1978), provides for the National Governing Bodies for each Olympic Sport, such as USAG.

151.  Pursuant to 36 U.S.C.A. §220505(b)(9), the USOC may "sue and be sued" in any federal district court.

152.  USOC and its agents transact business in the State of Michigan and acted to cause, and the consequences of those actions to occur, the causes of action set forth in this Complaint in the State of Michigan.

153.  According to its Congressional charter, the USOC's purpose is "to provide swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition." 36 U.S.C. §220503.

154. The USOC has designated Defendant USAG as the National Governing Body for the Olympic sport of Gymnastics in the United States of America.

155. Sarah Hirshland is the current CEO for the USOC.

156. Prior to Ms. Hirshland's appointment, Susanne Lyons served as acting CEO.

157. Scott Blackmun is the immediate former CEO for the USOC.

158. Larry Probst is the Chairman of the Board of Directors for the USOC.

159. Defendant Twistars USA, Inc. d/b/a Gedderts' Twistars Gymnastics Club USA (hereinafter, "Defendant Twistars") was and continues to be an organization incorporated in Michigan.

160. Defendant John Geddert is or was the owner and operator of Twistars USA, Inc. d/b/a Gedderts' Twistars Gymnastics Club USA at all times relevant to this Complaint. Defendant Geddert also served as the USA World and 2012 Olympic Women's Gymnastics Team Head Coach.[56]

## IV. COMMON FACTUAL ALLEGATIONS

161. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

162. At all relevant times, Nassar, Stollak, Strampel, Kovan, Dietzel, Klages, and Teachnor-Hauk maintained offices at MSU in East Lansing, Michigan.

163. At all relevant times, MSU, MSU Trustees, Nassar, Stollak, Strampel, Kovan, Dietzel, Klages, and Teachnor-Hauk were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

---

[56] http://region5.com/wp-content/uploads/2011/07/John-Geddert-Biography.pdf.

24

164.  Gary Stollak, Ph.D. was employed by the MSU Defendants and served as Professor of Psychology at MSU.

165.  Stollak also provided clinical psychology services while employed by MSU as Professor of Psychology.

166.  At all relevant times, Strampel, D.O. was the Dean of the College of Osteopathic Medicine under which Defendant Nassar worked as an Associate/Assistant Professor.

167.  At all relevant times, Kovan was the Chair/Clinic Director of the MSU Sports Medicine Clinic under which Nassar practiced medicine and worked as a Doctor of Osteopathic Medicine, and the Head Team Physician for MSU Athletics under which Defendant Nassar worked as Team Physician for the MSU Women's Gymnastics Team.

168.  At all relevant times Dietzel was the Chair/Clinic Director for the MSU Sports Medicine Clinic under which Defendant Nassar worked as Doctor of Osteopathic Medicine.

169.  Kathie Klages as head coach of the MSU Gymnastics Program conducted classes and programs for minor children and young adults who were not MSU student athletes.

170.  Klages regularly referred MSU student athletes as well as young minor athletes who were not MSU students to Nassar for medical treatment.

171.  Teachnor-Hauk provided athletic training services to MSU student athletes.

172.  Teachnor-Hauk regularly referred MSU student athletes to Nassar for medical treatment.

173.  At all relevant times Nassar, Stollak, Strampel, Kovan, Dietzel, Klages, and Teachnor-Hauk were acting in the scope of their employment or agency with MSU.

174.  At all relevant times Nassar, Stollak, Strampel, Kovan, Dietzel, and Teachnor-Hauk had a special relationship and collegial affiliation with one another as co-employees for MSU and as fellow medical professionals.

175.   At all relevant times Nassar and Klages had a special relationship and collegial affiliation with one another as co-employees for MSU.

176.   At all relevant times Nassar and Defendant Geddert were acting in the scope of their employment or agency with Defendant USAG.

177.   At all relevant times Nassar and Defendant Geddert were acting in the scope of their agency with Defendant Twistars.

178.   Nassar graduated from Michigan State University with a Doctor of Osteopathic Medicine degree in approximately 1993.

179.   Nassar was employed by and/or an agent of Defendant USAG from approximately 1986 to 2015, serving in various positions including but not limited to:

   a.   Certified Athletic Trainer;

   b.   Osteopathic Physician;

   c.   National Medical Director;

   d.   National Team Physician, USA Gymnastics; and

   e.   National Team Physician, USA Gymnastics Women's Artistic Gymnastics National Team.

180.   As an employee and/or agent of Defendant USAG, Nassar served in the positions listed above at the 1996, 2000, 2004, and 2012 Summer Olympic Games, regularly at the Karolyi Ranch, at USAG sponsored and sanctioned competitions in the U.S. and internationally, and while he treated USAG members at his office at MSU and at Twistars.

181.   Nassar was employed by MSU from approximately 1996 to 2016 in various positions including but not limited to:

   a.   Assistant and/or Associate Professor, Defendant MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;

     b.      Team Physician, Defendant MSU's Men's and Women's Gymnastics Team;

     c.      Team Physician, Defendant MSU's Men's and Women's Track and Field Teams;

     d.      Team Physician, Defendant MSU's Men's and Women's Crew Team;

     e.      Team Physician, Defendant MSU's Intercollegiate Athletics;

     f.      Medical Consultant, Defendant MSU's Wharton Center for the Performing Arts;

     g.      Advisor, Student Osteopathic Association of Sports Medicine.

182.    As an Assistant and/or Associate Professor for Defendant MSU Division of Sports Medicine, Defendant Nassar provided medical services for Defendant MSU's Sports Medicine Clinic.

183.    For over twenty (20) years, MSU's Sports Medicine Clinic has provided health care to MSU student athletes and others.[57]

184.    When the MSU operated the MSU Sports Medicine Clinic and provided medical services to Plaintiffs, and others, they were acting as an arm of the state.

185.    The MSU Sports Medicine Clinic charged patients, including Plaintiffs, for their receipt of medical services.

186.    Charging Plaintiffs (and others) and billing insurance companies, for medical services is an activity proprietary in nature

187.    MSU charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.[58]

188.    The MSU Sports Medicine Clinic did not provide medical services for the common good of all, but rather for its paying clients.

189.    The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the

---

[57] *See,* "MSU Sports Medicine," http://sportsmed.msu.edu/, last accessed, Feb. 25, 2018.
[58] *See,* "MSU Sports Medicine, Patient Information," http://sportsmed.msu.edu/patients.html, last accessed, February 16, 2018.

business of providing medical services for the primary purpose of raising funds and making profit for MSU.

190. The MSU Sports Medicine Clinic cannot be and is not normally supported by taxes and fees.

191. By seeking medical treatment and services from MSU's Sports Medicine and from Defendant Nassar while in the course of his employment, agency, and/or representation with the MSU, a special, confidential, and fiduciary relationship existed between Plaintiffs, MSU, and Nassar.

192. As part of Nassar's employment and contractual duties with MSU, Nassar was responsible for spending between 50 to 70% of his time engaged in "Outreach" and/or "Public Services."

193. A part of Nassar's outreach included providing medical treatment to athletes affiliated with Defendants USAG and Twistars as well as other organizations such as Holt High School.

194. In order to participate in USAG sanctioned events, it is necessary to be a USAG member.

195. To obtain membership with USAG, an individual must pay dues.

196. Similarly, in order for a gymnastics club to be considered a USAG member club, the gymnastics club must also pay dues, and if the member club seeks to hold a USAG sanctioned event at the club, the club must pay a fee.

197. All those who seek to coach, judge, or participate in USAG sanctioned events must also pay a membership fee.

198. The exchange of money for membership creates a fiduciary relationship and duty between USAG, their members/athletes, coaches, judges, and their clubs.

199. Defendant USAG regularly recommended Nassar to its members as a reputable physician.

200. Defendant Twistars is a gymnastics facility with which Nassar affiliated from its inception in or around 1996.

201. Defendant John Geddert, owner and operator of Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA, served as the USA World and 2012 Olympic Women's

Gymnastics Team Head Coach.

202. Defendant Twistars is a USAG member club and ostensible agent of Defendant USAG.

203. Defendant Twistars required its gymnasts, especially those with aspirations of competing, to become USAG members and pay membership fees to Defendant USAG.

204. Club membership in Defendant USAG is a substantial benefit for Defendant Twistars and Defendant Geddert, as membership with Defendant USAG and participation in Defendant USAG sanctioned events is a considerable factor that interested gymnasts consider in joining a gymnastics club-particularly gymnasts who have collegiate, national, or Olympic aspirations in competitive gymnastics.

205. Defendant Geddert regularly recommended Defendant Nassar to members of Defendant Twistars as a reputable physician.

206. Plaintiffs relied on the recommendations of Defendants Geddert and USAG and continually sought treatment from Defendant Nassar.

207. Defendant Nassar was a representative or agent of Twistars who performed treatment at their facilities on a regular basis.

208. Plaintiffs had a physician-patient special relationship with Defendant Nassar when he treated them at Twistars in his capacity as a representative or agent of Twistars.

209. Defendant Nassar regularly treated Plaintiffs who were members of Defendant Twistars at their facility.

210. The relationship between Defendants USAG, Twistars, Geddert, Nassar, and MSU was symbiotic in nature, in that the Defendants enjoyed financial benefits from one another and that was reliant on one another to continue receiving said benefits.

211. MSU received financial benefits from its relationship with Nassar, Defendant USAG, Defendant Twistars, Defendant Geddert, and Defendant USOC including increased patients

to the MSU Sports Medicine Clinic, increased billing, revenue, and profit for the MSU Sports Medicine Clinic, and national and international recognition, fame, and prestige.

212.   Defendant Nassar received financial benefits from his relationship with USAG, Twistars, Geddert, and the MSU, including but not limited to increased patients at the MSU Sports Medicine Clinic, additional billing, revenue, and profit for the MSU Sports Medicine Clinic, and national and international recognition, fame, and prestige.

213.   Defendant USAG received financial benefits from his relationship with Twistars, Geddert, MSU, USOC, and Nassar, including but not limited to increased membership in its organization, increased or additional membership fees, and national and international recognition, fame, and prestige.

214.   Defendants Geddert and Twistars received financial benefits from its relationship with USAG, USOC, and Nassar, including but not limited to increased membership in the gym, membership fees, and national and international recognition, fame, and prestige.

215.   For a period of time, Defendant Twistars displayed a photo of Nassar at its facility.

216.   As an agent of Defendant Twistars, Nassar regularly provided services and treatment to Defendant Twistars' members and Defendant USAG's members on Defendant Twistars' premises.

217.   Plaintiffs had a special and fiduciary relationship with Defendants Twistars and Geddert by virtue of being dues paying members with Defendant Twistars.

218.   Plaintiffs were often under the direct supervision and control of Twistars or its agents and were in fact *in loco parentis* with Twistars while competing, training, and receiving "treatment" from Defendant Nassar.

219.   Oftentimes while training and while competing for Defendants Twistars and Geddert at Twistars events (also USAG sanctioned events) Plaintiffs were away from their parents and

under the complete care, custody, and control of Defendants Twistars and Geddert.

220. As a physician of Osteopathic Medicine, Defendant Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students and student-athletes of Defendant MSU.

221. Nassar is not and has never been a medical doctor of obstetrics or gynecology.

222. Nassar is not and has never been trained or certified as a pelvic floor therapist.

223. While employed by MSU, USAG, and Twistars, Nassar practiced medicine at Defendant MSU's Sports Medicine Clinic, a facility at MSU.

224. To gain Plaintiffs' trust, at appointments, Nassar would give some Plaintiffs gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without.

225. Additionally, Nassar would also see many Plaintiffs outside of normal business hours at his office at MSU and sometimes at his residence to gain their trust.

226. In many cases, Nassar did not have Plaintiffs use the main entrance and exit at MSU's Sports Medicine Clinic for appointments with Nassar.

227. In other situations, Nassar did not have Plaintiffs check in or check out with staff of MSU's Sports Medicine Clinic for appointments with Nassar.

228. Some Plaintiffs were told by Nassar, when calling to schedule an appointment, in order to be seen more quickly, to tell MSU's Sports Medicine Clinic staff that they were suffering from a back injury even though they weren't—a practice which gave Nassar an opportunity to examine Plaintiffs in a way that would leave them more vulnerable and susceptible to sexual assault and abuse.

229. Nassar would regularly and frequently see Plaintiffs at MSU's Sports Medicine Clinic, many of whom were minors, without the presence of a chaperone (*e.g.*, parent, guardian, resident, nurse, etc.).

230.  Nassar would communicate with Plaintiffs, many of whom were minors, via text message or social media, often times without including their parents in the communication.

231.  MSU (collectively), USAG, Twistars and Geddert never trained, educated, or warned Plaintiffs, who were Defendants' patients and members (respectively), that the actions described above were warning signs for sexual abuse and sexual assault.

232.  Because of the special and fiduciary relationship shared between MSU, Defendants USAG, Twistars, and Geddert and Plaintiffs, each Defendant had a legal duty to exercise reasonable care toward Plaintiffs, who were their patients and members (respectively).

233.  MSU and Defendants USAG, Twistars, and Geddert had a duty to exercise reasonable care in supervising Defendant Nassar while he was their employee or agent.

234.  Collectively, the Defendants breached the duties they owed Plaintiffs and ultimately failed to exercise reasonable care, leaving them vulnerable to be sexually abused, assaulted, and molested by Defendant Nassar.

235.  During his employment, agency, and representation with the MSU, Defendant USAG, Defendant Twistars, and Defendant USOC, Nassar sexually assaulted, abused, and molested Plaintiffs by engaging in nonconsensual sexual touching, assault, and harassment including but not limited to digital vaginal and anal penetration.

236.  The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.[65]

237.  MSU, through its Sports Medicine Clinic and Nassar, provided medical care and treatment to

---

[65]  *See*, Michigan Administrative Code, R. 325.70001, et seq., Available at http://www.michigan.gov/documents/CIS_WSH_part554_35632_7.pdf. Last accessed, January 5, 2017.

Plaintiffs who were patients of Nassar.

238. Plaintiffs were business invitees at the MSU Sports Medicine Clinic where they were supposed to receive medical care and treatment by Nassar, free of harm.

239. MSU is not immune from liability as it failed to warn Plaintiffs of the known or foreseeable dangers regarding complaints related to Nassar as early as 1997/1988 and failed to train its employees, representative, and agents about such dangers and to warn and protect Plaintiffs from such dangers, and otherwise failed to supervise and train employees of the MSU Sports Medicine Clinic to act in a manner consistent with a reasonably prudent facility.

240. To the best of Plaintiffs' knowledge, neither the MSU, nor Defendants USAG, Twistars, or USOC had or enforced a policy which required their patients and members to avoid being seen for treatment at a physician's residence.

241. To the best of Plaintiffs' knowledge, neither the MSU, nor Defendants USAG, Twistars, or USOC had or enforced a policy which required their patients and members to have the presence of a chaperone (*e.g.*, parent, guardian, resident, nurse, etc.) when treating in a private or sensitive area.

242. To the best of Plaintiffs' knowledge, neither the MSU, nor Defendants USAG, Twistars, or USOC had or enforced a policy which required their patients not to communicate with physicians via text message or social media in order to schedule appointments.

243. Collectively, Defendants' failures as described above left Plaintiffs vulnerable and susceptible to sexual assaulted and abuse.

244. In or around 1997/1998, Plaintiff Larissa Boyce[66] reported to Defendant Klages concerns regarding Defendant Nassar's conduct and "treatment."

---

[66] Plaintiff Boyce is a Plaintiff in member case 1:17-cv-222.

245.   Defendant Klages dissuaded Plaintiff Boyce from completing a formal report and warned Boyce that the report would have serious consequences for both Plaintiff Boyce and Nassar.

246.   Around that same time, Plaintiff Jane B8 Doe[67] was questioned by Klages regarding Nassar's "treatment" and Plaintiff Jane B8 Doe affirmatively confirmed she had also been sexually assaulted and abused.

247.   Klages told Plaintiff Jane B8 Doe there was no reason to bring up or otherwise report Defendant Nassar's conduct.

248.   In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert regarding Defendant Nassar's conduct, yet the concerns and allegations went unaddressed.

249.   Also in or around 1998, Jane A71 Doe complained to a coach at Twistars' facility regarding Nassar's conduct, yet the concerns and allegations went unaddressed.

250.   Defendant Geddert received knowledge of these complaints in his capacity as an employee or agent of USAG as well as his capacity as owner and operator of a USAG member gym, Twistars.

251.   In or around 1999 MSU was also put on notice of Nassar's conduct by Christie Achenbach, a MSU student athlete, after she complained to MSU employees, including trainers and her head coach Kelli Bert, that Nassar touched her vaginal area although she was seeking treatment for an injured hamstring.

252.   Despite her complaints to MSU representatives, Christie Achenbach's concerns and allegations went unaddressed.

253.   In approximately 2000, Tiffany Thomas Lopez (formerly Jane T.T. Doe), a female student

---

[67] Plaintiff Jane B8 Does is a Plaintiff in member case 1:17-cv-222.

athlete and member of MSU's Women's Softball Team, was sexually assaulted and abused during "treatment" by Nassar and reported Nassar's conduct to MSU's employees, including trainers.

254.   Ms. Lopez's allegations regarding the sexual assault include the following statements:

Plaintiff is informed and believes, and on that basis alleges, that Defendants knew or should have known that NASSAR had engaged in unlawful sexually-related conduct in the past, and/or was continuing to engage in such conduct. Defendants had a duty to disclose these facts to Plaintiff, her parents and others, but negligently and/or intentionally suppressed, concealed or failed to disclose this information. The duty to disclose this information arose by the special, trusting, confidential, fiduciary relationship between Defendants and Plaintiff. Specifically, the Defendant MSU knew that NASSAR was performing intravaginal adjustments with his bare, ungloved hand and in isolation with young females, based on the following:

a.   The Plaintiff, approximately 18 years old at the time, had a visit with NASSAR where he touched her vagina, in order to purportedly heal back pain she was having, under the guise of legitimate medical treatment. The Plaintiff complained to a trainer on her softball team who responded by saying that NASSAR was a world renowned doctor, and that it was legitimate medical treatment. The Plaintiff continued with the purported treatment;

b.   As the purported treatments continued, NASSAR became more bold, having the Plaintiff remove her pants, and then inserting his bare, ungloved and unlubricated hand into her vagina. The Plaintiff, again, reported to Defendant MSU training staff, this time a higher ranking trainer. This trainer told the Plaintiff that the treatment sounded unusual and that the Plaintiff needed to speak to an even higher level trainer in the Department, who ended up being one of three individuals who supervised the entire department at Defendant MSU;

c.   When the Plaintiff went to see this individual, the Plaintiff was told by that individual that what happened to the Plaintiff was not sexual abuse, that NASSAR was a world renowned doctor, and that the Plaintiff was not to discuss what happened with NASSAR and was to continue seeing him for purported treatment. The Plaintiff continued to see NASSAR for treatment;

d.   Finally, in or around 2001, the Plaintiff refused to continue to see NASSAR for these abusive and invasive procedures. Defendant MSU then pressured and coerced the Plaintiff to declare herself medically inactive. The Plaintiff was shunned from the Defendant MSU sports program, and left Defendant MSU

to return home to California.[68]

255.    Despite her complaints to MSU employees, agents, and representatives, Ms. Lopez's concerns

and allegations went unaddressed in violation of reporting policies and procedures and Title

IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

256.    MSU, Kelli Bert, Defendant Teachnor-Hauk, and other MSU employees and representatives

also had the following obligations, among others, pursuant to its Office of Institutional Equity

("OIE") policy:

a.      "to promptly take steps to investigate or otherwise determine what occurred and then

to address instances of relationship violence and sexual misconduct when it knows or

should have known about such instances."

b.      to inform "the MSU Police of all reports it receives regarding sexual assaults.";

c.      to "take immediate steps to initiate the investigatory process to determine what

happened and to resolve the matter promptly and equitably.";

d.      to "take prompt, responsive action to support a claimant and will take steps to

eliminate, prevent, or address a hostile environment if it determines that one exists.";

e.      "to conduct a prompt, adequate, reliable, and impartial investigation to determine what

occurred and then to take appropriate steps to resolve the situation when it learns of

an incident of sexual misconduct;

f.      "independently    investigate    complaints    of    relationship    violence    and

sexual misconduct.";

g.      to conduct an investigation "by the Office of Institutional Equity under the direction

---

[68] *See*, Case No. BC644417, filed with the Superior California Court of the State of California, County of Los Angeles, December 21, 2016, ¶26.

of the Deputy Title IX Coordinator for Investigations.";

h.      to promptly report allegations of sexual misconduct "to the Office of Institutional Equity."

257.    Upon information and belief, and in violation of federal law, state law, and the MSU OIE Policy, MSU failed to take any action in response to the 1997/1998, 1999, and 2000 complaints.

258.    Because MSU took no action to investigate the 1997/1998, 1999, or 2000 complaints and took no corrective action during that time frame, under the guise of treatment, dozens of Plaintiffs, and possibly hundreds of others, many of whom were minors, were also sexually assaulted, abused, and molested by Nassar by vaginal and anal digital penetration, without the use of gloves or lubricant and by touching and groping their breasts.

259.    Between 2000 and 2002, Plaintiff Jennifer Rood Bedford raised concerns regarding Nassar with Athletic Trainer Lianna Hadden telling her she was uncomfortable with Nassar's conduct and inquired into how to make a complaint/report to indicate she had been uncomfortable with his conduct at her appointments.

260.    Following a discussion with Ms. Hadden, Plaintiff Jennifer Rood Bedford was confused and frightened about the potential repercussion and ultimately did not file a formal complaint.

261.    MSU failed to educate Plaintiff Jennifer Rood Bedford and other MSU athletes on issues regarding sexual abuse and sexual assault.

262.    MSU's athletic trainers and staff were not properly trained or educated regarding osteopathic medicine and therefore followed inadequate safeguards and procedures which put Plaintiff Jennifer Rood Bedford, and other student athletes at risk of suffering sexual abuse and sexual assault.

263.    In 2004, Nassar authored a chapter in Principles of Manual Sports Medicine by Steven J.

Karageanes.

264. In the chapter, Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the many cultural stigmas in touching this area."

265. Nassar recommended taking "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

266. There is no mention of intravaginal or intra-rectal techniques or procedures in the chapter.

267. As described in detail below, Nassar often failed to follow his own recommendations with Plaintiffs as:

    a.      He did not explain any intravaginal or intra-rectal techniques to Plaintiffs or their parents; and,

    b.      He did not warn Plaintiffs he was going to engage in vaginal or anal digital penetration before doing so.

268. In 2004, Brianne Randall reported Nassar's conduct to her parents and to the Meridian Township Police Department in Meridian Township, Michigan.

269. Also in or around 2004, Plaintiff Kyle Stephens, at approximately age 12 years of age, who was not a patient of Nassar, reported inappropriate conduct and touching of a sexual nature to Stollak who was employed by MSU.

270. Consequently, Stollak had reasonable cause to suspect sexual abuse.

271. Stollak was a mandatory reporter.

272. To the best of Plaintiffs' knowledge, Stollak failed to report Nassar's conduct to law enforcement, child protective services, or MSU.

273. Gary Stollak as a practicing clinical psychologist knew or should have known of the danger posed by childhood sexual abusers.

274. Based upon Plaintiff Kyle Stephens' report, Gary Stollak knew or should have known that it was foreseeable that Nassar could pose a danger to other children.

275. Stollak's failure to report Nassar endangered dozens, if not hundreds of Plaintiffs who were subsequently sexually abused, assaulted, and molested by Defendant Nassar.

276. In or around 2010, Defendant Geddert witnessed a gymnast who was approximately 15 years old being sexual assaulted by Nassar.[69]

277. Upon witnessing the sexual assault, Defendant Geddert made a joke and made a statement to the gymnast to effect of: "I guess your back really did hurt."[70]

278. In or around 2010, Defendant Geddert served in a leadership role with Defendant USAG notably as a USAG coach representing Team USA in national and international USAG competitions and on the Junior Olympic Program Committee.

279. In or around 2011, Defendant Geddert was traveling in a vehicle with members of the USAG Senior National Team, including Aly Raisman.[71]

280. At the time, Defendant Geddert was serving in his capacity as a USAG Olympic Coach.[72]

281. Ms. Raisman indicated she and her teammates would talk about Defendant Nassar's conduct amongst themselves.[73]

282. While traveling together, in Defendant Geddert's presence, one of Ms. Raisman's teammates

---

[69] Testimony given on May 12, 2017 at the Preliminary Examination hearing in *People v. Nassar*, Case No. 17-318-FY.
[70] *Id.*
[71] Raisman says Olympics coach might have known about Nassar abuse for years, Saba Hamedy, available at https://www.cnn.com/2018/02/08/politics/aly-raisman-coach-allegations/index.html. Last accessed Feb. 8, 2018.
[72] *Id.*
[73] *Id.*

described "in graphic detail" what Defendant Nassar had done to her the prior evening.[74]

283.  Ms. Raisman stated Defendant Geddert did not question her or her teammate about the statements made.

284.  Again, in or around 2011, Defendant Geddert served in a leadership role with Defendant USAG notably as a USAG coach representing Team USA in national and international USAG competitions and on the Junior Olympic Program Committee.

285.  As early as 2010, through Defendant Geddert, Defendant USAG had notice of Defendant Nassar's misconduct and propensity to sexually abuse and assault girls and young women.

286.  In 2014, following receipt of an unrelated complaint regarding a sexual assault on MSU's campus, between 2014 and 2015 the U.S. Department of Education's Office of Civil Rights (hereinafter "OCR") conducted an investigation regarding the complainant's allegations, another complaint regarding sexual assault and retaliation from 2011, and Defendant MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.[75]

287.  The OCR concluded their investigation in 2015 and presented MSU with a twenty-one page agreement containing measures and requirements to resolve the 2011 and 2014 complaints and to bring Defendant MSU in compliance with Title IX.[76]

288.  While the OCR was conducting their investigation, additional complaints regarding Nassar's conduct surfaced in 2014. The victim reported she had an appointment with Nassar to address

---

[74] *Id.*

[75] *See,* Letter from U.S. Department of Education Office for Civil Rights to Michigan State University, September 1, 2015, OCR Docket #15-11-2098, #15-14-2113. Available at https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf, last accessed January 4, 2017.

[76] *See,* Resolution Agreement, August 28, 2015, OCR Document #15-11-2098, #15-14-2133. Available at, https://www2.ed.gov/documents/press-releases/michigan-state-agreement.pdf. Last accessed January 5, 2017.

hip pain and was sexually abused and molested by Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.[77]

289.    Upon information and belief, MSU investigated the 2014 complaints through their Office of Institutional Equity ("MSU OIE").

290.    Plaintiff Amanda Thomashow reported to MSU facts which were omitted or withheld from the MSU OIE investigative report including, but not limited to, the following:

    a.    Nassar was sexually aroused while touching her;

    b.    The appointment with Nassar did not end until she physically removed his hands from her body.

291.    Three months after initiating the investigation, in July 2014, the victim's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[78]

292.    One of the medical experts consulted by the MSU OIE in investigating the victim's allegations was Brooke Lemmen, D.O.

293.    Following the investigation, upon information and belief, Nassar became subject to new institutional guidelines including:

    a.    Nassar was not to examine or treat patients alone but was to be accompanied by a chaperone such as a resident or nurse;[79]

    b.    The alleged "procedure" was to altered to ensure there would be little to no skin to

---

[77] *See*, At MSU: Assault, harassment and secrecy. Matt Mencarini, December 15, 2016. Available at, http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/. Last accessed January 5, 2017.
[78] *Id.*
[79] *Id.*

skin contact when in certain "regions" and if skin to skin contact was "absolutely necessary" the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure;" and,

c.    New people in the practice were to be "oriented" to ensure understanding with the guidelines.

294.    Strampel, Kovan, and Dietzel failed to supervise, oversee, or otherwise ensure Nassar was adhering to the conditions listed above.

295.    MSU's Police Department ("MSU PD") also investigated the 2014 allegations made by Plaintiff Jane D1 Doe.

296.    Nassar represented to MSU PD during the 2014 investigation that he was known as "The Dream Builder" and "The Body Whisperer."

297.    Nassar represented to MSU PD that he felt like he didn't have to go to work, but that he gets to go to work, and that "It just rocks my world."

298.    On or about May 25, 2014 at 9:33 AM, Nassar sent an email to Strampel expressing concerns that Plaintiff Jane D1 Doe thought he was being too "invasive" into her life and that he thought that she "...may have felt like I 'stalking' her at that point..."

299.    In or around June 2014, an Ingham County Assistant Prosecuting Attorney recommended to MSU PD detectives that they should interview a non-MSU expert in Nassar's medical field as further investigation into Plaintiff Jane D1 Doe's allegations.

300.    Upon information and belief, MSU PD and the MSU OIE did not interview any non-MSU experts during the 2014 investigation.

301.    From July 2014 to September 2016, despite complaints about Nassar's conduct, MSU continued to permit Nassar unfettered access to female athletes without adequate oversight or supervision to ensure he was complying with the new guidelines.

302. In approximately summer 2015, the USOC because aware of Nassar's sexual misconduct.

303. Nassar was permitted to return to work although a criminal investigation remained open until approximately December 2015.

304. At the conclusion of the criminal investigation, on or around December 15, 2015, a representative from MSU's police department spoke with Nassar, advised him to thoroughly explain his medical techniques to patients prior to touching them, ensuring that they understood, and to have a chaperone in the exam room with him at all times.[80]

305. Nassar responded indicating he fully understood and had made that process and procedure his routine since the case evolved.[81]

306. Nassar's statement to Defendant MSU was completely false, and his statement and actions went unchecked, unverified, and unsupervised by MSU.[82]

307. At no time during or following the investigation did MSU, MSU Board of Trustees, Strampel, Kovan, or Dietzel take any steps to ensure Nassar was in compliance with the guidelines.

308. MSU, MSU Board of Trustees, Strampel, Kovan, or Dietzel failed to monitor Defendant Nassar in his clinical practice following the investigation.

309. Prior to and after the investigation, MSU, MSU Board of Trustees, Strampel, Kovan, or Dietzel failed to train Nassar regarding inappropriate touching, informed consent, chaperone practices, and medical record charting.

310. In or around June 2015, Plaintiff Maggie Nichols and other athletes were overheard discussing

---

[80] MSU University Police Department Case Report No. 1758100919. Available at
http://mediad.publicbroadcasting.net/p/michigan/files/201712/fbi_investigation_into_nassar.pdf?_ga=2.158457466.
1791923992.1513722353-1282647051.1440964267, Last accessed, Feb. 17, 2018.
[81] *Id.*
[82] *See generally,* specific allegations from Plaintiffs who were sexually abused, assaulted, and molested after July 2014 in W.D. Mich. Case Nos. 1:17-cv-29, 1:17-cv-222, 1:17-cv-244, 1:17-cv-254, 1:17-cv-257, 1:17-cv-288, 1:17-cv-349, 1:17-cv-676, and 1:17-cv-684. Several of the Plaintiffs include allegations that Nassar did not explain his medical techniques, did not have a chaperone in the room such as a resident or nurse during any explanation (of which there usually wasn't an explanation) or during the "procedure."

Nassar's misconduct at the Karolyi Ranch.

311. The "Karolyi Ranch" was designated as being the United States' Olympic Training Center, thus, was required to follow all protocols, mandates, policies, bylaws, rules, and/or practices of Defendant USOC (as well as Defendant USAG).

312. Defendant USOC was responsible for ensuring that the Karolyi Ranch, provided adequate supervision for the minors training and competing thereat, reasonable safety protocols ensuring the safety of those minors, and reasonable supervision, training, and oversight procedures for all medical care provided to gymnasts at the Karolyi Ranch, including training of staff on identification of sexual abuse, proper procedures, use Karolyi Ranch, including training of staff on identification of sexual abuse, proper procedures, use of proper medical care, and staffing of ample medical personnel to ensure proper care of all minor gymnasts.

313. An adult reported Plaintiff Jane Nichols' concerns to USAG.

314. Plaintiff Nichols' complaints were received by former USAG President and CEO Steve Penny and at least one representative of the USOC, among others.

315. Mr. Penny and USAG dissuaded Plaintiff Nichols and her family from pursuing the matter and asked that they refrain from contacting law enforcement.

316. At least five weeks passed before USAG reported Defendant Nassar to law enforcement.

317. Allegedly, after receiving allegations of what USAG described as "athlete concerns," in approximately summer 2015 USAG relieved Defendant Nassar of his duties.[87]

318. Defendant Nassar represented publicly that he "retired" from his duties with USAG.

---

[87] *See*, Former USA Gymnastics doctor accused of abuse, Mark Alesia, Marisa Kwiatkowski, Tim Evans, September 12, 2016. Available at, http://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/, Last accessed, February 25, 2018.

319. At no time did USAG or the USOC inform MSU, MSU Trustees, or other MSU representatives or Defendants Twistars, Geddert or any USAG members or member clubs of the concerns that led to Defendant Nassar being relieved from his duties with Defendant USAG.

320. At no time did USAG or the USOC inform its members, coaches, member clubs, or the public that Defendant Nassar had been dismissed, relieved from his duties, and was under criminal investigation.

321. Instated USAG and the USOC allowed its members and the public to believe Nassar simply "retired."

322. Nassar continued to sexually assault, abuse, and molest young women and girls following his "retirement" from USAG.

323. In August 2016, the Indianapolis Star published an article titled, "A blind eye to sex abuse: How USA Gymnastics failed to report cases," the subheading of the article reading, "The prominent Olympic organization failed to alert authorities to many allegations of sexual abuse by coaches."

324. The article chronicles a history of USAG's failure to properly report sexual abuse stating in part:

> Top executives at one of American's most prominent Organizations failed to alert authorities to many allegations of sexual abuse by coaches – relying on a policy that enabled predators to abuse gymnasts long after USA Gymnastics had received warnings ...In 2013 ... two former [USAG] officials admitted under oath that the organization routinely dismissed sexual abuse allegations as hearsay unless they came directly from a victim or a victim's parent ... records show the organization compiled complaint dossiers on more than 50 coaches and filed them in a drawer in its executive office in Indianapolis ... [USAG] compiled confidential sexual misconduct complaint files about 54 coaches over a 10-year period from 1996 to 2006 ... It's unclear which, if any,

of the complaints in those files were reported to authorities.[88]

325. Following publication of this article Plaintiff Rachael Denhollander[89] and a former Olympic gymnast (who was anonymous at the time, but has since publicly identified herself as Olympic bronze medalist Jamie Dantzscher) contacted the Indianapolis Star with reports of Defendant Nassar's sexual abuse, assault, and molestation.

326. Nassar's employment ended with MSU on approximately September 20, 2016 only after the MSU Defendants became aware that:

a. Nassar and Defendnat USAG were sued by a former Olympian who alleged she was sexually assaulted by Defendant Nassar;[90] and,

b. A former patient of Nassar, Plaintiff Rachael Denhollander, filed a criminal complaint with the Michigan State University Police Department alleging Nassar sexually assaulted her when she was 15 years old and seeking treatment for back pain as a result of gymnastics. Plaintiff Denhollander's allegations of sexual assault by Defendant Nassar included but were not limited to:

    i. Massaging her genitals;

    ii. Penetrating her vagina and anus with his finger and thumb; and,

    iii. Unhooking her bra and massaging her breasts.[91]

327. Reasons given to Nassar for his termination included but were not limited to:

---

[88] *Id.*
[89] Lead Case No.: 1:17-00029.
[90] *See,* Case No. 34-2016-00200075, filed with the Superior Court of the State of California, County of Sacramento, September 8, 2016. A copy of the Complaint is available at https://www.documentcloud.org/documents/3106054-JANE-JD-COMPLAINT-Signed.html, Last accessed January 5, 2017.
[91] *See,* Former USA Gymnastics doctor accused of abuse, Mark Alesia, Marisa Kwiatkowski, Tim Evans, September 12, 2016. Available at, http://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/, Last accessed January 5, 2017.

a.      Deviation from "required best practices put in place following the internal sexual harassment investigation conducted … in 2014;"

b.      Failure to disclose a 2004 complaint to Meridian Township Police; and,

c.      Dishonesty by Nassar when MSU questioned him about receiving prior complaints about the "procedure" at issue.

328.    Shortly after MSU terminated Nassar's employment, Klages requested the MSU Women's Gymnastics Team members to sign a card from the team to show their support for Nassar—despite the fact that Defendant Klages was aware that Defendant Nassar's employment had been terminated due to numerous claims of sexual assault against patients and athletes.[92]

329.    Klages also passionately defended Defendant Nassar to the MSU Women's Gymnastics Team and told her athletes that she would trust her own grandkids with him—despite the numerous allegations of sexual assault against Nassar and the existence of open criminal investigations into his conduct.

330.    In September 2016, following MSU's termination of Nassar's employment, MSU Athletic Department's Director of Athletic Communications, Jamie Weir Baldwin, instructed members of the MSU Women's Gymnastics Team not to speak to the media or post on their social media accounts regarding Defendant Nassar's actions.

331.    Based on the communications of the MSU Athletic Department, members of the MSU Women's Gymnastics Team believed that they would be punished by MSU or face negative

---

[92] *See*, MSU Abuse Scandal: Coach Had Gymnasts Sign Card for Dr. Larry Nassar, Stephanie Gosk, Kristen Powers, and Tracy Connor, March 21, 2017. Available at, https://www.nbcnews.com/news/us-news/msu-abuse-scandal-coach-had-gymnasts-sign-card-dr-larry-n731781. Last accessed December 27, 2017.

consequences if they came forward to the police or media to describe sexual assaults against them.

332.   Several Plaintiffs were made aware of the allegations of Nassar's widespread sexual abuse on or around September 12, 2016 or sometime thereafter through related media coverage.[93]

333.   Others have been made aware of the allegations of Nassar's conduct more recently through related media coverage.

334.   In late November 2016, Nassar was arrested and charged in Ingham County, Michigan on three charges of First Degree Criminal Sexual Conduct with a Person Under 13, and was later released on $1,000,000.00 bond.[94]

335.   In mid-December 2016, Nassar was indicted, arrested, and charged in Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

336.   According to the federal indictment,[95] Nassar:

a.   Knowingly received and attempted to receive child pornography between approximately September 18, 2004 and December 1, 2004;

b.   Knowingly possessed thousands of images of child pornography between approximately February 6, 2003 and September 20, 2016 including images involving a minor who had not attained 12 years of age.

337.   In December 2016, following the filing of federal child pornography charges against Nassar, Klages continued to defend Nassar and told the parent of at least one of Nassar's victims that the child pornography "could have been planted" by somebody suing Nassar and also

---

[93] *Id.*
[94] State of Michigan, Ingham County Circuit Court Case No. 1603031.
[95] 1:16-cr-00242 PageID.1-4.

continued to deny that Nassar had sexually assaulted any patients by suggesting that the victims had "misinterpreted the treatment."

338.   MSU did not directly encourage the members of the MSU Women's Gymnastics Team to report suspected abuse by Defendant Nassar to the police until February 2017— approximately 5 months after MSU terminated Nassar's employment.

339.   In approximately December 2016, Defendant USAG settled one or more claims against it involving allegations of sexual abuse by Nassar against Olympic gold-medal-winning gymnast McKayla Maroney pursuant to a confidential settlement agreement in California.

340.   Upon information and belief, USAG entered into one or more confidential settlement agreements in California involving claims of child sex abuse or other acts that could be prosecuted as a felony sex offense by Defendant Nassar.

341.   Notably, California law prohibits confidential settlements in cases involving allegations of child sexual abuse or an act that could be prosecuted as a felony sex offense. CAL. CIV. PROC. CODE § 1002.

342.   Upon information and belief, Defendant USAG's settlement agreement with McKayla Maroney is not the first or the only settlement agreement that USAG has entered into to resolve civil claims of victims of sexual abuse by Nassar against USAG.

343.   Testimony given by an FBI agent at a hearing held on December 21, 2016, alleged, among other allegations, that Nassar used a GoPro camera to record video images of children in a swimming pool and that:

   a.   Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and,[96]

---

[96] *Id.* at PageID.49-50.

     b.     Nassar's thumb can be seen pressing into a child's vagina/vaginal area.[97]

344.    In mid-January 2017, Brooke Lemmen, D.O. submitted a letter of resignation to Mr. Strampel amid allegations that she:

     a.     Removed several boxes of confidential treatment patient records from Defendant MSU's Sports Medicine clinic at Nassar's request;

     b.     Did not disclose to Defendant MSU that Defendant USAG was investigating Nassar as of July 2015; and,

     c.     Made a staff member feel pressured not to fully cooperate in an internal investigation into allegations against Nassar.

345.    On February 7, 2017, a superseding indictment added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."[98]

346.    Amid allegations that Klages received concerns regarding Nassar's conduct and "treatment" in 1997/1998, yet dissuaded the complainant from formally complaining, and for her passionate defense of Nassar when allegations against him surfaced in fall 2016, on or about February 13, 2017, Defendant MSU suspended Ms. Klages from her duties as Head Coach of MSU's Women's Gymnastics team.

347.    Klages retired from MSU a day after being suspended.

348.    On February 17, 2017, following a Preliminary Examination, Nassar was ordered to stand trial

---

[97] *Id.* at PageID.50.
[98] *Id.* at PageID.88.

on three charges of First Degree Criminal Sexual Conduct with a Person Under 13 in Ingham County, Michigan following testimony which included, among others, allegations of digital vaginal penetration at Nassar's residence.

349. On February 22, 2017, Nassar was arraigned on 22 counts of First Degree Criminal Sexual Conduct with a Person Under 13 and 14 counts of Third Degree Criminal Sexual Conduct with a Person Under the age of 13 in Ingham County, Michigan[99] and Eaton County, Michigan.[100]

350. In mid-March 2017, Steve Penny resigned as president of Defendant USAG amid allegations Defendant USAG failed to promptly notify authorities of allegations raised against Nassar.

351. Nassar's Preliminary Examinations on the second set of charges in Ingham County was held on May 12, 2017, May 26, 2017, and June 23, 2017.

352. At the conclusion of the Preliminary Examination, Nassar was ordered to stand trial on 12 counts of First Degree Criminal Sexual Conduct with a Person Under 13 following testimony by Rachael Denhollander and other, which included among others, allegations of digital vaginal penetration by Nassar.

353. Nassar's Preliminary Examination on the charges issued in Eaton County, Michigan was held on June 30, 2017.

354. At the conclusion of the Preliminary Examination, Nassar was ordered to stand trial on 7 counts of First Degree Criminal Sexual Conduct with a Person Under 13 following testimony,

---

[99] *State v. Nassar*, Ingham County District Court Case No. 17-00425, *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Ingham_County_charges_Feb._2017_5 52531_7.pdf
[100] *State v. Nassar*, Eaton County District Court Case No. 17-0318, *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Eaton_County_charges_Feb._2017_55 2536_7.pdf

which included among others, allegations of digital vaginal penetration by Nassar.

355.   Plaintiffs Jane C1 Doe, Jane C4 Doe, and Jane C5 Doe are among the victims identified in the state criminal charges.[101]

356.   On June 26, 2017, Deborah J. Daniels, J.D. released a report titled, "Report to USA Gymnastics on Proposed Policy and Procedural Changes for the Protection of Young Athletes."[102]

357.   Ms. Daniels' report proposed 70 separate policy and procedural changes to Defendant USAG and in a section titled "Overarching Recommendation: Cultural Shift Throughout USA Gymnastics," suggested:

   a.   USA Gymnastics needs to undergo a complete cultural change, permeating the entire organization and communicated to the field in all its actions. Further, USA Gymnastics needs to take action to ensure that this change in culture also is fully embraced by the clubs that host member coaches, instructors and athletes."

358.   Included within the 70 separate policy and procedural changes suggested by Daniels' were the following recommendations:

   a.   Seek Individuals With Expertise in Child Protection for Leadership Team;

   b.   Change Culture of Entire Staff to Athlete Safety First;

   c.   Provide a Stronger Support System to Athletes;

   d.   Permit Third-Party Reporting of Policy Violations and Abuse to USA Gymnastics by Third Parties;

   e.   Require Reporting of Abuse and Reporting of Policy Violations;

---

[101] Member Case No.: 1:17-00257.
[102] Available at, https://usagym.org/PDFs/About%20USA%20Gymnastics/ddreport_062617.pdf. Last accessed February 28, 2018.

     f.      Enforce Serious Consequences for Failure to Report Abuse;

     g.     Expand Reporting Methods to Encourage and Facilitate Reporting;

     h.     Accept and Investigate Reports Relating to Misconduct by a Member in Which the Victim is a Non-Member; and,

     i.      Provide Training to All Members and Staff Regarding Reporting Requirements.

359.    To date, it is unknown how many, if any, of the 70 recommendations have been implemented by Defendant USAG or USAG member gyms, coaches, and volunteers.

360.    On July 10, 2017, Defendant Nassar plead guilty to the federal charges of child pornography, receipt/attempted receipt of child pornography, and destruction and concealment of records and tangible objects.

361.     On November 22, 2017, Defendant Nassar plead guilty to 7 counts of first-degree criminal sexual conduct in Ingham County Michigan.

362.    On November 29, 2017, Defendant Nassar plead guilty to 3 counts of first degree criminal sexual conduct in Eaton County Michigan.

363.    On December 7, 2017 Defendant Nassar was sentenced in federal court to a 720 month (60 year) prison term. The sentence included three 240 month (20 year) terms to be served consecutively.

364.    From, January 16, 2018 to January 24, 2018, a sentencing hearing was held in Ingham County Michigan for the 7 counts of First Degree Criminal Sexual Conduct to which Defendant Nassar plead guilty.

365.    From January 31, 2018 to February 5, 2018, a sentencing hearing was held in Eaton County Michigan for the 3 counts of First Degree Criminal Sexual Conduct to which Defendant Nassar plead guilty.

366.    Hundreds of Plaintiffs, as well as others who are not Plaintiffs in this action or the consolidated member cases, provided victim impact statements at the hearings.

367.    Some of the Plaintiffs who were seeking to proceed anonymously in this litigation chose to publicly identify themselves at the sentencing hearing.

368.    In total, approximately 204 victim impact statements were given over 9 days in two counties. The first speaker, was Plaintiff Kyle Stephens—the last speaker, was Plaintiff Rachael Denhollander. They bookended many of Plaintiffs in this case and the other consolidated member cases.

369.    On January 24, 2018, Nassar was sentenced to a 40 to 175 year prison term in Ingham County, Michigan.

370.    On February 5, 2018, Nassar was sentenced to a 40 to 125 year prison term in Eaton County, Michigan.

371.    During a press conference held prior to the opening of the 2018 Winter Olympic Games in Pyenog Chang, South Korea, USOC Chairman Larry Probst apologized to sexual assault survivors of Defendant Nassar, saying "The Olympic system in the United States failed those athletes … and we are part of the Olympic System in the United States.

372.    Mr. Probst acknowledged the USOC should have reached out sooner to gymnasts who were survivors of sexual abuse.

373.    Mr. Probst also acknowledge the USOC should have attended recently concluded sentencing hearings in Michigan from January to February, 2018, stating "That was simply a mistake … We should have been there."

374.    At that same press conference, Mr. Probst also defendant Scott Blackmun's handling of the complaints received by the USOC in 2015 regarding Nassar's sexual misconduct.

375.    Mr. Blackmun later resigned as CEO of the USOC.

376. Later, in February 2018, Congress enacted the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act ("Safe Sport Act") to "prevent the sexual abuse of minors and amateur athletes by requiring the prompt reporting of sexual abuse to law enforcement authorities, and for other purposes."

377. On March 28, 2017, in a hearing on the congressional bills preceding the enactment of the Safe Sport Act, Rick Adams, USOC Executive in charge of governing body development apologized to survivors of sexual abuse stating, "We do take responsibility, and we apologize to any young athlete who has ever faced abuse."

378. Under the Ted Stevens Olympic and Amateur Sports Act, "'amateur athlete' means an athlete who meets the eligibility standards established by the national governing body or paraolympic sports organization for the sport in which the athlete competes." 36 U.S.C. § 220501(b)(1).

379. Plaintiffs who were USAG members were amateur athletes as defined under the Safe Sport Act at the time of suffering abuse by Nassar and at the time employees and representatives of Defendants USAG and USOC learned of Nassar's abuse and sexual misconduct.

380. The Safe Sport Act amended 34 U.S.C. 20341 as follows: "[T]he term 'covered individual' means an adult who is authorized, by a national governing body, a member of a national governing body, or an amateur sports organization that participates in the interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization." 34 U.S.C. § 20341(c)(9).

381. Employees, representatives, and agents of Defendants USOC and USAG who received reports of Defendant Nassar's misconduct as noted and indicated above, qualify as covered individuals under the Safe Sport Act.

382. Defendant USOC has the power to decertify USAG and any member gyms or teams in executing their duty to ensure "proper safety precautions have been taken to protect the personal welfare of the athletes," in granting NGB's a sanction to host national or international events." 36 U.S.C. §220525(b)(4)(F).

383. Moreover, as part of an NGB's mandate from Defendant USOC, Defendant USAG was to, "encourage and support, research, development, and dissemination of information in the areas of sports medicine and sports safety."

384. Had Defendant USOC performed its mandate reasonably and diligently, and in accord with its duty to protect minor children under Federal and Michigan law, Defendant Nassar would have been investigated, sanctioned, and/or removed from the employ and service of Defendants USOC, USAG, and others.

385. At all times relevant to Plaintiffs' sexual abuse at the hands of Defendant Nassar, Defendant USOC was responsible for the Plaintiffs supervision while they competed at the Olympics, the Olympic Trials, the World Artistic Gymnastics Championships, and other meets and competitions within the purview of the USOC.

386. Defendant USOC provided entirely inadequate or ineffective measures to ensure Plaintiffs' protection from the risk of sexual abuse, either at the events or in their living quarters, where sexual abuse by Defendant Nassar occurred.

387. Plaintiffs were either provided little supervision or no supervision by Defendants USOC and USAG while "treatment" was performed in their living quarters by Defendant Nassar.

388. In approximately 2010, Defendant USOC convened what it termed the "Working Group for Safe Training Environments" to purportedly address, among other issues, physical and sexual abuse of amateur athletes in NGBs.

389. It was not until approximately 2011, after this commission met that Defendant USOC hired

an individual to head its "SafeSport" program and later, in approximately 2012, "SafeSport" handbook was adopted and promulgated safeguards and safety protections from minor athletes from the risks and dangers of sexual abuse.

390. These policies were adopted well after former USAG president Robert Colarossi informed Defendant USOC of the dangers and risks of sexual abuse in gymnastics, almost a decade prior.

391. One requirement for NGBs, such as Defendant USAG to remain in good standing with Defendant USOC is to "1) comply with the safe sport policies of the corporation and with the policies and procedures of the independent safe sport organization designated by the corporation to enhance safe sport practices and to investigate and resolve safe sport violations (no exceptions to this requirement shall be allowed unless granted by the CEO, or his designee, after allowing the [NGB] … to present the reasons for such exception) …."

392. To the best of Plaintiff's knowledge and belief, the policies introduced in 2011 by SafeSport have become more stringent over the years.

393. However, Plaintiffs are also informed and believe, and on that basis allege that Defendant USOC has continually failed to adequately enforce these policies on the whole, and utterly failed to enforce these policies against Defendants Nassar and USAG.

394. Defendant USOC has had and continues to have a culture and atmosphere that conceals known and suspected sexual abusers which transcends all policies and procedures currently and previously existing.

395. Defendant USOC has a practice and culture of ignoring its own internal rules and mandates for NBGs such as Defendant USAG, in order to protect its reputation and blind itself to known abusers within the ranks of NBGs for which it is responsible.

396. Defendant USOC currently promulgates SafeSport policies that prevent "…USOC employees,

coaches, contracted staff, volunteers, board members, committee and task force members, and other individuals working with athletes or other sport participants while at an OTC, whether or not they are employees of the USOC" and "...[a]thletes training while at an OTC, whether or not they are employees of the USOC" and "...[a]thletes training and/or residing at a USOC Olympic Training Center" from engaging in sexually abusive misconduct, including "child sexual abuse" and "sexual misconduct." *See* USOC Safe Sport Policies, Section II(c).

397. Defendant USOC also has policies for identifying "grooming" behaviors which it defines as "...the most common strategy used by offenders to seduce their victims."

398. These policies (or prior versions that were similar or less restrictive) were in effect and applied to Defendant USAG as early as 2012.

399. Defendant Nassar Defendant USAG's National Team Physician was subject to every iteration of these policies.

400. Despite the existence of these policies, after 2012, Defendant USOC allowed Defendant Nassar to continue to participate with minor children in conjunction with Defendant USAG, the NGB for Women's Gymnastics, and failed to adequately enforce these policies, or mandate that Defendant USAG enforce these policies.

401. For example, Defendant Nassar was repeatedly informally censured, disciplined, and reprimanded by Defendants USOC and USAG, Mr. Penny, and Mr. Parilla for taking an inordinate number of photographs of young girls, who were gymnasts.

402. This misconduct by Defendant Nassar was in direct contravention of his duties set forth by Defendants USOC and USAG and was not communicated to Plaintiffs.

403. This misconduct was not further investigated, not reported to law enforcement or child welfare authorities, and was never made known to Plaintiffs, their parents, or other gymnasts,

in direct violation of Defendant USAG's mandate under Defendant USOC's polices, procedures and rules.

404. Due to Defendant USOC's systemic and knowing failure to enforce these policies, Plaintiffs were sexually harassed, abused, and molested by Defendant Nassar.

405. To the best of Plaintiff's knowledge and belief, Defendant USAG was and has at all relevant times been "in good standing" with Defendant USOC despite failing to adhere to and enforce USOC's SafeSport policies.

406. In or around 2015 when Defendants USOC and USAG learned of Nassar's sexual misconduct, they both failed to protect their members and other amateur athletes from Nassar.

407. Upon learning of Defendant Nassar's sexual misconduct, Defendants USOC and USAG failed to immediately report Nassar's misconduct to law enforcement.

408. This delay left dozens if not hundreds of athletes at risk for sexual abuse, assault, and molestation at the hand of Defendant Nassar.

409. Defendants USOC and USAG also failed to notify MSU and Defendant Twistars of the reports of Nassar's sexual misconduct.

410. This failure also left dozens if not hundreds of athletes at risk for sexual abuse, assault, and molestation at the hand of Defendant Nassar.

411. As advertised on its website, "[t]he USOC has two primary responsibilities in its oversight of Olympic and Paralympic sport in the United States. The first is to generate resources in support of its mission, which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end."

412. Furthermore, Defendant "...USOC is committed to creating a safe and positive environment for athletes' physical, emotional and social development and to ensuring that it promotes an

environment free of misconduct."

413.  Under the Ted Stevens Amateur Sports Act, 36 *U.S.C.* §§220501, *et seq.* (hereinafter, "Ted Stevens Act") Defendant USOC had a mandatory obligation to ensure that before granting NGBs, including Defendant USAG, a sanction to host National or International events, that they provide "proper medical supervision will be provided for athletes who will participate in the competition." 36 U.S.C. §§220525(b)(4)(E).

414.  Defendant USOC has failed to fulfill its core mission to support and protect amateur athletes under its federal congressional charter.

415.  Investigations by the Michigan Attorney General's office, U.S. Congress, and other law enforcement offices and governmental departments are open and ongoing.

416.  The U.S. House Energy and Commerce Committee held a hearing on May 23, 2018 and questioned CEOs of various NGBs including Kerry Perry, President and CEO of Defendant USAG and Suzanne Lyons, former acting CEO of the USOC.

417.  Ms. Lyons apologized to athletes who were sexually abused and their families, stressed a commitment to protect athletes, and to make changes to the USOC to prevent future abuse stating, "The Olympic community failed the people it was supposed to protect ... I know that we can do better."

418.  The U.S. Senate Subcommittee on Consumer Protection, Product Safety, Insurance and Data Security have held three hearings (June 5, 2018, and July 24, 2018) and questioned current and former representatives and employees of Defendants MSU, USAG, and USOC.

419.  In June 2018, Rhonda Faehn testified she learned of Nassar's abuse and misconduct in approximately June 2015 yet never reporter it to law enforcement.[103]

---

[103] Archived webcast of the hearing is available at
https://www.commerce.senate.gov/public/index.cfm/hearings?ID=FEE69D30-2152-45BE-9E31-9A6ECEDB4CF2.

420.    Ms. Faehn testified Steve Penny repeatedly told her not to report to law enforcement and that "he would handle it."

421.    Ms. Faehn testified further she was instructed to tell gymnasts reports of abuse by Nassar were being handled within USAG and that families also need not contact law enforcement.

422.    Ms. Faehn also testified Mr. Penny instructed a USAG employee to travel to the Karolyi ranch and gather medical records and return them to USAG headquarters in Indianapolis, Indiana.

423.    To the best of Plaintiffs' knowledge and believe, the medical records have not been located.

424.    At the same hearing, Mr. Penny invoked his Fifth Amendment right against self-incrimination and refused to answer any questions.

425.    In July 2018, through her testimony, Kerry Perry confirmed Ms. Faehn's story regarding the missing medical records.[104]

426.    Ms. Perry also expressly confirmed that Defendant Nassar was USAG's agent, directly contradicting USAG's arguments and positions in its previously filed Motions to Dismiss and Answers.

427.    The Law and Justice Committee and Appropriates Subcommittee on Higher Education of the Michigan House of Representatives led a four month investigation which concluded with a bipartisan package of legislation to effect recommendations made in an April 2018 report to the Speaker of the House.

428.    Among the many recommendations by the committees included a bill to extend the statute of limitations to allow survivors of sexual abuse and sexual assault additional time to avail themselves of the judicial system to seek redress of their harm, 2018 Public Act 183.

429.    The law was passed and became effective June 12, 2018, MCL §600.5851b(3).

---

[104] Archived webcast of the hearing available at
https://www.commerce.senate.gov/public/index.cfm/hearings?ID=1E819A6A-87FE-4798-84C9-2AD010BB77EF.

430.    This statute has the effect of expanding the civil statute of limitations for claims involving sexual abuse prospectively and also, for a limited number of cases, provides retroactivity for claims "commenced" within 90 days following its enactment.

431.    During and in the wake of the sentencing hearings:

a.    Defendant Geddert was suspended by Defendant USAG on or around January 22, 2018, announced his retirement a few days later, and ostensibly transferred ownership and control of Defendant Twistars to his wife Kathryn Geddert;

b.    Ms. Simon resigned as President of Defendant MSU on January 24, 2018;

c.    Mr. Hollis resigned as Athletic Director of Defendant MSU on January 26, 2018;

d.    By January 31, 2018, the entire board of Defendant USAG resigned under threat of decertification by the USOC.

e.    Steps to revoke Defendant Strampel's tenure and terminate his employment were initiated on or around February 9, 2018, with Defendant MSU stating publicly, "…Strampel did not act with the level of professionalism we expect from individuals who hold senior leadership positions, particularly in a position that involves student and patient safety…Further allegations have arisen that question where his personal conduct over a long period of time met MSU's standards."[105]

f.    Scott Blackmun resigned as USOC Chief Executive Officer on February 28, 2018.[106]

g.    Strampel was arrested and charged criminally with charges of felony misconduct in

---

[105] *See*, Engler Takes First step to Remove Strampel, February 8, 2018, available at http://msutoday.msu.edu/news/2018/engler-takes-first-step-to-remove-strampel/. Last accessed Feb. 25, 2018.

[106] U.S. Olympic Committee CEO Scott Blackmun resigns, A.J. Perez, available at https://www.indystar.com/story/sports/olympics/2018/02/28/u-s-olympic-committee-ceo-scott-blackmun-resigns/382569002/. Last accessed February 28, 2018.

office, and fourth degree criminal sexual conduct in March 2018; he later retired from MSU;

h.    Rhonda Faehn was dismissed from her position as senior vice president of USAG in May 2018;

i.    Klages was charged criminally with two counts of lying to investigators in August 2018; and,

j.    Kerry Perry resigned as USAG CEO on September 4, 2018.

432.    Though Defendant USAG complied with Defendant USOC's request for the entire Board to resign, appointments and hires made in the interim months have been widely criticized and discredited.

433.    Defendants USAG and USOC have failed to effect meaningful change that will protect athletes at all levels of sport.

434.    This litigation commenced in January 2017, and Plaintiffs remain deeply concerned that current and future gymnasts and athletes are remain risk of suffering abuse of all types including sexual, emotional, and physical.

**V.    SPECIFIC FACTUAL ALLEGATIONS**

    **A.    LINDSEY LEMKE**

435.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

436.    Plaintiff Lemke started training at Twistars in approximately 2004.

437.    After suffering a back injury in approximately 2008, Twistars instructed Plaintiff Lemke to seek treatment with Nassar.

438.    Nassar gave Plaintiff Lemke gifts on occasion, such as a pin from his participation in the Olympic Games with USAG.

439. In addition, Nassar would also give Plaintiff Lemke gifts for her birthday, and he also gave Plaintiff Lemke a gift upon her matriculation to college to the University of North Carolina.

440. During her initial visits with Nassar, Plaintiff Lemke would treat with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

441. These visits would often occur outside of regular clinic hours when the other clinic personnel had already left for the day.

442. Nassar instructed Plaintiff Lemke to text his personal cell phone when she arrived, and he would allow her entrance to the clinic via a side door.

443. For later treatments, Plaintiff Lemke would have her appointments with Nassar in the back room at Twistars and at Nassar's house.

444. Nassar lived in the same neighborhood as Plaintiff Lemke and her father, and Nassar established a relationship of trust with both Plaintiff Lemke and parents.

445. Nassar's gift-giving and relationship with Plaintiff Lemke and her parents further ingratiated himself into a position of trust.

446. Nassar would usually begin treatments by looking at the alignment of Plaintiff Lemke's back. Then, Nassar would massage Plaintiff Lemke's back and move downwards toward her buttocks. Nassar would then put his hands on Plaintiff Lemke's genital area, push on the sides of her vagina, and rub her vagina over the top of her clothes. From there, Nassar would reach is hand into Plaintiff Lemke's underwear and rub Plaintiff Lemke's bare skin on and around her vagina. Finally, Nassar would digitally penetrate Plaintiff Lemke's vagina.

447. From approximately 2008 to 2012, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Lemke by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff Lemke's consent or the consent of Plaintiff Lemke's parents.

448. Plaintiff Lemke was a minor at the time of these assaults, as she did not reach the age of majority until 2013.

449. From 2008 to 2012, Plaintiff Lemke was assaulted by Nassar approximately three times per week and the assaults would take place in a back room at Twistars, in the basement of Nassar's home in Holt, Michigan, or at Nassar's office at MSU.

450. During this four-year-period, Nassar sexually assaulted, battered, abused, and molested Plaintiff Lemke on approximately six hundred different occasions.

451. In the fall of 2015, Plaintiff Lemke began attending MSU on athletic scholarship on the women's gymnastics team.

452. Plaintiff Lemke continued treatments with Nassar while at MSU from approximately December 2015 to September 2016.

453. Plaintiff Lemke treated with Nassar in approximately 2016 at his office at MSU.

454. In one or more of these 2016 treatments, Plaintiff Lemke was suffering from back pain. Under the guise of treatment, Nassar performed acupuncture on Lemke's buttocks and genital area.

455. Plaintiff Lemke did not treat or intend to treat with Defendant Nassar for issues related to obstetrics or gynecology (hereinafter "OB/GYN").

456. Plaintiff Lemke believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

457. In approximately September 2016, during one of Plaintiff Lemke's gymnastics practices, a representative from the MSU Athletic Department, came to the MSU Women's Gymnastics team practice and instructed the team to leave the gym for a meeting. During this meeting, the representative informed Plaintiff Lemke and the MSU Women's Gymnastics team that allegations of sexual abuse had been brought forward against Nassar.

458. This MSU representative also told Plaintiff Lemke to respond, "No comment," to any

questions from media, not to discuss Nassar with their families, and to forward any calls to MSU's legal department.

459. Plaintiff Lemke and her teammates came away from this meeting with the impression that they should also not discuss Nassar with the police or law enforcement.

460. Shortly after the meeting, then-MSU Women's Gymnastics Head Coach Kathie Klages (hereinafter "Klages") told Plaintiff Lemke that her personal cellular telephone could be subject to "checks."

461. Plaintiff Lemke understood this statement to mean that MSU intended to randomly check her personal cellular telephone to ensure that she was not speaking with media or law enforcement regarding the allegations against Nassar.

462. After Nassar was indicted on federal child pornography charges, Plaintiff Lemke discussed the sexual assaults with her mother, Christy Lemke-Akeo.

463. Shortly after this conversation, Christy Lemke-Akeo called Klages to discuss the assaults against her daughter. Klages responded by stating that Nassar's digital vaginal penetration of Plaintiff Lemke was a proven medical treatment. When questioned regarding the child pornography charges against Nassar by Christy Lemke-Akeo, Klages responded by stating that someone may have planted the child pornography on Nassar's property in an attempt frame Nassar.

464. In approximately 2013 or 2014, Defendant Geddert kicked Lemke and her teammates out of gymnastics practice at Twistars and required the gymnasts to clean the girls' locker-room.

465. After the girls had been cleaning the locker-room for some time, Defendant Geddert entered the girls' locker-room unannounced and retrieved a hidden video camera.

466. Defendant Geddert would often enter the girls' locker-room unannounced and without providing notice while female athletes were inside the locker-room and changing into and out

of their leotards.

467.   When Lemke was 14 or 15 years old, Geddert made a comment to Lemke that she looked like a Victoria Secrets model after she arrived at his gym in a new pink leotard.

468.   Geddert was approximately 52 years old at the time that he made the Victoria Secrets comment to Lemke.

**B.      KYLIE CHESTER**

469.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

470.   Plaintiff Kylie Chester ("Chester") grew up in the Lansing, Michigan area.

471.   Chester was a gymnast and member of Twistars from approximately 2001 to 2005.

472.   After retiring from gymnastics, Chester became a dancer.

473.   In approximately 2010, Chester suffered a back injury from dancing.

474.   Chester went to Dr. Michael Shingles at the MSU Sports Medicine Clinic with complaints of back pain suffered through her participation in dance.

475.   Dr. Shingles is a surgeon and because Chester did not want surgery, it was decided that she should instead see Nassar.

476.   Chester began to see Nassar for her back pain.

477.   In approximately 2010, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Chester by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Chester's consent or the consent of Chester's parents at the MSU Sports Medicine Clinic.

478.   Chester continued to see and be abused by Nassar throughout 2010 for approximately 6-8 months on a weekly to bi-weekly basis.

479.   The abuse would last approximately 10 to 15 minutes.

480. In 2010, Chester was a minor, approximately 15 years old.

481. Defendant Nassar did not give prior notice or obtain consent for digital penetration or to touch Chester's vagina or genital area.

482. Chester did not treat or intend to treat with Nassar for OB/GYN issues.

483. Chester believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

### C. AMANDA SMITH

484. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

485. Plaintiff Amanda Smith ("Smith") began participation in gymnastics at a very young age.

486. Smith was a member of and trained at Twistars from approximately 1999 to 2003.

487. Smith was a member of USAG from approximately 1996 to 2004.

488. Smith first met Nassar in approximately 1999 or 2000 at Twistars.

489. When Smith would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar, who would often be present at Twistars during Smith's training sessions to provide medical treatment to gymnasts.

490. Smith continued to see Nassar for various injuries while she was at Twistars until 2003.

491. Smith retired from gymnastics in 2004 and began her career as a pole vaulter for Okemos High School.

492. In approximately 2006, when Smith was about 14 years old, Smith suffered a back injury while pole vaulting.

493. Smith's mother called MSU Sports Medicine Clinic and it was recommended that Smith see Nassar for treatment for her pole vaulting injury.

494. In 2006, under the guise of treatment, Nassar sexually assaulted, battered, abused, and

molested Smith at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Smith's consent or the consent of Smith's parents.

495. Smith's mother was physically present during the "treatments" at Nassar's office at MSU, but Nassar positioned Smith in a manner such that her mother could not see the sexual assault.

496. Nassar made inappropriate comments to Smith during her appointments such as asking her if she had a boyfriend, asking if she was a virgin, joking about her not having intercourse yet, and commenting how child birth would be difficult for her because she had small hips.

497. Nassar also told Smith that she was "lucky [she] quit gymnastics, otherwise [her] body would not look as good as it does now."

498. Smith was approximately 14 years old at the time of the digital penetration sexual assault.

499. Nassar would often hug Smith when she saw him at Twistars and at the MSU Sports Medicine Clinic.

500. Nassar would also occasionally "like" or comment on pictures on Smith's Facebook account.

501. Nassar did not give prior notice or obtain consent for digital penetration from Smith or from Smith's parents even though she was a minor when Nassar digitally penetrated Smith.

502. Smith did not treat or intend to treat with Nassar for OB/GYN issues.

503. Smith believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**D.    JANE C1 DOE**

504. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

505. Plaintiff Jane C1 Doe was a gymnast who began training at Twistars in approximately 2000 or 2001.

506.  In approximately 2008, Plaintiff Jane C1 Doe, while engaging in gymnastics training at Twistars, suffered a back injury.

507.  Twistars instructed Plaintiff Jane C1 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C1 Doe's training sessions to provide medical treatment to gymnasts.

508.  Plaintiff would also treat with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

509.  Plaintiff Jane C1 Doe treated with Nassar at his office at MSU and in the back room at Twistars from approximately 2008 to 2012.

510.  From 2008 to 2012, Plaintiff Jane C1 Doe was a minor, approximately 12 to 17 years old.

511.  Plaintiff Jane C1 Doe presented to Defendant Nassar with complaints of back pain as a result of gymnastics.

512.  From approximately 2008 to 2012, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents on approximately two hundred different occasions.

513.  The assaults would occur almost every Monday evening in the back room at Twistars.

514.  A few of the assaults also occurred at Nassar's office at MSU.

515.  Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C1 Doe or her parents.

516.  Plaintiff Jane C1 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

517.  Plaintiff Jane C1 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

and molestation and for Defendant Nassar's pleasure and self-gratification.

E.   **JANE C2 DOE**

518.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

519.   Plaintiff Jane C2 Doe was a gymnast who trained at Twistars from approximately 2003 to 2014.

520.   When Plaintiff Jane C2 Doe would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C2 Doe's training sessions to provide medical treatment to gymnasts.

521.   Plaintiff Jane C2 Doe also treated with Nassar at his office at MSU.

522.   Nassar also instructed Plaintiff Jane C2 Doe to come to his house in Holt, Michigan for medical visits on approximately three separate occasions.

523.   Nassar would also communicate with Plaintiff Jane C2 Doe through Facebook, including the scheduling of appointments, and would occasionally "like" pictures of Plaintiff Jane C2 Doe wearing swimwear.

524.   Plaintiff Jane C2 Doe presented to Defendant Nassar with complaints of back and hip pain suffered through her participation in gymnastics.

525.   From approximately 2011 to 2013, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C2 Doe by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents in the back room at Twistars and in the basement of Nassar's home on approximately three separate occasions.

526.   Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C2 Doe in approximately 2011 by reaching his hands underneath her leotard and rubbing and touching

Plaintiff's genital area without gloves, notice, warning, or Plaintiff Jane C2 Doe's consent when treating Plaintiff Jane C2 Doe for a back injury in the back room of Twistars.

527. In approximately 2012, Nassar instructed Plaintiff Jane C2 Doe to come to his home for "treatment."

528. On this occasion, Plaintiff Jane C2 Doe was seeking treatment for a hip injury.

529. Plaintiff Jane C2 Doe and her mother went to the basement of Nassar's home in Holt, Michigan, where Nassar maintained an office.

530. Plaintiff Jane C2 Doe positioned herself on the adjusting table in Nassar's basement, and Nassar covered the lower half of Plaintiff Jane C2 Doe's body with a towel to conceal his actions.

531. Nassar then washed his hands with hand sanitizer, reached his hands underneath the towel, pulled down Plaintiff Jane C2 Doe's yoga pants, and digitally penetrated Plaintiff Jane C2 Doe's vagina without the use of gloves and without Plaintiff Jane C2 Doe's consent or the consent of Plaintiff Jane C2 Doe's mother, who was physically present in the room at the time.

532. Plaintiff Jane C2 Doe's mother was unaware that Nassar was touching and digitally penetrating Plaintiff Jane C2 Doe's vagina because Nassar had concealed his actions by placing a towel over the lower half of Plaintiff Jane C2 Doe's body.

533. In approximately 2013, Nassar again sexually assaulted Plaintiff Jane C2 Doe in the back room of Twistars by reaching his hands underneath Plaintiff Jane C2 Doe's leotard and then rubbing and touching Plaintiff Jane C2 Doe's genital area without the use of gloves and without Plaintiff Jane C2 Doe's consent or the consent of Plaintiff Jane C2 Doe's parents.

534. From 2011 to 2013, Plaintiff Jane C2 Doe was a minor, approximately 14 to 17 years old.

535. Defendant Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff Jane C2 Doe's vagina or genital area.

536. Plaintiff Jane C2 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

537. Plaintiff Jane C2 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

F. **JANE C3 DOE**

538. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

539. As a minor, Jane C3 Doe participated in organized gymnastics.

540. Plaintiff Jane C3 Doe treated with Defendant Nassar in approximately 1998 or 1999 and in approximately 2005 or 2006 at his office at MSU.

541. From 1998 to 1999, Plaintiff Jane C3 Doe was a minor, approximately 12 to 14 years old.

542. Plaintiff Jane C3 Doe presented to Defendant Nassar with complaints of lower back pain suffered as a result of gymnastics.

543. On approximately six separate occasions at appointments at his office at MSU, Defendant Nassar digitally penetrated Plaintiff Jane C3 Doe's vagina without prior notice or the consent of Plaintiff Jane C3 Doe or her parents and without gloves or lubricant. The assaults would sometimes last up to 45 minutes.

544. On at least one occasion, Plaintiff Jane C3 Doe's mother was physically present in the room but was unable to see the sexual assault occur based on the way that Nassar had positioned Plaintiff Jane C3 Doe.

545. Plaintiff Jane C3 Doe's lower back injury was re-aggravated in approximately 2005 or 2006, so Plaintiff Jane C3 Doe returned to the MSU Sports Medicine Clinic to see Nassar for treatment.

546. In approximately 2005 or 2006, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C3 Doe by touching and rubbing her genital area

and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff Jane C3 Doe's consent on approximately 2 to 4 different occasions.

547. On at least one of these occasions, Plaintiff Jane C3 Doe observed that Nassar was sexually aroused following the "treatment."

548. Plaintiff Jane C3 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

549. Plaintiff Jane C3 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

### G.    JANE C4 DOE

550. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

551. Plaintiff Jane C4 Doe engaged in gymnastics training at Twistars starting when she was about 4 years old.

552. In approximately 2008, Plaintiff Jane C4 Doe, while engaging in gymnastics training at Twistars, suffered a back injury.

553. Twistars instructed Plaintiff Jane C4 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C4 Doe's training sessions to provide medical treatment to gymnasts.

554. Plaintiff Jane C4 Doe would also treat with Nassar at his office at MSU's Sports Medicine Clinic for medical treatment, which is located on MSU's East Lansing, Michigan campus.

555. Plaintiff Jane C4 Doe treated with Nassar from approximately 2008 until 2013 at the basement of Nassar's home, the back room at Twistars, and at Nassar's office at MSU.

556. From approximately 2008 to 2013, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C4 Doe in the basement of his home, the back

room at Twistars, and at his office at MSU by touching and rubbing her breasts and genital area and digitally penetrating her vagina and anus without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents.

557.   The digital vaginal penetrations would typically last about 15 minutes.

558.   Plaintiff Jane C4 Doe was a minor at the time of most of the sexual assaults, as she did not reach the age of majority until the spring of 2013.

559.   Plaintiff Jane C4 Doe saw Nassar approximately weekly for treatments from 2008 to 2013 and was digitally vaginally penetrated by Nassar during most of these appointments.

560.   During at least one of the assaults, Nassar commented on the "tightness" of Plaintiff Jane C4 Doe's vagina.

561.   Plaintiff Jane C4 Doe was never billed for "treatments" with Nassar.

562.   Plaintiff Jane C4 Doe's appointments with Nassar at his office at MSU almost always occurred outside of regular business hours with the exceptions being appointments for x-rays or other radiological imaging.

563.   Nassar would make arrangements to let Jane C4 Doe into Nassar's office at MSU because the main doors would be locked.

564.   Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C4 Doe or from Jane C4 Doe's parents even though she was a minor at the time that most of the assaults occurred.

565.   Plaintiff Jane C4 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

566.   Plaintiff Jane C4 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

   **H.**   **JANE C5 DOE**

567. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

568. Plaintiff Jane C5 Doe began her involvement in gymnastics when she was approximately 3 years old.

569. Plaintiff Jane C5 Doe started training at Twistars at approximately the age of 12.

570. In approximately 2009, Plaintiff, while engaging in gymnastics training at Twistars, suffered a back injury.

571. Twistars instructed Plaintiff to seek treatment with Nassar who would often be present at Twistars during Plaintiff's training sessions to provide medical treatment to gymnasts.

572. Plaintiff Jane C5 Doe treated with Defendant Nassar in approximately 2009 to 2011 at his office at MSU, the back room at Twistars, and in the basement of Nassar's home.

573. From 2009 to 2011, Plaintiff Jane C5 Doe was a minor, approximately 15 to 17 years old.

574. From approximately 2009 to 2011, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C5 Doe in the basement of his home, the back room at Twistars, and at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C5 Doe's consent or the consent of Plaintiff Jane C5 Doe's parents.

575. During one of the first sexual assaults, Nassar told Plaintiff Jane C5 Doe regarding the "treatment" involving digital vaginal penetration, "We don't tell parents about this because they wouldn't understand."

576. Plaintiff Jane C5 Doe was a minor at the time she was assaulted as she did not reach the age of majority until 2012.

577. Plaintiff Jane C5 Doe suffered at least one bacterial infection in a sensitive area during the time of her treatment.

578. At one point in time, Nassar sent Jane C5 Doe a friend request on Facebook and would often comment on or "like" her photographs.

579. On one of Plaintiff Jane C5 Doe's photographs on Facebook, Nassar commented, "[Y]ou radiate pure beauty."

580. Nassar did not give prior notice or obtain consent for digital vaginal penetration from Plaintiff Jane C5 Doe or Plaintiff Jane C5 Doe's parents even though she was a minor at the time.

581. Neither Plaintiff Jane C5 Doe nor Plaintiff Jane C5 Doe's parents consented to any touching, rubbing, or digital penetration of Plaintiff's vagina.

582. Plaintiff Jane C5 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

583. Plaintiff Jane C5 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

I.     **JANE C6 DOE**

584. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

585. As a minor, Plaintiff Jane C6 Doe participated in high school cheerleading.

586. In approximately 2009, Plaintiff Jane C6 Doe suffered a hip injury while participating in cheerleading.

587. After seeing several physicians, Plaintiff Jane C6 Doe was referred to see Nassar at the MSU Sports Medicine Clinic.

588. Part of the reason that Plaintiff Jane C6 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level gymnasts.

589.  After Plaintiff Jane C6 Doe completed an initial evaluation at the MSU Sports Medicine Clinic, she was scheduled for an appointment with Nassar for treatment.

590.  In approximately 2009 to 2010, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C6 Doe by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C6 Doe's consent or the consent of Plaintiff Jane C6 Doe's parents on approximately 40 occasions over approximately an 18-month period.

591.  On at least one occasion, Plaintiff Jane C6 Doe's mother was physically present in the room but was unable to see the sexual assault occur based on the way that Nassar had positioned Plaintiff Jane C6 Doe.

592.  Plaintiff Jane C6 Doe was a minor at the time that some of these assaults occurred, as she did not reach the age of majority until 2010.

593.  Plaintiff Jane C6 Doe would wear normal street clothes to the appointments, and Nassar would request for her to change into shorts with Velcro down the side. During the "treatment," Nassar would unfasten the Velcro on the right side to gain access to Plaintiff Jane C6 Doe's genital area.

594.  Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C6 Doe or from Jane C6 Doe's parents even though she was a minor at the time.

595.  Plaintiff Jane C6 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

596.  Plaintiff Jane C6 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

J.  **JANE C7 DOE**

597.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous

paragraphs.

598.   As a minor, Plaintiff Jane C7 Doe participated in high school gymnastics.

599.   In approximately 1999 to 2000, Plaintiff Jane C7 Doe suffered a back injury following a car accident.

600.   After seeing several physicians, Plaintiff Jane C7 Doe was referred to see Nassar at the MSU Sports Medicine Clinic.

601.   Part of the reason that Plaintiff Jane C7 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level gymnasts.

602.   In approximately 1999 to 2000, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C7 Doe at Nassar's office at the MSU Sports Medicine Clinic by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C7 Doe's consent or the consent of Plaintiff Jane C7 Doe's parents on approximately 10 to 20 occasions over approximately a 12-month period.

603.   On at least one occasion, Plaintiff Jane C7 Doe's mother was physically present in the room but was unable to see the sexual assault occur based on the way that Nassar had positioned Plaintiff Jane C7 Doe.

604.   Plaintiff Jane C7 Doe was a minor at the time these assaults occurred, as she did not reach the age of majority until 2001.

605.   During some of the assaults, Nassar would become sexually aroused, and Plaintiff Jane C7 Doe could feel Nassar's penis rubbing against her body.

606.   The assaults would typically last for approximately one hour.

607.   Based on Nassar's representations, Plaintiff Jane C7 Doe believed the "treatment" she

received to be legitimate medical procedures until reports surfaced in or about September 2016 of similar allegations by other women.

608. Plaintiff Jane C7 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

609. Plaintiff Jane C7 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

K.    JANE C8 DOE

610. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

611. Plaintiff Jane C8 Doe started participating in organized gymnastics when she was 3 years old.

612. Plaintiff Jane C8 Doe started training at Twistars when she was approximately 11 years old.

613. Plaintiff Jane C8 Doe suffered a number of injuries during her gymnastics training and was referred by Twistars to seek treatment with Nassar.

614. From approximately 2009 to 2014, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C8 Doe at Nassar's office at the MSU Sports Medicine Clinic, the back room at Twistars, and at the basement of Nassar's home, by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C8 Doe's consent or the consent of Plaintiff Jane C8 Doe's parents on approximately 100 different occasions.

615. Plaintiff Jane C8 Doe was a minor at the time of these assaults.

616. During these assaults, Nassar would occasionally make comments about how one day Plaintiff Jane C8 Doe would develop breasts and would also make comments about the size of Plaintiff Jane C8 Doe's butt.

617. During one of the first assaults, Nassar ruptured Plaintiff Jane C8 Doe's hymen because

Plaintiff Jane C8 Doe was a virgin and approximately 12 to 13 years old at the time of the first assault.

618.    Due to Nassar's decision not to wear gloves during the assaults, Nassar's fingernails would occasionally lacerate the inside of Plaintiff Jane C8 Doe's vagina and anus.

619.    From approximately 2009 to 2014, Plaintiff Jane C8 Doe suffered from an unusually high number of urinary tract infections and bladder infections, which Plaintiff Jane C8 Doe believes may have been a consequence of Nassar's assaults.

620.    Based on Nassar's representations, Plaintiff Jane C8 Doe believed the "treatment" she received to be legitimate medical procedures until reports surfaced in or about September 2016 of similar allegations by other women.

621.    Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C8 Doe or from Jane C8 Doe's parents even though she was a minor at the time.

622.    Plaintiff Jane C8 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

623.    Plaintiff Jane C8 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

L.    **JANE C9 DOE**

624.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

625.    As a minor, Plaintiff Jane C9 Doe participated in high school gymnastics.

626.    In approximately 2008, Plaintiff Jane C9 Doe suffered a back injury.

627.    After seeing several physicians, Plaintiff Jane C9 Doe was referred to see Nassar at the MSU Sports Medicine Clinic.

628.    Due to her background as a high school gymnast, part of the reason that Plaintiff Jane C9 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level gymnasts.

629.    After Plaintiff Jane C9 Doe completed an initial evaluation at the MSU Sports Medicine Clinic, she was scheduled for an appointment with Nassar for treatment.

630.    In approximately 2008 to 2009, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C9 Doe by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C9 Doe's consent on approximately two to three occasions over approximately a 3-month period.

631.    Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C9 Doe.

632.    Plaintiff Jane C9 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

633.    Plaintiffs Jane C9 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**M.    JANE C10 DOE**

634.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

635.    Plaintiff Jane C10 Doe participated in high school soccer.

636.    In approximately 2011, Plaintiff Jane C10 Doe suffered a back injury.

637.    After seeing several physicians, Plaintiff Jane C10 Doe was referred to see Nassar at the MSU Sports Medicine Clinic.

638. Due to her background as a high school athlete, part of the reason that Plaintiff Jane C10 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level athletes.

639. After Plaintiff Jane C10 Doe completed an initial evaluation at the MSU Sports Medicine Clinic, she was scheduled for an appointment with Nassar for treatment.

640. In approximately 2011 to 2012, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C10 Doe by touching and rubbing her genital area and digitally penetrating her vagina and anus at his office at MSU without the use of gloves and without Plaintiff Jane C10 Doe's consent or the consent of Plaintiff Jane C10 Doe's parents on approximately thirty occasions over approximately a 10-month period.

641. During one of the first treatments, Nassar told Plaintiff Jane C10 Doe that he needed to insert his finger into her vagina and anus because that was the best way to manipulate the ligaments in her lower back.

642. At one point in time, Nassar sent Plaintiff Jane C10 Doe a request to be her friend on Facebook and would occasionally send her messages.

643. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C10 Doe.

644. Plaintiff Jane C10 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

645. Plaintiff Jane C10 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

N. JANE C11 DOE BY NEXT FRIEND JANE C12 DOE

646. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

647.   In approximately 2012, Plaintiff Jane C11 Doe began gymnastics training at Twistars.

648.   Shortly after she started training at Twistars, Plaintiff Jane C11 Doe suffered a back injury while engaging in gymnastics training at Twistars.

649.   Twistars instructed Plaintiff Jane C11 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C11 Doe's training sessions to provide medical treatment to gymnasts.

650.   Plaintiff Jane C11 Doe would also treat with Nassar at his office at MSU's Sports Medicine Clinic for medical treatment, which is located on MSU's East Lansing, Michigan campus.

651.   Plaintiff Jane C11 Doe treated with Nassar from approximately 2012 until 2015 at the back room at Twistars and at Nassar's office at MSU.

652.   From approximately 2012 to 2015, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C11 Doe in the back room at Twistars and at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C11 Doe's consent or the consent of Plaintiff Jane C11 Doe's parents.

653.   Plaintiff Jane C11 Doe was approximately 10 years old at the time of the first assault and is still a minor child.

654.   The assaults at Nassar's office at the MSU Sports Medicine Clinic would typically last approximately 60 to 90 minutes.

655.   The assaults at the back room at Twistars would typically last approximately 10 to 15 minutes.

656.   Jane C12 Doe was physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff in a manner such that Jane C12 Doe could not see the sexual assault.

657.   Defendant Nassar did not give prior notice or obtain consent for digital penetration from

84

Plaintiff Jane C11 Doe or from Jane C12 Doe.

658. Plaintiff Jane C11 Doe and Jane C12 Doe did not treat or intend for Plaintiff Jane C11 Doe to treat with Defendant Nassar for OB/GYN issues.

659. Plaintiff Jane C11 Doe and Jane C12 Doe believe the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

### O.   JANE C13 DOE

660. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

661. As a minor child, Plaintiff Jane C13 Doe engaged in gymnastics training at Olympia Gymnastics, Inc., d/b/a Olympia Gymnastics Academy in Shelby Township, Michigan.

662. Olympia Gymnastics Academy is a gym with certification and/or affiliation with USAG.

663. Plaintiff Jane C13 Doe was a member of USAG from approximately 2004 to 2010.

664. From approximately 2004 to 2010, Plaintiff Jane C13 Doe attended various Invitational Meets at Twistars.

665. While training at Olympia Gymnastics Academy, Plaintiff Jane C13 Doe suffered a foot injury.

666. Olympia Gymnastics Academy referred Plaintiff Jane C13 Doe to see Nassar for treatment for her foot injury due in part to Nassar's employment, agency, or affiliation with USAG.

667. Based on the referral, Plaintiff Jane C13 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

668. Plaintiff Jane C13 Doe treated with Nassar in approximately 2010 at Nassar's office at the MSU Sports Medicine Clinic.

669. In approximately 2010, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C13 Doe at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without

Plaintiff Jane C13 Doe's consent or the consent of Plaintiff Jane C13 Doe's parents on approximately 20 different occasions.

670. Plaintiff Jane C13 Doe was approximately 12 years old at the time of the assaults.

671. Plaintiff Jane C13 Doe's parents were physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff Jane C13 Doe in a manner such that her parents could not see the sexual assault.

672. Nassar affirmatively and falsely indicated to Plaintiff Jane C13 Doe and her parents that he was performing legitimate medical treatment on Plaintiff Jane C13 Doe when in fact he was sexually assaulting Plaintiff Jane C13 Doe for his own self-gratification.

673. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C13 Doe or from Jane C13 Doe's parents even though she was a minor at the time.

674. Plaintiff Jane C13 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

675. Plaintiff Jane C13 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**P.   JANE C14 DOE**

676. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

677. In approximately 1997, Plaintiff Jane C14 Doe began gymnastics training at Twistars.

678. When Plaintiff Jane C14 Doe suffered injuries or experienced pain during her training, Twistars instructed Plaintiff Jane C14 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C14 Doe's training sessions to provide medical treatment to gymnasts.

679.  Plaintiff Jane C14 Doe treated with Nassar from approximately 2001 until 2002 at the back room at Twistars.

680.  From approximately 2001 to 2002, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C14 Doe in the back room at Twistars by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C14 Doe's consent or the consent of Plaintiff Jane C14 Doe's parents.

681.  Plaintiff Jane C14 Doe was approximately 14 years old at the time of the first assault.

682.  Plaintiff Jane C14 Doe was sexually assaulted by Nassar approximately once or twice per week by Nassar in the back room at Twistars from approximately 2001 to 2002.

683.  On a number of occasions, Plaintiff Jane C14 Doe observed that Nassar was sexually aroused during the "treatments."

684.  In 2001 to 2002, Plaintiff Jane C14 Doe was a minor and was approximately 12 to 14 years old.

685.  Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C14 Doe or her parents.

686.  Plaintiff Jane C14 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

687.  Plaintiffs Jane C14 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

## Q.    JANE C15 DOE

688.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

689.  Plaintiff Jane C15 Doe began participation in gymnastics when she was just 3 years old.

690.  In 2001, when Plaintiff Jane C15 Doe was about 10 years old, she started gymnastics training at Conrad's Gymnastics Academy, Inc., d/b/a Michigan Elite Gymnastics Academy (commonly known as "MEGA") in Farmington Hills, Michigan.

691.  MEGA is a gym with certification and/or affiliation with USAG.

692.  Plaintiff Jane C15 Doe was a USAG member from approximately 2003 to 2009.

693.  Plaintiff Jane C15 Doe attended various Meets and Invitational Meets at Twistars between approximately 2003 to 2009.

694.  While training at MEGA, Plaintiff Jane C15 Doe suffered a foot injury.

695.  Sometime in 2006, Nassar came to MEGA to provide medical examinations to gymnasts and to check their flexibility.

696.  In approximately 2008, Plaintiff Jane C15 Doe suffered a lower back injury during her gymnastics training at MEGA.

697.  MEGA referred Plaintiff Jane C15 Doe to see Nassar for treatment due in part to Nassar's employment, agency, or affiliation with USAG.

698.  Based on the referral, Plaintiff Jane C15 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

699.  Plaintiff Jane C15 Doe treated with Nassar in approximately 2008 at Nassar's office at the MSU Sports Medicine Clinic.

700.  In approximately 2008, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C15 Doe at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C15 Doe's consent or the consent of Plaintiff Jane C15 Doe's parents on approximately 2 to 3 different occasions.

701.  During Plaintiff Jane C15 Doe's first visit to Nassar's office, Nassar gave her a postcard with

signed autographs of Olympic gymnasts.

702.    Plaintiff Jane C15 Doe was approximately 12 years old at the time of the assaults.

703.    Plaintiff Jane C15 Doe's mother was physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff Jane C15 Doe in a manner such that her mother could not see the sexual assault.

704.    Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C15 Doe or from Jane C15 Doe's parents even though she was a minor at the time.

705.    Plaintiff Jane C15 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

706.    Plaintiff Jane C15 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**R.    JANE C16 DOE**

707.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

708.    Plaintiff Jane C16 Doe began participation in gymnastics when she was just 2 or 3 years old.

709.    In 2002, when Plaintiff Jane C16 Doe was about 11 years old, she started gymnastics training at Red Cedar Gymnastics, L.L.C., d/b/a Red Cedar Gymnastics in Okemos, Michigan.

710.    Red Cedar Gymnastics, L.L.C. is a gym with certification and/or affiliation with USAG.

711.    Plaintiff Jane C16 Doe was a USAG member from approximately 2000 to 2007.

712.    Plaintiff Jane C16 Doe attended various Meets and Invitational Meets at Twistars from approximately 2000 to 2007.

713.    While training at Red Cedar Gymnastics, Plaintiff Jane C16 Doe suffered from plantar fasciitis.

714.    Sometime in 2002, Plaintiff Jane C16 Doe was referred to Nassar for her foot injury by Red Cedar Gymnastics coaches or staff.

715. Plaintiff Jane C16 Doe suffers from an auto-inflammatory disease that affects her muscles and tendons called Cryopyrin-Associated Periodic Syndromes ("CAPS").

716. As a result of her CAPS, Plaintiff Jane C16 Doe was forced to take a break from gymnastics training from approximately 2003-2005.

717. In approximately 2007, Plaintiff Jane C16 Doe was forced to retire completely from gymnastics at approximately age 15 due to CAPS.

718. Despite her diagnosis, Plaintiff Jane C16 Doe remained active in other high school sports including swimming, diving, and cheerleading.

719. Plaintiff Jane C16 Doe knew of Nassar from her involvement in organized gymnastics and was referred to Nassar to obtain treatment for CAPS because of Nassar's employment, agency, or affiliation with USAG, MSU, and Twistars.

720. Plaintiff Jane C16 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

721. Plaintiff Jane C16 Doe treated with Nassar from approximately 2009 to 2016 at Nassar's office at the MSU Sports Medicine Clinic.

722. From approximately 2009 to 2016, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C16 Doe at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C16 Doe's consent or the consent of Plaintiff Jane C16 Doe's parents on approximately 50 different occasions during approximately a 6-year period.

723. From approximately 2009 to 2016, under the guise of treatment, Nassar rubbed Plaintiff Jane C16 Doe's breast, including in 2016 when Nassar groped Plaintiff Jane C16 Doe's breast, without the use of gloves and without Plaintiff Jane C16 Doe's consent or the consent of Plaintiff Jane C16 Doe's parents on approximately 50 different occasions during

approximately a 6-year period.

724. Plaintiff Jane C16 Doe was approximately 16 to 23 years old at the time of the assaults.

725. On at least one occasion, Plaintiff Jane C16 Doe noticed Nassar was aroused during one of the "treatments."

726. Plaintiff Jane C16 Doe's mother was physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff Jane C16 Doe in a manner such that her mother could not see the sexual assault.

727. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C16 Doe or from Jane C16 Doe's parents even though she was a minor at the time.

728. Plaintiff Jane C16 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

729. Plaintiff Jane C16 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

S.    JANE C17 DOE

730. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

731. Plaintiff Jane C17 Doe grew up in Wisconsin.

732. Plaintiff Jane C17 Doe began gymnastics training when she was about 6 years old.

733. At the age of 11, due to her aptitude and skill, Plaintiff Jane C17 Doe began gymnastics training at a gym in Madison, Wisconsin that would allow her to compete on a national level.

734. By the age of 13, Plaintiff Jane C17 Doe began seriously training for a spot on the 1996 Women's Olympic Gymnastics Team.

735. At the age of approximately 15, Plaintiff Jane C17 Doe began experiencing tremendous back pain and was diagnosed with fracture in one of the vertebrae in her back.

736. After her severe back injury, Plaintiff Jane C17 Doe trained for the Junior Level Olympics, a sanctioned competition by USAG.

737. In 1997, when Plaintiff Jane C17 Doe was approximately 18 years old, she competed at the Nationals meet for the Junior Level Olympics, which was a sanctioned competition by USAG.

738. The Nationals meet was held at Disney's ESPN Wide World of Sports Complex near Orlando, Florida.

739. During this competition, Plaintiff Jane C17 Doe's back injury flared up and caused her to seek medical treatment from the USAG-provided medical staff at the competition.

740. Nassar was the only doctor that was in the training room at the competition.

741. Nassar had Plaintiff Jane C17 Doe remove her leotard.

742. In approximately 1997, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C17 Doe at the Junior Olympics Nationals, USAG sanctioned event, by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C17 Doe's consent.

743. The alleged "treatment" lasted approximately 20-30 minutes.

744. Nassar did not use lotion or lubricant when he digitally penetrated Plaintiff Jane C17 Doe.

745. Plaintiff Jane C17 Doe's coach was physically present during the "treatment," but Nassar positioned Plaintiff Jane C17 Doe in a manner such that her coach could not see the sexual assault.

746. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Jane C17 Doe.

747. Plaintiff Jane C17 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

748. Plaintiff Jane C17 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

and molestation and for Defendant Nassar's pleasure and self-gratification.

**T.    JANE C18 DOE BY NEXT FRIEND JANE C19 DOE**

749.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

750.    In approximately 2010, Plaintiff Jane C18 Doe began gymnastics training at Twistars.

751.    Shortly after she started training at Twistars, Plaintiff Jane C18 Doe suffered a hamstring injury while engaging in gymnastics training at Twistars.

752.    Twistars instructed Plaintiff Jane C18 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C18 Doe's training sessions to provide medical treatment to gymnasts.

753.    Plaintiff Jane C18 Doe would also treat with Nassar at his office at MSU's Sports Medicine Clinic for medical treatment, which is located on MSU's East Lansing, Michigan campus.

754.    Plaintiff Jane C18 Doe also treated with Nassar in the basement of his home in Holt, Michigan.

755.    Plaintiff Jane C18 Doe treated with Nassar from approximately 2011 until 2014.

756.    From approximately 2011 to 2014, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C18 Doe in the back room at Twistars and at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C18 Doe's consent or the consent of Plaintiff Jane C18 Doe's parents.

757.    Plaintiff Jane C18 Doe was approximately 10 years old at the time of the first assault and is still a minor child.

758.    The assaults would typically last approximately 30 to 40 minutes.

759.    Jane C19 Doe was physically present during a significant number of the "treatments," but Nassar positioned Plaintiff Jane C18 Doe in a manner such that Plaintiff Jane C19 Doe could

not see the sexual assault.

760. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C18 Doe or from Jane C19 Doe.

761. During one of the "treatments," Plaintiff Jane C18 Doe indicated to Nassar that she was uncomfortable and did not like the "treatment." Nassar responded by saying, "I know," and proceeded forward with the assault anyway.

762. Plaintiff Jane C18 Doe and Jane C19 Doe did not treat or intend for Plaintiff Jane C18 Doe to treat with Defendant Nassar for OB/GYN issues.

763. Plaintiff Jane C18 Doe and Jane C19 Doe believe the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

### U.    JANE C20 DOE

764. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

765. Plaintiff Jane C20 Doe began participation in gymnastics at a very young age and trained at a prominent gymnastics gym in the Canton, Michigan area that is certified and/or affiliated with USAG.

766. Plaintiff Jane C20 Doe was a USAG member from approximately 2002 to 2012.

767. Plaintiff Jane C20 Doe attended various Meets and Invitational Meets at Twistars from approximately 2002 to 2012.

768. In approximately 2005, when Plaintiff Jane C20 Doe was approximately 10 years old, Plaintiff Jane C20 Doe first met Defendant Nassar, who would often be present at various USAG-sanctioned gymnastics meets.

769. Due to Defendant Nassar's prominence in gymnastics, his affiliation with USAG and MSU, Plaintiff Jane C20 Doe was referred to seek treatment with Defendant Nassar when she suffered various injuries during the course of her gymnastics training.

770. In approximately 2006, when Plaintiff Jane C20 Doe was about 11 years old, Plaintiff Jane C20 Doe suffered an injury during her gymnastics training that required medical treatment.

771. Plaintiff Jane C20 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus, which is about an hour drive from Plaintiff Jane C20 Doe's home.

772. Plaintiff Jane C20 Doe treated with Nassar for various injuries from approximately 2006 to 2016 at Nassar's office at the MSU Sports Medicine Clinic approximately 3 to 4 times a month.

773. From 2006 to 2016, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C20 Doe at his office at MSU, at Twistars Meets and Invitationals, and at Jenison Fieldhouse by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C20 Doe's consent or the consent of Plaintiff Jane C20 Doe's parents on approximately 300 different occasions.

774. Plaintiff Jane C20 Doe was approximately 11 to 21 years old at the time of the assaults.

775. During the majority of the assaults, Plaintiff Jane C20 Doe observed that Nassar was sexually aroused and could see him becoming visibly erect through his pants.

776. In approximately 2010, when Plaintiff Jane C20 Doe was 14 years old, she was forced to retire from gymnastics due to injuries. When Plaintiff Jane C20 Doe informed Defendant Nassar that she was retiring from gymnastics, she requested a referral to a physician who was closer to her home for continuing treatment. In response, Defendant Nassar indicated that he could make a referral to another physician but told Plaintiff Jane C20 Doe, "There's nobody who will care about you like I will."

777.   Plaintiff Jane C20 Doe's mother was physically present during at least one of the "treatments" at Defendant Nassar's office at MSU, but Defendant Nassar positioned Plaintiff Jane C20 Doe in a manner such that her mother could not see the sexual assault.

778.   Defendant Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C20 Doe or from Plaintiff Jane C20 Doe's parents even though she was a minor for a majority of the assaults.

779.   Plaintiff Jane C20 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

780.   Plaintiff Jane C20 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

## V.   JANE C21 DOE

781.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

782.   Plaintiff Jane C21 Doe was a gymnast who trained at Twistars from approximately 2002 to 2014.

783.   When Plaintiff Jane C21 Doe would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C21 Doe's training sessions to provide medical treatment to gymnasts.

784.   Plaintiff Jane C21 Doe also treated with Nassar at his office at MSU.

785.   Plaintiff Jane C21 Doe presented to Defendant Nassar with complaints of back pain suffered through her participation in gymnastics.

786.   In approximately November 2010, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C21 Doe by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without

Plaintiff's consent or the consent of Plaintiff's parents in the back room at Twistars.

787. In 2010, Plaintiff Jane C21 Doe was a minor, approximately 14 years old.

788. Defendant Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff Jane C21 Doe's vagina or genital area.

789. Plaintiff Jane C21 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

790. Plaintiff Jane C21 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**W.    JANE C22 DOE**

791. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

792. Plaintiff Jane C22 Doe grew up in the Lansing, Michigan area.

793. Plaintiff Jane C22 Doe was Twistars gymnast in approximately 2000.

794. Plaintiff Jane C22 Doe was a dancer for the then Children's Ballet Theater (the "Theater"), which is now known as the Capital Ballet Theater.

795. Nassar would be backstage during Plaintiff Jane C22 Doe's dance theater performances and would also come to the Theater to give workshops.

796. The Theater referred Plaintiff Jane C22 Doe to see Nassar for various injuries resulting from dance from approximately 2004 to 2010.

797. In approximately 2006, at the age of 10 or 11, Plaintiff Jane C22 Doe went to see Nassar for a dance injury.

798. Nassar massaged her back, buttocks, hips, and neck while manipulating her body on the examination table.

799. During the massage, Nassar had his leg up on the examination table and his eyes were closed.

800. While massaging her back, Nassar reached around her body and groped her chest and breast.

801. Plaintiff Jane C22 Doe's mother was physically present during this "treatment" at Nassar's office at MSU Sports Medicine Clinic, but Nassar positioned Plaintiff Jane C22 Doe in a manner such that her mother could not see the sexual assault.

802. In approximately 2014, Plaintiff Jane C22 Doe suffered a hip injury from dancing.

803. Plaintiff Jane C22 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic

804. In approximately 2014 when Plaintiff Jane C22 Doe was approximately 18 years old, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C22 Doe by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff Jane C22 Doe's consent.

805. The abuse lasted approximately 5 to 10 minutes.

806. Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff Jane C22 Doe's vagina, genital area, or breasts.

807. Plaintiff Jane C22 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

808. Plaintiff Jane C22 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

X. **JANE C23 DOE BY NEXT FRIEND JANE C24 DOE**

809. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

810. Plaintiff Jane C23 Doe began participation in gymnastics at a very young age.

811. Plaintiff Jane C23 Doe was a member of USAG from approximately 2008-2016.

812. Plaintiff Jane C23 Doe experienced immediate success as a young gymnast and was put on the elite path.

813.   Plaintiff Jane C23 Doe was a US National team member from approximately 2014-2015.

814.   Plaintiff Jane C23 Doe trained at the Karolyi Ranch approximately 7-8 times between the years of approximately 2013-2015 when she was approximately 9-11 years old.

815.   Plaintiff Jane C23 Doe trained as a gymnast at Twistars from approximately February 2015-December 2015.

816.   Twistars instructed Plaintiff Jane C23 Doe to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C23 Doe's training sessions to provide medical treatment to gymnasts.

817.   Plaintiff Jane C23 Doe would also treat with Nassar at his office at MSU's Sports Medicine Clinic for medical treatment, which is located on MSU's East Lansing, Michigan campus.

818.   Plaintiff Jane C23 Doe treated with Nassar from approximately 2014 until 2016.

819.   In approximately 2015, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C23 Doe in the back room at Twistars by touching and rubbing her genital area and digitally penetrating her anus without the use of gloves and without Plaintiff Jane C23 Doe's consent or the consent of Plaintiff Jane C23 Doe's parents.

820.   Plaintiff Jane C23 Doe was approximately 11years old at the time of the assault and is still a minor child.

821.   Jane C24 Doe was physically present during the "treatment," but Nassar positioned Plaintiff Jane C23 Doe in a manner such that Jane C24 Doe could not see the sexual assault.

822.   During the "treatment," Plaintiff Jane C23 Doe became uncomfortable and attempted to move her body away from Nassar, however, Nassar held onto Plaintiff Jane C23 Doe's buttocks aggressively to prevent her from moving.

823.   Plaintiff Jane C24 Doe was present during the "treatment" and the "treatment" concluded when Plaintiff Jane C24 Doe began to ask Nassar questions after seeing her daughter moving

uncomfortably.

824. Nassar then attempted to explain the "treatment" without going into specific detail.

825. Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C23 Doe or from Plaintiff Jane C24 Doe.

826. While Nassar was "treating" Plaintiff Jane C23 Doe, he failed to treat Plaintiff Jane C23 Doe's broken arm, which ultimately resulted in Plaintiff Jane C23 Doe seeking medical treatment for reconstructive surgery from the University of Michigan.

827. Plaintiff Jane C23 Doe and Jane C24 Doe did not treat or intend for Plaintiff Jane C23 Doe to treat with Nassar for OB/GYN issues.

828. Plaintiff Jane C23 Doe and Jane C24 Doe believe the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

829. Upon information and belief, Jane C24 Doe believes that Defendant Geddert has video cameras placed strategically throughout Twistars in every location except the back-room where medical "treatments" took place.

Y. **JANE C25 DOE**

830. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

831. In approximately 2000 or 2001, Plaintiff Jane C25 Doe experienced chronic back pain.

832. Due to her chronic back pain, one of Plaintiff Jane C25 Doe's colleagues suggested that she go to see Nassar at the MSU Sports Medicine Clinic.

833. Plaintiff Jane C25 Doe resided in the East Lansing, Michigan area and part of the reason that Plaintiff Jane C25 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level gymnasts.

834.  Plaintiff Jane C25 Doe sought treatment from Nassar at the MSU Sports Medicine Clinic, which at that time was in the same building at the Sparrow Michigan Athletic Club located at 2900 Hannah Boulevard, East Lansing, Michigan.

835.  In approximately 2000 or 2001, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C25 Doe by touching and rubbing her genital area without the use of gloves and without Plaintiff Jane C25 Doe's consent.

836.  Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C25 Doe.

837.  Plaintiff Jane C25 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

838.  After her appointment, Plaintiff Jane C25 Doe informed her physical therapist that something uncomfortable happened, however, her physical therapist informed her that, "he would not get his kicks off of you."

839.  Upon information and believe, the physical therapist was previously employed by Sparrow Hospital and is now employed by MSU.

840.  Plaintiffs Jane C25 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**Z.    JANE C26 DOE**

841.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

842.  Plaintiff Jane C26 Doe was a gymnast and member of USAG from approximately 2001 to 2008.

843.  Plaintiff Jane C26 attended various Meets, Invitational Meets, and Summer Camps at Twistars from approximately 2001 to 2008.

844.  Plaintiff Jane C26 Doe trained as a gymnast at Champions Gymnastics in Ann Arbor,

Michigan.

845.   In approximately 2007 or 2008 Plaintiff Jane C26 Doe suffered an injury to her leg and hip.

846.   When Plaintiff Jane C26 Doe suffered her injury, her coaches referred her to see Nassar.

847.   Plaintiff Jane C26 Doe sought medical treatment for her injury from Nassar at the MSU Sports Medicine Clinic in East Lansing, Michigan.

848.   In approximately 2007 or 2008, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C26 Doe by touching and rubbing her genital area and anus and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents at the MSU Sports Medicine Clinic.

849.   During this appointment, Plaintiff Jane C26 Doe was a minor, approximately 12 years old.

850.   Defendant Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff Jane C26 Doe's vagina or genital area.

851.   In approximately 2013, Plaintiff Jane C26 Doe was in her first year as a student at MSU.

852.   In approximately 2013, Plaintiff Jane C26 Doe intended to treat with Nassar spinal stenosis in her neck.

853.   Plaintiff Jane C26 Doe sought medical treatment from Nassar at the Suburban Ice Arena in East Lansing, Michigan.

854.   In approximately 2013, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C26 Doe by touching and rubbing her breast without Plaintiff's consent or the consent of Plaintiff's parents at the MSU Sports Medicine Clinic.

855.   Plaintiff Jane C26 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

856.   Plaintiff Jane C26 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

and molestation and for Defendant Nassar's pleasure and self-gratification.

**AA.    JANE C27 DOE**

857.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

858.    Plaintiff Jane C27 Doe participated in high school softball, wrestling, and weight lifting.

859.    In approximately 2010, Plaintiff Jane C27 Doe suffered a back injury.

860.    Plaintiff Jane C27 Doe was referred to see Nassar at the MSU Sports Medicine Clinic by her athletic trainer.

861.    Due to her background as a high school athlete, part of the reason that Plaintiff Jane C27 Doe went to see Nassar at the MSU Sports Medicine Clinic was because of Nassar's impressive resume and reputation in treating Olympic-level athletes.

862.    After Plaintiff Jane C27 Doe completed an initial evaluation at the MSU Sports Medicine Clinic, she was scheduled for an appointment with Nassar for treatment.

863.    From approximately 2010 to 2011, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C27 Doe by touching and rubbing her genital area and digitally penetrating her vagina and anus at his office at MSU without Plaintiff Jane C27 Doe's consent or the consent of Plaintiff Jane C27 Doe's parents on approximately ten separate occasions.

864.    During one of the first treatments, Nassar told Plaintiff Jane C10 Doe that he needed to insert his finger into her vagina and anus because there were pressure points inside of her that he needed to relieve.

865.    At one point in time, Nassar told Plaintiff Jane C27 Doe that he mostly treated gymnasts and did not treat many athletes that participated in the athletics Plaintiff Jane C27 Doe did and asked Plaintiff Jane C27 Doe to provide him a picture of her.

866.    As Nassar requested and because Nassar made her feel special, Plaintiff Jane C27 Doe gave

        Nassar a picture of herself in her wrestling uniform.

867.    Defendant Nassar did not give prior notice or obtain consent for digital penetration from

        Plaintiff Jane C27 Doe.

868.    Plaintiff Jane C27 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN

        issues.

869.    Plaintiff Jane C27 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

        and molestation and for Defendant Nassar's pleasure and self-gratification.

**BB.    JANE C28 DOE**

870.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous

        paragraphs.

871.    Plaintiff Jane C28 Doe suffers from chronic scoliosis.

872.    After completing a marathon in December 1998, Plaintiff Jane C28 Doe experienced back and

        muscle pain.

873.    Plaintiff Jane C28 Doe resided in the East Lansing, Michigan area and had heard of Nassar

        throughout the community.

874.    The reason that Plaintiff Jane C28 Doe went to see Nassar at the MSU Sports Medicine Clinic

        was because of Nassar's impressive resume and reputation in treating Olympic-level gymnasts.

875.    In 1999, Plaintiff Jane C28 Doe sought treatment from Nassar at the MSU Sports Medicine

        Clinic, which at that time was in the same building at the Sparrow Michigan Athletic Club

        located at 2900 Hannah Boulevard, East Lansing, Michigan.

876.    In approximately 1999, under the guise of treatment, Nassar sexually assaulted, battered,

        abused, and molested Plaintiff Jane C28 Doe by touching, rubbing, and patting her genital area

        and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C28

Doe's consent.

877. Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C28 Doe.

878. Plaintiff Jane C28 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

879. Plaintiffs Jane C28 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**CC.   JANE C29 DOE**

880. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

881. Plaintiff Jane C29 Doe began participation in gymnastics at a very young age.

882. Plaintiff Jane C29 Doe was a member of and trained at Twistars from approximately 2002 – 2008 or 2009.

883. Plaintiff Jane C29 Doe first met Nassar in approximately 2006 or 2007 at Twistars when Plaintiff Jane C29 Doe experienced a neck injury.

884. When Plaintiff Jane C29 Doe would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar, who would often be present at Twistars during Plaintiff Jane C29 Doe's training sessions to provide medical treatment to gymnasts.

885. Plaintiff Jane C29 Doe continued to see Nassar for various injuries while she was at Twistars until 2008 or 2009.

886. Plaintiff Jane C29 Doe retired from gymnastics in 2008 or 2009 and began her as a competitive cheerleader and member of the pom team.

887. In approximately 2010, when Plaintiff Jane C29 Doe was about 15 years old, Plaintiff Jane C29 Doe suffered stress fracture injuries in her hip and an injury to her hamstrings.

888.  Due to Plaintiff Jane C29 Doe's knowledge of Nassar from when she was at Twistars and because of Nassar's fame and reputation, Plaintiff Jane C29 Doe sought treatment from Nassar at the MSU Sports Medicine Clinic.

889.  In 2010, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C29 Doe at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C29 Doe's consent or the consent of Plaintiff Jane C29 Doe's parents.

890.  Plaintiff Jane C29 Doe's mother was physically present during some the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff Jane C29 Doe in a manner such that her mother could not see the sexual assault.

891.  Nassar made inappropriate sexual comments to Plaintiff Jane C29 Doe during her appointments such making comments about her vagina, including that "oh, you get so wet" and "when you go on the spring board for vaulting, do you pee a little because you get so wet?"

892.  Nassar also asked Plaintiff Jane C29 Doe if he could take pictures or videos of her during the procedures in order to show them at various conventions he taught at. Plaintiff Jane C29 Doe declined.

893.  Plaintiff Jane C29 Doe was often able to feel that Nassar was aroused because he would be pushed against her body as he performed the "treatments."

894.  Plaintiff Jane C29 Doe was approximately 15 years old at the time of the digital penetration assault.

895.  Nassar would also occasionally "like" or comment on pictures on Plaintiff Jane C29 Doe's Facebook account, as well as send her messages such as "Merry Christmas" or "Happy Birthday."

896.    Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C29 Doe or from Plaintiff Jane C29 Doe's parents even though she was a minor when Nassar digitally penetrated Plaintiff Jane C29 Doe.

897.    Plaintiff Jane C29 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

898.    Plaintiff Jane C29 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

## DD.    JANE C30 DOE

899.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

900.    Plaintiff Jane C30 Doe grew up in the Lansing, Michigan area and attended Holt High School.

901.    In 1999 while attending a gymnastics sports camp at MSU, Plaintiff Jane C30 Doe suffered an injury to her lower back.

902.    Plaintiff Jane C30 Doe's family physician, Defendant Shirley Robertson, referred Plaintiff Jane C30 Doe to Nassar.

903.    Based on the referral, Plaintiff Jane C30 Doe sought treatment with Nassar at his office at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

904.    Plaintiff Jane C30 Doe treated with Nassar from approximately 1999-2002 at Nassar's office at the MSU Sports Medicine Clinic and at Holt High School.

905.    From approximately 1999-2002, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C30 Doe at his office at MSU and in approximately 2000 at Holt High School by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C30 Doe's consent or the consent of Plaintiff Jane C30 Doe's parents.

906.    During one of Plaintiff Jane C30 Doe's appointments with Nassar, Nassar gave her a postcard

with signed autographs of Olympic gymnasts.

907.    Plaintiff Jane C30 Doe was approximately 15-18 years old at the time of the assaults.

908.    Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C30 Doe or from Plaintiff Jane C30 Doe's parents even though she was a minor at the time of the majority of the assaults.

909.    Plaintiff Jane C30 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

910.    Plaintiff Jane C30 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

EE.    **JANE C31 DOE**

911.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

912.    Plaintiff Jane C31 Doe began participation in gymnastics at a very young age.

913.    Plaintiff Jane C31 Doe was a member of and trained at Twistars from approximately 2002 to 2011.

914.    Plaintiff Jane C31 Doe was a member of USAG from approximately 2002 to 2011.

915.    Plaintiff Jane C31 Doe first met Nassar in approximately 2002 at Twistars.

916.    When Plaintiff Jane C31 Doe would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C31 Doe's training sessions to provide medical treatment to gymnasts.

917.    In approximately 2006, when Plaintiff Jane C31 Doe was about 10 years old, Plaintiff Jane C31 Doe suffered a back injury during her gymnastics training that required medical treatment.

918.    Plaintiff Jane C31 Doe treated with Nassar for various injuries from approximately 2006-2016 at Nassar's office at Twistars, the MSU Sports Medicine Clinic, and Jenison Fieldhouse on MSU's campus.

919. From approximately 2006 to 2016, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C31 Doe at Twistars, at his office at MSU, and at Jenison Fieldhouse by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C31 Doe's consent or the consent of Plaintiff Jane C31 Doe's parents on approximately 300 different occasions.

920. In 2016, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C31 Doe at his office at Sparrow Sports Medicine Practice, located 2900 Hannah Boulevard, Suite B-102, East Lansing Michigan, by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Plaintiff Jane C31 Doe's consent.

921. Nassar would often hug and rub Plaintiff Jane C31 Doe's back during the appointments, which Plaintiff Jane C31 Doe does not believe was for any medical purpose.

922. Plaintiff Jane C31 Doe was approximately 10 to 20 years old at the time of the assaults.

923. Plaintiff Jane C31 Doe's mother was physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff Jane C31 Doe in a manner such that her mother could not see the sexual assault.

924. Nassar would also occasionally "like" or comment on pictures on Plaintiff Jane C31 Doe's social media while she was a still a minor.

925. Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C31 Doe or from Plaintiff Jane C31 Doe's parents even though she was a minor for a majority of the assaults.

926. Plaintiff Jane C31 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

927. Plaintiff Jane C31 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

and molestation and for Defendant Nassar's pleasure and self-gratification.

FF.   **JANE C32 DOE**

928.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

929.   Plaintiff Jane C32 Doe began participation in gymnastics at a very young age.

930.   Plaintiff Jane C32 Doe drove two hours from her house in order to be a member and train at Twistars from approximately 2009 to 2014.

931.   Plaintiff Jane C32 Doe was also a member of USAG from approximately 2003 or 2004 to 2015.

932.   Plaintiff Jane C32 Doe was a successful gymnast and a Region 5 National Team Member from approximately 2011-2015.

933.   When Plaintiff Jane C32 Doe would suffer injuries during gymnastics training, Twistars instructed her to seek treatment with Nassar who would often be present at Twistars during Plaintiff Jane C32 Doe's training sessions to provide medical treatment to gymnasts.

934.   In approximately 2010, when Plaintiff Jane C32 Doe was about 10 years old, Plaintiff Jane C32 Doe suffered a hamstring injury during her gymnastics training that required medical treatment.

935.   From approximately 2010 to 2015, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C32 Doe at Twistars, at his office at MSU, and at his home by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves and without Plaintiff Jane C32 Doe's consent or the consent of Plaintiff Jane C32 Doe's parents.

936.   In 2011, Plaintiff Jane C32 Doe sought treatment from Nassar for a leg injury.

937.   Nassar informed Plaintiff Jane C32 Doe that her leg was not broken, it had calcification, and

required massages.

938. These massages included Nassar sexually assaulting, battering, abusing, and molesting Plaintiff Jane C32 Doe by touching and rubbing her genital area and digitally penetrating her vagina.

939. Plaintiff Jane C32 Doe's leg did not get better and she later discovered through a visit to the Emergency Room that Nassar had misdiagnosed her leg as her leg was broken.

940. Nassar would often hug Jane C32 Doe, rub her back, and rub and crack her feet and toes during the appointments, which Plaintiff Jane C32 Doe does not believe these actions were for medical purposes.

941. Plaintiff Jane C32 Doe was approximately 12 to 17 years old at the time of the sexual assaults.

942. Nassar gave Plaintiff Jane C32 Doe gifts such as an Olympic shirt, three Chinese magnetic healing balls, and a "care package" containing items from the 1996 Olympics. The "care package" was sent to Plaintiff Jane C32 Doe's home in Ohio.

943. Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C32 Doe or from Plaintiff Jane C32 Doe's parents even though she was a minor for a majority of the assaults.

944. Plaintiff Jane C32 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN issues.

945. Plaintiff Jane C32 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**GG.** **JANE C33 DOE**

946. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

947. Plaintiff Jane C33 Doe began participation in gymnastics at a very young age.

948. Plaintiff Jane C33 Doe was a member of USAG from approximately 1999 – 2011.

949.    Plaintiff Jane C33 Doe was a successful gymnast and obtained a scholarship to compete at
        Michigan State University as a gymnast.

950.    When Plaintiff Jane C33 Doe would suffer injuries or required medical attention while a
        student-athlete at Michigan State University, she was instructed by her coaches and trainers to
        seek medical treatment from Nassar.

951.    In approximately 2015, Plaintiff Jane C33 Doe suffered an injury to her shoulder.

952.    Plaintiff Jane C33 Doe treated with Nassar for her shoulder injury from approximately 2015-
        2016 at Nassar's office at the MSU Sports Medicine Clinic and Jenison Fieldhouse on MSU's
        campus.

953.    From approximately 2015 to 2016, under the guise of treatment, Nassar sexually assaulted,
        battered, abused, and molested Plaintiff Jane C33 Doe at his office at MSU and at Jenison
        Fieldhouse by touching and rubbing her genital area, groping and massaging Plaintiff Jane C33
        Doe's breasts, and by performing acupuncture near or around Plaintiff Jane C33 Doe's genital
        area.

954.    Nassar touched Plaintiff Jane C33 Doe in her genital area without the use of gloves, without
        Plaintiff Jane C33 Doe's consent, and without providing Jane C33 Doe prior explanation.

955.    While Plaintiff Jane C33 Doe was receiving acupuncture in her groin and genital area and while
        being completely exposed, Defendant Nassar asked to take a picture of Plaintiff Jane C33 Doe;
        however, Plaintiff Jane C33 Doe denied Nassar's request.

956.    Plaintiff Jane C33 Doe did not treat or intend to treat with Defendant Nassar for OB/GYN
        issues.

957.    Plaintiff Jane C33 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,
        and molestation and for Defendant Nassar's pleasure and self-gratification.

HH.    **JANE C34 DOE**

958.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

959.   Plaintiff Jane C34 Doe was a Michigan high school athlete that participated in basketball and trap shooting.

960.   Plaintiff Jane C34 Doe suffered from severe foot pain.

961.   After seeing numerous doctors, Plaintiff Jane C34 Doe was referred to see Nassar in approximately 2005.

962.   During her first appointment with Nassar, Nassar informed Jane C34 Doe that he believed her foot pain was due to hips not being properly aligned.

963.   Nassar would massage Plaintiff Jane C34 Doe's lower back and move downwards toward her buttocks. Nassar would then put his hands on Plaintiff Jane C34 Doe's genital area and digitally penetrate Plaintiff Jane C34 Doe's vagina.

964.   From approximately 2005 to 2006, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C34 Doe by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff Jane C34 Doe's consent or the consent of Plaintiff Jane C35 Doe's parents.

965.   Plaintiff Jane C34 Doe was a minor for the majority of the time of when these assaults took place, as she did not reach the age of majority until 2006.

966.   From 2005 to 2006, Plaintiff Jane C34 Doe was assaulted by Nassar approximately on approximately ten separate occasions at the MSU Sports Medicine Clinic located in East Lansing, Michigan on MSU's campus.

967.   Plaintiff Jane C34 Doe did not treat or intend to treat with Defendant Nassar for issues related to obstetrics or gynecology (hereinafter "OB/GYN").

968.   Plaintiff Jane C34 Doe believes the conduct by Defendant Nassar was sexual assault, abuse,

and molestation and for Defendant Nassar's pleasure and self-gratification.

## II.    JANE C35 DOE

969.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

970.    Plaintiff Jane C35 Doe grew up in the Lansing, Michigan area.

971.    Jane C35 Doe was a gymnast and member of Great Lakes Gymnastics from approximately 1985 to 1992.

972.    Jane C35 Doe was a member of the United States Gymnastics Federation ("USGF") from approximately 1985 to 1992.

973.    Upon information and belief, USGF was the national governing body for gymnastics prior to USAG.

974.    Defendant Geddert was a coach at Great Lakes Gymnastics and was Jane C35 Doe's coach for the majority of the time she was a member of Great Lakes Gymnastics.

975.    Jane C35 Doe began treating with Nassar in approximately 1988 at Great Lakes Gymnastics.

976.    Jane C35 Doe treated with Nassar for a variety of injuries.

977.    From approximately 1988 to 1991, Jane C35 Doe treated with Nassar approximately twice a day for three to four days a week.

978.    Nassar would often undress or "help" Jane C35 Doe dress in order to better "treat" Jane C35 Doe's injuries.

979.    From approximately 1988 to 1991, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Jane C35 Doe by touching and rubbing her breasts, touching and rubbing her genital area, and digitally penetrating her vagina and anus without the use of gloves or lubricant and without Jane C35 Doe's consent or the consent of Jane C35 Doe's parents at Great Lakes Gymnastics.

980. On more than one occasion, Jane C35 Doe believes that Nassar experienced an orgasm while allegedly treating Jane C35 Doe.

981. Jane C35 Doe estimates that she was assaulted and abused by Defendant Nassar on approximately 1,148 separate occasions over a three-year period.

982. From 1988 to 1991, Jane C35 Doe was a minor, approximately 14 to 17 years old.

983. Nassar did not give prior notice or obtain consent for digital penetration or to touch Jane C35 Doe's breasts, vagina, anus or genital area.

984. Jane C35 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

985. Jane C35 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

## JJ. JANE C36 DOE

986. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

987. Plaintiff Jane C36 Doe began participation in gymnastics at a very young age.

988. Jane C36 Doe was a member of USAG from approximately 2004 or 2005 to 2014 as a gymnast.

989. Jane C36 Doe is currently a member of USAG as a coach and has been since approximately 2015.

990. Jane C36 Doe previously trained at Alpine Gymnastics and Rising Star Gymnastics in Grand Rapids, Michigan.

991. Jane C36 Doe first met Nassar in approximately 2009 at Holt High School in Holt, Michigan for a USAG State Meet after Jane C36 Doe obtained an injury during the meet.

992. Nassar recommended that Jane C36 Doe continue to seek treatment with him at his office at MSU.

993. Jane C36 Doe continued to see Nassar for various injuries at his office at MSU from

approximately 2009 to 2012.

994. Jane C36 Doe also saw Nassar at Twistars Invitational Meets from approximately 2009 to 2012.

995. Jane C36 Doe sought treatment from Nassar for ankle, high hamstring, hip, and back injuries.

996. From 2009 to 2012, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Jane C36 Doe at his office at MSU and at Twistars Invitational Meets by touching and rubbing her genital area and digitally penetrating her vagina and anus without the use of gloves and without Jane C36 Doe's consent or the consent of Jane C36 Doe's parents.

997. From approximately 2009 to 2012, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Jane C36 Doe at his office at MSU by performing acupuncture on her breasts.

998. Jane C36 Doe's mother was physically present during the "treatments" at Nassar's office at MSU, but Nassar positioned himself and Jane C36 Doe in a manner such that her mother could not see the sexual assault.

999. Nassar would often have his eyes closed while performing the alleged treatment on Jane C36 Doe.

1000. From 2009 to 2012 Jane C36 Doe was a minor and was approximately 13 or 14 to 16 years old.

1001. Nassar would also occasionally "like" or comment on pictures on Jane C36 Doe's Facebook account, which included comments such as "very pretty" or "beautiful."

1002. Nassar also gave Jane C36 Doe gifts such as an Olympic bag, Olympic pins, Olympic pictures, and other various items Nassar had from the Olympics.

1003. Nassar did not give prior notice or obtain consent for digital penetration from Jane C36 Doe

or from Jane C36 Doe's parents even though she was a minor when Nassar digitally penetrated her.

1004.   Jane C36 Doe did not treat or intend to treat with Nassar for OB/GYN issues.

1005.   Jane C36 Doe believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

**KK.   JANE C37 DOE BY NEXT FRIEND JANE C38 DOE**

1006.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1007.   Plaintiff Jane C37 Doe began participation in gymnastics at a very young age.

1008.   Plaintiff Jane C37 Doe was a member of Twistars from approximately 2010 to 2017.

1009.   Plaintiff Jane C37 Doe was a member of USAG from approximately 2010 to 2017.

1010.   Plaintiff Jane C37 Doe still participates in gymnastics through her high school.

1011.   Shortly after she started training at Twistars, Plaintiff Jane C37 Doe suffered various injuries while engaging in gymnastics training at Twistars.

1012.   Plaintiff Jane C37 Doe to sought treatment with Dr. Brooke Lemmen and Nassar who would often be present at Twistars during Plaintiff Jane C37 Doe's training sessions to provide medical treatment to gymnasts.

1013.   Plaintiff Jane C37 Doe would also treat with Nassar at his office at MSU's Sports Medicine Clinic for medical treatment, which is located on MSU's East Lansing, Michigan campus.

1014.   Plaintiff Jane C37 Doe treated with Nassar from approximately 2011 or 2012 until 2016 at the back room at Twistars and at Nassar's office at MSU.

1015.   From approximately 2013 to 2016, under the guise of treatment, Nassar sexually assaulted, battered, abused, and molested Plaintiff Jane C37 Doe in the back room at Twistars and at his office at MSU by touching and rubbing her genital area and digitally penetrating her vagina

without the use of gloves and without Plaintiff Jane C37 Doe's consent or the consent of Plaintiff Jane C37 Doe's parents.

1016. Plaintiff Jane C37 Doe was approximately 11 years old at the time of the first assault and is still a minor child.

1017. The assaults would typically last approximately 15 to 20 minutes.

1018. While assaulting Jane C37 Doe, Nassar would often make comments about her pelvis and made comments to the effect that he had her whole pelvis bone in his hand.

1019. Jane C37 Doe's mother or father was physically present during at least one of the "treatments" at Nassar's office at MSU, but Nassar positioned Plaintiff in a manner such that Jane C37 Doe's mother and father could not see the sexual assault.

1020. Defendant Nassar did not give prior notice or obtain consent for digital penetration from Plaintiff Jane C37 Doe or from Jane C37 Doe's parents.

1021. Plaintiff Jane C38 Doe saw Nassar have an erection during one of Jane C37 Doe's appointments.

1022. Nassar would also occasionally "like" pictures on Jane C37 Doe's Instagram account.

1023. Nassar would also occasionally "like" or comment on pictures of Jane C37 Doe on Jane C38 Doe's Facebook account.

1024. Plaintiff Jane C37 Doe and Jane C38 Doe did not treat or intend for Plaintiff Jane C37 Doe to treat with Defendant Nassar for OB/GYN issues.

1025. Plaintiff Jane C37 Doe and Jane C38 Doe believe the conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification.

## VI.    FRAUDULENT CONCEALMENT

1026. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1027. Because of the relationship between Plaintiffs and Defendants, Defendants had an obligation and duty under the law not to hide material facts and information about Defendant Nassar's past, and his deviant sexual behavior and propensities.

1028. Additionally, Defendants had an affirmative duty to inform, warn, and institute appropriate protective measures to safeguard minor s who were reasonably likely to come in contact with Defendant Nassar, including Plaintiffs.

1029. Defendants' willful failure to notify, give adequate warning, and implement appropriate safeguard amounts to fraud under the circumstances.

A.  **DEFENDANT USA GYMNASTICS**

1030. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1031. Plaintiffs had a special and fiduciary relationship with Defendant USAG by virtue of being dues paying members with Defendant USAG.

1032. Plaintiffs were often under the direct supervision and control of USAG or its agents and were in fact *in loco parentis* with USAG while receiving "treatment" from Defendant Nassar.

1033. Oftentimes while training (including training at the Karolyi Ranch, a USAG sponsored program and sanctioned facility), and while competing at USAG sanctioned events Plaintiffs were away from their parents and under the complete care, custody, and control of USAG.

1034. Given the special and fiduciary relationship between Plaintiffs and Defendant USAG, Defendant USAG had an affirmative duty to disclose, and to warn and protect their members who sought Defendant Nassar's medical treatment from sexual abuse, assault, and molestation.

1035. Plaintiffs were minors or young adults who trusted Defendant USAG who recommended Defendant Nassar to provide them with medical services and who also possessed sensitive and confidential information about their health.

1036. Plaintiffs incorporate by reference the Fraud claims made below and hereby allege that Defendant USAG committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant USAG at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiffs involving a past or existing fact by:

   a.   making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

   b.   making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

   c.   making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

   d.   making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

   e.   making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

   f.   making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

   g.   making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or

shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1037. The material representation(s) to Plaintiffs by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

1038. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist;

1039. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a. Would believe that the "treatments" were in fact "treatments;"

b. Would believe that the "treatment[s]" were proper, appropriate, and legitimate;

c. Would not believe that they had been sexually assaulted;

d. Should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

e. Would continue the "treatment[s]" so that he could continue to sexually assault them;

f. Would not question and/or report the conduct to appropriate authorities; and,

g. Would not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant USAG.

1040. Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

a. Reasonably believed that the "treatments" were in fact "treatments;"

b. Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c. Reasonably did not believe that they had been sexually assaulted;

    d.        Believed that they should continue the "treatment[s];"

    e.        Did not believe that they should question and/or report the conduct to appropriate authorities; and did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant USAG.

1041.  Plaintiffs thereby suffered injury, in that Plaintiffs:

    a.        Could not stop the sexual assault;

    b.        Continued to undergo the "treatment[s]" and sexual assaults; and,

    c.        Suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

1042.  Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

    a.        Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.  Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.  Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.  Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  Making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.  Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  Making a statement, explaining to Plaintiffs and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1043.  Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.  Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.  Dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

c.  Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

     d.     Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

     e.     Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

     f.     Gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

1044.   By failing to inform its members of the allegations surrounding Defendant Nassar which led to his separation from USAG, Defendant USAG suppressed Plaintiffs' discovery of a cause of action.

1045.   Defendant USAG's fiduciary relationships with its members creates a duty to inform them of prior complaints of sexual abuse by Defendant Nassar, including the reports to Defendant USAG's agent, Defendant Geddert as early as 1998.

1046.   In or around 2010, Defendant Geddert witnessed a gymnast who was approximately 15 years old being sexual assaulted by Defendant Nassar.[107]

1047.   Upon witnessing the sexual assault, Defendant Geddert made a joke and made a statement to the gymnast to effect of: "I guess your back really did hurt."[108]

1048.   In or around 2010, Defendant Geddert served in a leadership role with Defendant USAG

---

[107] Testimony given on May 12, 2017 at the Preliminary Examination hearing in *People v. Nassar*, Case No. 17-318-FY.

[108] *Id.*

notably as a USAG coach representing Team USA in national and international USAG competitions and on the Junior Olympic Program Committee.

1049.   In or around 2011, Defendant Geddert was traveling in a vehicle with members of the USAG Senior National Team, including Aly Raisman.[109]

1050.   At the time, Defendant Geddert was serving in his capacity as a USAG Olympic Coach.[110]

1051.   Ms. Raisman indicated she and her teammates would talk about Defendant Nassar's conduct amongst themselves.[111]

1052.   While traveling together, in Defendant Geddert's presence, one of Ms. Raisman's teammates described "in graphic detail" what Defendant Nassar had done to her the prior evening.[112]

1053.   Ms. Raisman stated Defendant Geddert did not question her or her teammate about the statements made.

1054.   Again, in or around 2011, Defendant Geddert served in a leadership role with Defendant USAG notably as a USAG coach representing Team USA in national and international USAG competitions and on the Junior Olympic Program Committee.

1055.   As early as 2010, through Defendant Geddert, Defendant USAG had notice of Defendant Nassar's misconduct and propensity to sexually abuse and assault girls and young women.

1056.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

---

[109] Raisman says Olympics coach might have known about Nassar abuse for years, Saba Hamedy, available at https://www.cnn.com/2018/02/08/politics/aly-raisman-coach-allegations/index.html. Last accessed Feb. 8, 2018.
[110] *Id.*
[111] *Id.*
[112] *Id.*

1057. At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant USAG and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant USAG.

1058. At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### B.   DEFENDANTS TWISTARS AND JOHN GEDDERT

1059. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1060. Plaintiffs had a special and fiduciary relationship with Defendants Twistars and Geddert by virtue of being dues paying members with Defendant Twistars.

1061. Plaintiffs were often under the direct supervision and control of Twistars or its agents and were in fact *in loco parentis* with Twistars while receiving "treatment" from Defendant Nassar.

1062. Oftentimes while training and while competing for Defendants Twistars and Geddert at Twistars events (also USAG sanctioned events) Plaintiffs were away from their parents and under the complete care, custody, and control of Defendants Twistars and Geddert.

1063. Given the special and fiduciary relationship between Plaintiffs and Defendants Twistars and Geddert, Defendants Twistars and Geddert had an affirmative duty to disclose, and to warn and protect their members who sought Defendant Nassar's medical treatment from sexual abuse, assault, and molestation.

1064. Plaintiffs were minors or young adults who trusted Defendants Twistars and Geddert who recommended Defendant Nassar to provide them with medical services and who also possessed sensitive and confidential information about their health.

1065. Plaintiffs incorporate by reference the Fraud claims made below and hereby allege that Defendant Twistars committed Fraudulent Concealment by committing Fraud, as described

in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant Twistars at the time his sexual assaults occurred by Defendant Nassar making material representation(s) to Plaintiffs involving a past or existing fact by:

a.  making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.  making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.  making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.  making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.  making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place when it was not and while he was digitally penetrating Plaintiffs, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1066.  The material representation(s) to Plaintiffs by Defendant Nassar were false in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

1067. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

1068. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs such that Plaintiffs should:

   a.    believe that the "treatments" were in fact "treatments," should believe that the "treatment[s]" were proper, appropriate, and legitimate;

   b.    not believe that they had been sexually assaulted so that Defendant Nassar could prevent discovery of his sexual assaults;

   c.    continue the "treatment[s]" so that Defendant Nassar could continue to sexually assault them;

   d.    not question and/or report the conduct to appropriate authorities; and,

   e.    not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar, Defendant USAG, and/or Defendant Twistars.

1069. Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

   a.    reasonably believed that the "treatments" were in fact "treatments;"

   b.    reasonably believed that the "treatments" were proper, appropriate, and legitimate;

   c.    reasonably did not believe that they had been sexually assaulted;

   d.    believed that they should continue the "treatment[s];"

   e.    did not believe that they should question and/or report the conduct to appropriate authorities; and,

f.　did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar, Defendant USAG, and/or Defendant Twistars.

1070.　Plaintiffs thereby suffered injury, in that Plaintiffs could not stop the sexual assault; continued to undergo the "treatment[s]" and sexual assaults; and suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

1071.　Defendant Nassar concealing the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.　making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.　making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.　making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.　making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.  making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1072.  Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.  positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.  dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

c.  prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.  did not abide by or follow the standard of care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.  did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk

Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver;

f. did not abide by or follow Defendant Twistars' Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

g. gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

1073. In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert, the owner and operator of Defendant Twistars, regarding Defendant Nassar's conduct alleging sexual abuse, assault, and molestation.

1074. When Defendant Geddert received the 1998 complaint from the parent, Defendant John Geddert was the owner and operator of Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA and also an agent of Defendant USAG.

1075. Also, in or around 1998, after being assaulted at Twistars Plaintiff Jane A71 Doe, at approximately 12 years old, told a coach at Twistars, Defendant Nassar was being inappropriate and doing inappropriate things.

1076. To the best of Plaintiff Jane A71 Doe's knowledge, belief, and understanding, the coach at Twistars took absolutely no steps to investigate or report Defendant Nassar's conduct.

1077. In or around 2010, Defendant Geddert witnessed a gymnast who was approximately 15 years

old being sexual assaulted by Defendant Nassar.[113]

1078.  Upon witnessing the sexual assault, Defendant Geddert made a joke and made a statement to the gymnast to effect of: "I guess your back really did hurt."[114]

1079.  In or around 2010, Defendant Geddert was owner and operator of Defendant Twistars.

1080.  In or around 2011, Defendant Geddert was traveling in a vehicle with members of the USAG Senior National Team, including Aly Raisman.[115]

1081.  At the time, Defendant Geddert was serving in his capacity as a USAG Olympic Coach.[116]

1082.  Ms. Raisman indicated she and her teammates would talk about Defendant Nassar's conduct amongst themselves.[117]

1083.  While traveling together, in Defendant Geddert's presence, one of Ms. Raisman's teammates described "in graphic detail" what Defendant Nassar had done to her the prior evening.[118]

1084.  Ms. Raisman stated Defendant Geddert did not question her or her teammate about the statements made.

1085.  Again, in or around 2011, Defendant Geddert was owner and operator of Defendant Twistars.

1086.  As early as 1998, Defendant Twistars through their owner and operator Defendant Geddert had notice of Defendant Nassar's misconduct and propensity to sexually abuse and assault girls and young women.

1087.  By failing to inform its members of the allegations surrounding Defendant Nassar, Defendants Twistars and Geddert suppressed Plaintiffs' discovery of a cause of action.

---

[113] Testimony given on May 12, 2017 at the Preliminary Examination hearing in *People v. Nassar*, Case No. 17-318-FY.
[114] *Id.*
[115] Raisman says Olympics coach might have known about Nassar abuse for years, Saba Hamedy, available at https://www.cnn.com/2018/02/08/politics/aly-raisman-coach-allegations/index.html. Last accessed Feb. 8, 2018.
[116] *Id.*
[117] *Id.*
[118] *Id.*

1088.  Defendant Twistars and Geddert's fiduciary relationships with its members creates a duty to inform them of prior complaints of sexual abuse by Defendant Nassar, including the reports made directly to Defendant Geddert and an agent of Defendant Twistars in or around 1998.

1089.  The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

1090.  At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant Twistars and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant Twistars.

1091.  At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

C.      **DEFENDANT UNITED STATES OLYMPIC COMMITTEE**

1092.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1093.  Plaintiffs had a special and fiduciary relationship with Defendant USOC by virtue of being dues paying members with Defendant USOC.

1094.  Plaintiffs were often under the direct supervision and control of USOC or its agents and were in fact *in loco parentis* with USOC while receiving "treatment" from Defendant Nassar.

1095.  Oftentimes while training (including training at the Karolyi Ranch, a USOC sponsored program and sanctioned facility), and while competing at USOC sanctioned events Plaintiffs were away from their parents and under the complete care, custody, and control of USOC.

1096.  Given the special and fiduciary relationship between Plaintiffs and Defendant USOC, Defendant USOC had an affirmative duty to disclose, and to warn and protect their members who sought Defendant Nassar's medical treatment from sexual abuse, assault, and molestation.

1097. Plaintiffs were minors or young adults who trusted Defendant USOC who recommended Defendant Nassar to provide them with medical services and who also possessed sensitive and confidential information about their health.

1098. Plaintiffs incorporate by reference the Fraud claims made below and hereby allege that Defendant USOC committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant USOC at the time his sexual assaults occurred by Defendant Nassar (as Defendant USOC's employee or agent) making a material representation(s) to Plaintiffs involving a past or existing fact by:

   a.   making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

   b.   making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

   c.   making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

   d.   making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

   e.   making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

   f.   making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

   g.   making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly

after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1099. The material representation(s) to Plaintiffs by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

1100. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist;

1101. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.      would believe that the "treatments" were in fact "treatments;"

b.      would believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.      would not believe that they had been sexually assaulted;

d.      should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

e.      would continue the "treatment[s]" so that he could continue to sexually assault them;

f.      would not question and/or report the conduct to appropriate authorities; and,

g.      would not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant USOC.

1102. Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

a.      reasonably believed that the "treatments" were in fact "treatments;"

b.      reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.      reasonably did not believe that they had been sexually assaulted;

d.      believed that they should continue the "treatment[s];"

135

e.     did not believe that they should question and/or report the conduct to appropriate authorities; and did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant USOC.

1103.   Plaintiffs thereby suffered injury, in that Plaintiffs:

a.     could not stop the sexual assault;

b.     continued to undergo the "treatment[s]" and sexual assaults; and,

c.     suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

1104.   Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.     making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.     making the statement, referring to his conduct, disguised as "treatment," as a pelvic

adjustment;

c.      making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.      making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.      making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.      making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.      making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1105.   Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.      positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;,

b.      dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

c.      prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.      did not abide by or follow the standard and care which requires another medical

professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.    did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f.    gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

1106.   By failing to inform its members of the allegations surrounding Defendant Nassar which led to his separation from USAG, Defendant USOC suppressed Plaintiffs' discovery of a cause of action.

1107.   Defendant USOC's fiduciary relationships with its members creates a duty to inform them of prior complaints of sexual abuse by Defendant Nassar, including the reports to Defendant USAG's agent, Defendant Geddert as early as 1998.

1108.   In or around 2010, Defendant Geddert witnessed a gymnast who was approximately 15 years old being sexual assaulted by Defendant Nassar.[119]

1109.   Upon witnessing the sexual assault, Defendant Geddert made a joke and made a statement to the gymnast to effect of: "I guess your back really did hurt."[120]

1110.   In or around 2010, Defendant Geddert served in a leadership role with Defendant USAG notably as a USAG coach representing Team USA in national and international USAG

---

[119] Testimony given on May 12, 2017 at the Preliminary Examination hearing in *People v. Nassar*, Case No. 17-318-FY.
[120] *Id.*

competitions and on the Junior Olympic Program Committee.

1111.   In or around 2011, Defendant Geddert was traveling in a vehicle with members of the USAG Senior National Team, including Aly Raisman.[121]

1112.   At the time, Defendant Geddert was serving in his capacity as a USAG Olympic Coach.[122]

1113.   Ms. Raisman indicated she and her teammates would talk about Defendant Nassar's conduct amongst themselves.[123]

1114.   While traveling together, in Defendant Geddert's presence, one of Ms. Raisman's teammates described "in graphic detail" what Defendant Nassar had done to her the prior evening.[124]

1115.   Ms. Raisman stated Defendant Geddert did not question her or her teammate about the statements made.

1116.   Again, in or around 2011, Defendant Geddert served in a leadership role with Defendant USAG notably as a USAG coach representing Team USA in national and international USAG competitions and on the Junior Olympic Program Committee.

1117.   As early as 2010, through Defendant Geddert, Defendant USOC had notice of Defendant Nassar's misconduct and propensity to sexually abuse and assault girls and young women.

1118.   The actions and inactions of Defendants USOC, USAG, Nassar, and Geddert, as described in the preceding paragraphs, constituted Fraudulent Concealment.

1119.   At all times pertinent to this action, Defendants Nassar and Geddert were agents, apparent agents, servants, and employees of Defendant USOC and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendant USOC.

---

[121] Raisman says Olympics coach might have known about Nassar abuse for years, Saba Hamedy, available at https://www.cnn.com/2018/02/08/politics/aly-raisman-coach-allegations/index.html. Last accessed Feb. 8, 2018.
[122] *Id.*
[123] *Id.*
[124] *Id.*

At all material times, Plaintiffs were entirely free of any negligence contributing to the injuries and damages alleged.

## VII. CLAIMS AGAINST USA GYMNASTICS

1120. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1121. Defendant USAG owed Plaintiffs Lemke, Chester, Smith, Jane C1 Doe, Jane C2 Doe, Jane C4 Doe, Jane C5 Doe, Jane C8 Doe, Jane C11 Doe, Jane C13 Doe, Jane C14 Doe, Jane C15 Doe, Jane C16 Doe, Jane C17 Doe, Jane C18 Doe, Jane C20 Doe, Jane C21 Doe, Jane C22 Doe, Jane C23 Doe, Jane C26 Doe, Jane C29 Doe, Jane C31 Doe, Jane C32 Doe, Jane C33 Doe, Jane C35 Doe, Jane C36 Doe, and Jane C37 Doe, and all other Plaintiffs that were members of Defendant USAG, who participated in USAG sanctioned events, or participated at USAG club gyms a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

1122. The above referenced Plaintiffs will collectively be referred to hereinafter as "the USAG Plaintiffs."

### D. COUNT ONE

### GROSS NEGLIGENCE
### ALL USAG PLAINTIFFS
### AGAINST DEFENDANT USAG AND DEFENDANT NASSAR

1123. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1124. Defendant USAG owed the USAG Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

1125. The above-named Plaintiffs are or were members of USAG, participated in USAG sanctioned

events, or were knowledgeable of and in some cases referred to Defendant Nassar through USAG affiliations.

1126. Defendant Nassar owed the USAG Plaintiffs a duty to use due care in his capacity as an employee, representative, and/or agent of Defendant USAG.

1127. By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special, confidential, and fiduciary relationship between the USAG Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

1128. Defendant USAG's failure to adequately supervise Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the USAG Plaintiffs.

1129. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs under the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant USAG was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the USAG Plaintiffs.

1130. Defendant USAG's conduct demonstrated a willful disregard for necessary precautions to reasonably protect the USAG Plaintiffs' safety.

1131. Defendant USAG's conduct as described above, demonstrated a willful disregard for substantial risks to the USAG Plaintiffs.

1132. Defendant USAG breached its duties owed to the USAG Plaintiffs and was grossly negligent when they conducted themselves by actions described above, including but not limited to their failure to notify MSU about the reasons for Nassar's separation from USAG and more broadly the issues surrounding sexual abuse in gymnastics and warning signs and reporting requirements. Said acts were committed with reckless disregard for the USAG Plaintiffs' health, safety,

Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

1133.    As a direct and/or proximate result of Defendant USAG'S actions and/or inactions, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

E.    **COUNT TWO**

**NEGLIGENCE**
**ALL USAG PLAINTIFFS**
**AGAINST DEFENDANT USAG AND DEFENDANT NASSAR**

1134.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1135.    Defendant USAG owed the USAG Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while being treated by their employees, representatives, and agents.

1136.    The USAG Plaintiffs as members of Defendant USAG had a reasonable expectation that Defendant USAG was recommending competent and ethical physicians and trainers for medical treatment who would carry out said treatment without sexual assault, abuse, and molestation.

1137.    By being members of USAG and seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special,

confidential, and fiduciary relationship between the USAG Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing the aforementioned Plaintiffs a duty to use ordinary care.

1138. Defendant Nassar owed the USAG Plaintiffs a duty of ordinary care in carrying out medical treatment.

1139. Defendant USAG's failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

1140. Defendant USAG's failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

1141. Defendant USAG's failure to inform the USAG Plaintiffs and the public of the allegations and concerns leading to Defendant Nassar's separation from USAG was a breach of ordinary care.

1142. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting the USAG Plaintiffs was a breach of the duty to use ordinary care.

1143. As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

F. **COUNT THREE**

**VICARIOUS LIABILITY**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1144.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1145.   Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

1146.   Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

1147.   Defendant USAG's website contains sites portraying Defendant Nassar as the recipient of distinguished awards and boasts him as having been "instrumental" to the success of USA gymnastics.[136]

1148.   Defendant USAG employed and/or held Defendant Nassar out to be its agent and/or representative from approximately 1986 to 2015.

1149.   Defendant USAG is vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, or agency with Defendant USAG and while he had unfettered access to young female athletes.

1150.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing the USAG Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and

---

[136] For example, *see*, https://usagym.org/pages/post.html?PostID=14677&prog=h.

continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**G.   COUNT FOUR**

**EXPRESS/IMPLIED AGENCY**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1151.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1152.   An agent is a person who is authorized by another to act on its behalf.

1153.   Defendant USAG intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

1154.   On the basis of those representations, Plaintiffs reasonably believed Defendant Nassar was acting as an employee, agent, and/or representation of Defendant USAG.

1155.   The USAG Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above carried out through his employment, agency, and/or representation with Defendant USAG.

1156.   The USAG Plaintiffs were injured because they relied on Defendant USAG to provide employees or agents who would exercise reasonable skill and care.

1157.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, the Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing the USAG Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and

continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**H.   COUNT FIVE**

**NEGLIGENT SUPERVISION**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1158.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1159.   Defendant USAG had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency and/or representation of Defendant USAG and while he interacted with young female athletes including the USAG Plaintiffs.

1160.   It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiffs, unless properly supervised.

1161.   Defendant USAG by and through its employees, agents, managers and/or assigns such as Mr. Penny or Mr. Colarossi, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

1162.   Defendant USAG breached its duty to provide reasonable supervision of Defendant Nassar, and its failure permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against the USAG Plaintiffs.

1163.   The aforementioned sexual abuse occurred while Defendant Nassar was acting in the course of his employment, agency and/or representation of Defendant USAG.

1164.   Defendant USAG tolerated, authorized and/or permitted a custom, policy, practice or

procedure of insufficient supervision and failed to adequately screen, counsel or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the rights of persons such as the USAG Plaintiffs with impunity.

1165. As a direct and/or proximate result of Defendant USAG's negligent supervision, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

I.    **COUNT SIX**

**NEGLIGENT FAILURE TO WARN OR PROTECT**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1166. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1167. Given the direct or indirect knowledge of sexual abuse in youth sports and in particular gymnastics, it was reasonably foreseeable that sexual abuse of minors may occur if proper procedures were not taken by Defendant USAG.

1168. Defendant USAG knew or should have known that Defendant Nassar posed a risk of harm to the USAG Plaintiffs or those in the USAG Plaintiffs' situation.

1169. Defendant USAG had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

1170. Defendant USAG knew or should have known that Defendant Nassar previously committed

147

sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

1171. Defendant USAG had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

1172. The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar in his capacity as employee, agent, and/or representative of Defendant USAG and the USAG Plaintiffs.

1173. Defendant USAG breached said duty by failing to warn the USAG Plaintiffs from Defendant Nassar.

1174. Defendant USAG breached its duties to protect the USAG Plaintiffs by failing to detect and/or uncover evidence of sexual abuse and sexual assault, investigate Defendant Nassar, adjudicate and suspend and/or ban Defendant Nassar from USAG affiliation and USAG sanctioned events.

1175. Defendant USAG failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative of Defendant USAG, resulting in violations of the USAG Plaintiffs' rights.

1176. Defendant USAG willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect the USAG Plaintiffs from Defendant Nassar's conduct.

1177. As a direct and/or proximate result of Defendant USAG's negligent failure to warn or protect, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have

sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**J.    COUNT SEVEN**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE
ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1178.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1179.  Defendant USAG breached its duty to take reasonable protective measures to protect the USAG Plaintiffs and other individuals from the risk of childhood sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiffs and other individuals (including minors) about how to avoid such a risk.

1180.  Defendant USAG failed to implement reasonable safeguards to:

a.      Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar;

b.      Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiffs and other young athletes.

1181.  Defendant USAG failed to train or educate their members regarding the foreseeability and danger of sexual abuse by adults in authority positions.

1182.  As a direct and/or proximate result of Defendant USAG's negligent failure to train or educate, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and

will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**K.      COUNT EIGHT**

**NEGLIGENT RETENTION**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1183.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1184.  Defendant USAG had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

1185.  Defendant USAG was negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in their failure to adequately investigate, report, and address complaints about his conduct of which they knew or should have known.

1186.  Defendant USAG was negligent in the retention of Defendant Nassar when after they discovered, or reasonably should have discovered Defendant Nassar's conduct which reflected a propensity for sexual misconduct.

1187.  Defendant USAG's failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually the Plaintiffs as well as an unknown number of other individuals.

1188.  The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to the USAG Plaintiffs as well as other minors and young adults.

1189.  As a direct and/or proximate result of Defendant USAG's negligent retention, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations

of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

L.      **COUNT NINE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**ALL PLAINTIFFS AGAINST DEFENDANT USAG**

1190.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1191.   Defendant USAG allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults.

1192.   A reasonable person would not expect Defendant USAG to tolerate or permit their employee, agent, or representative to carry out sexual assault, abuse, or molestation.

1193.   Defendant USAG held Defendant Nassar in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Defendant Nassar and seek out his services and to not question his methods or motives.

1194.   Defendant USAG protected Defendant Nassar in part to bolster its national and international reputation in the gymnastics community.

1195.   A reasonable person would not expect Defendant USAG to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of sexual assault, abuse and molestation.

1196.   Defendant USAG's conduct as described above was intentional and/or reckless.

1197.   As a direct and/or proximate result of Defendant USAG's conduct, the USAG Plaintiffs suffered

discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing the USAG Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**M.**     **COUNT TEN**

**FRAUD AND MISREPRESENTATION**
**ALL USAG PLAINTIFFS AGAINST DEFENDANT USAG**

1198. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1199. Specifically, Plaintiffs incorporate the allegations contained in §§VI.A. and VI.C., Fraudulent Concealment.

1200. From approximately 1996 to summer 2015, Defendant USAG represented to the Plaintiffs and the public that Defendant Nassar was a competent, ethical, and safe physician.

1201. By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant USAG represented to Plaintiffs and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

1202. The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

1203. Additionally, complaints were made to Defendant USAG, yet Defendant USAG did not contact their members, including the USAG Plaintiffs, the MSU Defendants, or any other clubs, or organizations affiliated with Defendant Nassar to inform them of the allegations and potential harm to Plaintiffs and others.

1204. The USAG Plaintiffs relied on the assertions of Defendant USAG and several Plaintiffs continued to seek treatment of Defendant Nassar in the wake of known concerns and dangers.

1205. The USAG Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendant USAG's fraudulent misrepresentations regarding Defendant Nassar.

1206. As a direct and/or proximate result of Defendant USAG's fraudulent misrepresentations, the USAG Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## VIII. CLAIMS AGAINST TWISTARS AND JOHN GEDDERT

1207. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1208. Defendant Twistars owed Plaintiffs Lemke, Chester, Smith, Jane C1 Doe, Jane C2 Doe, Jane C4 Doe, Jane C5 Doe, Jane C8 Doe, Jane C11 Doe, Jane C14 Doe, Jane C18 Doe, Jane C21 Doe, Jane C22 Doe, Jane C23 Doe, Jane C29 Doe, Jane C31 Doe, Jane C32 Doe, Jane C35 Doe, Jane C36 Doe, and all other Plaintiffs that were members of Defendant Twistars or participated in

events at, held by, or sanctioned by Twistars and Geddert a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

1209.   The above referenced Plaintiffs will collectively be referenced to hereinafter as "the Twistars Plaintiffs."

### N.    COUNT ELEVN

### GROSS NEGLIGENCE
### ALL TWISTARS PLAINTIFFS AGAINST
### DEFENDANTS TWISTARS, GEDDERT, NASSAR

1210.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1211.   Defendants Twistars, Geddert, and Nassar owed the Twistars Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

1212.   Defendants Twistars, Geddert, and Nassar owed the Twistars Plaintiffs a duty to use due care as an employee, representative, and/or agent of Defendant Twistars.

1213.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendants Twistars and Geddert, a special, confidential, and fiduciary relationship between the Twistars Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

1214.   In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert, the owner and operator of Defendant Twistars, regarding Defendant Nassar's conduct alleging sexual abuse, assault, and molestation.

1215.   When Defendant Geddert received the 1998 complaint from the parent, Defendant John Geddert was the owner and operator of Twistars USA, Inc. d/b/a Geddert's Twistars

Gymnastics Club USA and also an agent of Defendant USAG.

1216. Despite being informed of Defendant Nassar's conduct, Defendant Geddert recommended Defendant Nassar as a physician to members and guests of Defendant Twistars.

1217. Defendants Twistars and Geddert knew or should have known what "treatments" Defendant Nassar was performing on their premises.

1218. Plaintiffs relied on Defendants Twistars and Geddert to provide employees that would use reasonable care and skill and not cause them harm.

1219. In or around 1998, after being assaulted at Twistars, Plaintiff Jane A71 Doe, at approximately 12 years old, told a coach at Twistars that Defendant Nassar was being inappropriate and doing inappropriate things.

1220. To the best of Plaintiff Jane A71 Doe's knowledge, belief, and understanding, the coach at Twistars took absolutely no steps to investigate or report Defendant Nassar's conduct.

1221. Defendant John Geddert is or was the owner and operator of Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA.

1222. Defendant Geddert served as the USA World and 2012 Olympic Women's Gymnastics Team Head Coach.

1223. Given known sexual abuse which has taken place in youth sports including gymnastics and the reasonable foreseeability that harm may occur to athletes, Defendants Twistars and Geddert not only referred athletes to Defendant Nassar but also failed to adequately supervise Defendant Nassar. Defendants Twistars and Geddert's action were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the Twistars Plaintiffs.

1224. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting the Twistars Plaintiffs in the course of his employment, agency, and/or representation of Defendants Twistars and Geddert and under the guise of rendering medical "treatment" as an employee, representative,

and/or agent of Defendants Twistars and Geddert was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the Twistars Plaintiffs.

1225.   Defendants Twistars and Geddert's conduct demonstrated a willful disregard for precautions to the Twistars Plaintiffs' safety.

1226.   Defendants Twistars and Geddert's conduct as described above, demonstrated a willful disregard for substantial risks to the Twistars Plaintiffs.

1227.   Defendants Twistars and Geddert breached their duties owed to the Twistars Plaintiffs and were grossly negligent when they conducted themselves by actions described above, said acts having been committed with reckless disregard for the Twistars Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

1228.   As a direct and/or proximate result of Defendants Twistars and Geddert's actions and/or inactions, the Twistars Plaintiffs discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

O.   **COUNT TWELVE**

**NEGLIGENCE**
**ALL TWISTARS PLAINTIFFS**
**AGAINST DEFENDANTS TWISTARS, GEDDERT, NASSAR**

1229.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous

paragraphs.

1230. In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert, the owner and operator of Defendant Twistars, regarding Defendant Nassar's conduct alleging sexual abuse, assault, and molestation.

1231. When Defendant Geddert received the 1998 complaint from the parent, Defendant John Geddert was the owner and operator of Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA and also an agent of Defendant USAG.

1232. Despite being informed of Defendant Nassar's conduct, Defendant Geddert recommended Defendant Nassar as a physician to members and guests of Defendant Twistars.

1233. Defendants Twistars and Geddert knew or should have known what "treatments" Defendant Nassar was performing on their premises.

1234. Plaintiffs relied on Defendants Twistars and Geddert to provide employees that would use reasonable care and skill and not cause them harm.

1235. Also, in or around 1998, after being assaulted at Twistars Plaintiff Jane A71 Doe, at approximately 12 years old, told a coach at Twistars, Defendant Nassar was being inappropriate and doing inappropriate things.

1236. To the best of Plaintiff Jane A71 Doe's knowledge, belief, and understanding, the coach at Twistars took absolutely no steps to investigate or report Defendant Nassar's conduct.

1237. In or around 2010, Defendant Geddert witnessed a gymnast who was approximately 15 years old being sexual assaulted by Defendant Nassar.[137]

1238. Upon witnessing the sexual assault, Defendant Geddert made a joke and made a statement to

---

[137] Testimony given on May 12, 2017 at the Preliminary Examination hearing in *People v. Nassar*, Case No. 17-318-FY.

the gymnast to effect of: "I guess your back really did hurt."[138]

1239. In or around 2010, Defendant Geddert was owner and operator of Defendant Twistars.

1240. In or around 2011, Defendant Geddert was traveling in a vehicle with members of the USAG Senior National Team, including Aly Raisman.[139]

1241. In or around 2011, Defendant Geddert was serving in his capacity as a USAG Olympic Coach,[140] and was also owner and operator of Twistars.

1242. Ms. Raisman indicated she and her teammates would talk about Defendant Nassar's conduct amongst themselves.[141]

1243. While traveling together, in Defendant Geddert's presence, one of Ms. Raisman's teammates described "in graphic detail" what Defendant Nassar had done to her the prior evening.[142]

1244. Ms. Raisman stated Defendant Geddert did not question her or her teammate about the statements made.

1245. Defendant Geddert owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation.

1246. Defendant Geddert owed the Twistars Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation and that Defendant Geddert as owner and operator of Twistars would reasonably supervise Defendant Nassar.

1247. In recommending Defendant Nassar with knowledge of Defendant Nassar's conduct, Defendant Geddert breached the duty of ordinary care to the Twistars Plaintiffs and the public.

1248. Defendant Twistars breached the duty of ordinary care to the Twistars Plaintiffs and the public

---

[138] *Id.*
[139] Raisman says Olympics coach might have known about Nassar abuse for years, Saba Hamedy, available at https://www.cnn.com/2018/02/08/politics/aly-raisman-coach-allegations/index.html. Last accessed Feb. 8, 2018.
[140] *Id.*
[141] *Id.*
[142] *Id.*

in failing to investigate the 1998 allegations, which were made to Defendant Geddert.

1249. Defendant Twistars breached the duty of ordinary care to the Twistars Plaintiffs and the public by failing to report the 1998 allegations, which were made to Mr. Geddert, to law enforcement.

1250. The Twistars Plaintiffs, as members of Defendant Twistars, in taking the recommendation of Mr. Geddert to seek medical treatment from Defendant Nassar had a reasonable expectation that Defendant Nassar would carry out medical treatment without subjecting them to sexual assault, abuse, or molestation.

1251. The Twistars Plaintiffs who attending and competed in USAG sanctioned meets sponsored by Defendant Twistars and received treatment from Defendant Nassar at said events had a reasonable expectation that Defendant Nassar would carry out medical treatment without subjecting her to sexual assault, abuse, or molestation and that Defendant Geddert as owner and operator of Twistars would reasonably supervise Defendant Nassar.

1252. The Twistars Plaintiffs who attended a USAG sanctioned meet sponsored by Defendant Twistars and received treatment from Defendant Nassar at said events had a reasonable expectation that Defendant Nassar would carry out medical treatment without subjecting them to sexual assault, abuse, or molestation and that Defendant Geddert as owner and operator of Twistars would reasonably supervise Defendant Nassar.

1253. By seeking medical treatment from Defendant Nassar, a special, confidential, and fiduciary relationship between the Twistars Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use ordinary care.

1254. Defendant Nassar owed the Twistars Plaintiffs a duty of ordinary care in carrying out medical treatment at Defendant Twistars' facilities.

1255. Defendant Twistars and Geddert's failure to adequately train and supervise Defendant Nassar while he was at their facility breached the duty of ordinary care.

1256.   Defendant Nassar's conduct at Defendant Twistars and Geddert's facility, in sexually assaulting, abusing, and molesting the Twistars Plaintiffs in the course of and under the guise of rendering medical "treatment" was a breach of the duty to use ordinary care.

1257.   As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, the Twistars Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**P.   COUNT THIRTEEN**

**EXPRESS/IMPLIED AGENCY**
**ALL TWISTARS PLAINTIFFS AGAINST DEFENDANT TWISTARS**

1258.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1259.   An agent is a person who is authorized by another to act on its behalf.

1260.   Defendant Twistars intentionally or negligently made representations that Defendant Nassar was its employee, agent, and/or representative.

1261.   On the basis of those representations, the Twistars Plaintiffs reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of Defendants Twistars and Geddert.

1262.   The Twistars Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above.

1263. The Twistars Plaintiffs were injured because they relied on Defendants Twistars and Geddert to provide employees, agents, and/or representatives who would exercise reasonable skill or care.

1264. As a proximate cause of Defendant Nassar's negligence carried out through his employment, agency, and or representation of Defendants Twistars and Geddert, the Twistars Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

### Q. COUNT FOURTEEN

### NEGLIGENT SUPERVISION
### ALL TWISTARS PLAINTIFFS AGAINST
### AGAINST DEFENDANTS TWISTARS AND GEDDERT

1265. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1266. Defendants Twistars and Geddert each had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, or representation of Defendant Twistars when he interacted with young female athletes including Plaintiffs.

1267. It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including the Twistars Plaintiffs unless properly supervised.

1268. Defendants Twistars and Geddert by and through their employees, agents, managers, and/or assigns, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults and due to:

    a.    the 1998 complaints made to Defendant Geddert and his agent of the nonconsensual sexual touching during "treatment";

    b.    Defendant Geddert witnessing a sexual assault in or around 2010; and,

    c.    Defendant Geddert overhearing an USAG National/Olympic athlete describe Defendant Nassar's misconduct in or around 2011.

1269. Defendants Twistars and Geddert breached its duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against the Twistars Plaintiffs.

1270. The aforementioned sexual abuse occurred while the Twistars Plaintiffs and Defendant Nassar were on the premises of Defendant Twistars, and while Defendant Nassar was acting in the course of his employment, agency, or representation of Defendant Twistars.

1271. Defendants Twistars and Geddert tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Nassar was allowed to violate the rights of persons such as the Twistars Plaintiffs with impunity.

1272. As a direct and/or proximate result of Defendants Twistars and Gedderts' negligent supervision, the Twistars Plaintiffs' suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be

prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**R.**    **COUNT FIFTEEN**

**NEGLIGENT FAILURE TO WARN OR PROTECT**
**ALL TWISTARS PLAINTIFFS AGAINST**
**AGAINST DEFENDANTS TWISTARS AND GEDDERT**

1273.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1274.   Defendant Twistars knew or should have known that Defendant Nassar posed a risk of harm to the Twistars Plaintiffs or those in Plaintiffs' situation.

1275.   As early as 1998, Defendant Twistars, by a complaint made to its owner/employee/agent/representative Defendant John Geddert, had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

1276.   Defendants Twistars and Geddert knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

1277.   Defendants Twistars and Geddert had a duty to warn or protect the Twistars Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

1278.   The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar, an agent/representative/employee of Defendant Twistars and the Twistars Plaintiffs.

1279.   The duty to disclose this information also arose by the special, trusting, confidential, and

fiduciary relationship between the Twistars Plaintiffs and Defendant Twistars by virtue of being dues paying members with Defendant Twistars.

1280. Defendants Twistars and Geddert breached said duty by failing to warn the Twistars Plaintiffs from Defendant Nassar.

1281. Defendants Twistars and Geddert breached their duties to protect the Twistars Plaintiffs by failing to detect and/or uncover evidence of sexual abuse and sexual assault, which was taking place on its premises and at its facility.

1282. Defendant Twistars and Geddert breached its duties to protect the Twistars Plaintiffs by failing to investigate Defendant Nassar, and adjudicate and suspend and/or ban Defendant Nassar from Twistars-sanctioned events.

1283. Defendants Twistars and Geddert failed to adequately screen, counsel, and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician with their organization, resulting in violations of the Twistars Plaintiffs.

1284. Defendants Twistars and Geddert willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect the Twistars Plaintiffs from Defendant Nassar's conduct.

1285. As a direct and/or proximate result of Defendant Twistars' negligent failure to warn or protect, the Twistars Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and

will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**S.**   **COUNT SIXTEEN**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
ALL TWISTARS PLAINTIFFS
AGAINST DEFENDANTS TWISTARS AND GEDDERT**

1286.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1287.   Defendants Twistars and Geddert allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults at its facility and other places.

1288.   A reasonable person would not expect Defendant Twistars to tolerate or permit its employee, agent, or representative to carry out sexual assault, abuse, or molestation.

1289.   Defendants Twistars and Geddert held Defendant Nassar in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Defendant Nassar, seek his services, and to not question his methods or motives.

1290.   Defendants Twistars and Geddert protected Defendant Nassar in part to bolster and sustain his national and international reputation in the gymnastics community, and Defendants Twistars Geddert's reputation in the gymnastics community.

1291.   A reasonable person would not expect Defendants Twistars and Geddert to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of sexual assault, abuse, and molestation on its premises and at its facility.

1292.   Defendants Twistars and Geddert's conduct as described above was intentional and/or reckless.

1293.   As a result of Defendant Twistars and Geddert's conduct, the Twistars Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress,

embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

T.     **COUNT SEVENTEEN**

**FRAUD AND MISREPRESENTATION**
**ALL TWISTARS PLAINTIFFS**
**AGAINST DEFENDANTS TWISTARS AND GEDDERT**

1294.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1295.   Specifically, Plaintiffs incorporate allegations contained in §§VI.A. and VI.D., Fraudulent Concealment.

1296.   From approximately 1996 to September 2016, Defendants Twistars and Geddert represented to the Twistars Plaintiffs and the public that Defendant Nassar was a competent, ethical, and safe physician.

1297.   By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant Twistars and Geddert represented to the Twistars Plaintiffs and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that the Twistars Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

1298.   The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest the Twistars Plaintiffs and an unknown number of individuals, at times at Defendant Twistars' facility.

1299. As early as 1998, Defendants Twistars and Geddert knew their representations of Defendant Nassar were false as Defendants Twistars and Geddert received a complaint of Defendant Nassar's conduct.

1300. Between the time of the 1998 complaint and September 2016, Defendants Twistars and Geddert continued to hold Defendant Nassar out as a competent and safe physician.

1301. The Twistars Plaintiffs relied on the assertions of Defendants Twistars and Geddert and several Plaintiffs continued to seek treatment of Defendant Nassar in the wake of known concerns and dangers.

1302. The Twistars Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendants Twistars and Geddert's fraudulent misrepresentations regarding Defendant Nassar.

1303. As a direct and/or proximate result of Defendants Twistars and Geddert's fraudulent misrepresentations, the Twistars Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## VII.    CLAIMS AGAINST THE UNITED STATES OLYMPIC COMMITTEE

1304. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1305. Plaintiffs with claims against Defendant USOC include Plaintiffs Lindsey Lemke, Jane C1 Doe, Jane C5 Doe, Jane C8 Doe, Jane C16 Doe, Jane C17, Jane C20 Doe, Jane C23, Jane C26

Doe, Jane C31 Doe, Jane C32 Doe, Jane C37 Doe, and all other Plaintiffs that were either elite or national gymnasts or who were assaulted after USOC had notice of Nassar's abuse.

1306.   The above referenced Plaintiffs will collectively be referred to hereinafter as "the USOC Plaintiffs."

U.   **COUNT EIGHTEEN**

**GROSS NEGLIGENCE**
**ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC AND DEFENDANT NASSAR**

1307.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1308.   Defendant USOC owed the USOC Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

1309.   The above-named Plaintiffs are or were amateur athletes within the meaning of 36 U.S.C. § 220501(b)(1) and participated in USOC sanctioned events (events held by USAG), and were knowledgeable of and in some cases referred to Defendant Nassar through USOC and USAG affiliations.

1310.   Defendant Nassar owed the USOC Plaintiffs a duty to use due care in his capacity as an employee, representative, and/or agent of Defendant USOC.

1311.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG who was sanctioned by the USOC, a special, confidential, and fiduciary relationship between the USOC Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

1312.   Defendant USOC's failure to adequately supervise Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the USOC Plaintiffs.

1313. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs under the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant USOC was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to the USOC Plaintiffs.

1314. Defendant USOC's conduct demonstrated a willful disregard for necessary precautions to reasonably protect the USOC Plaintiffs' safety.

1315. Defendant USOC's conduct as described above, demonstrated a willful disregard for substantial risks to the USOC Plaintiffs.

1316. Defendant USOC breached duties owed to the USOC Plaintiffs and were grossly negligent when they conducted themselves by actions described above, including but not limited to their failure to notify its member athletes as early as 1998, and their failure to notify MSU about the reasons for Nassar's separation from USOC and more broadly the issues surrounding sexual abuse in gymnastics and warning signs and reporting requirements. Said acts were committed with reckless disregard for Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

1317. As a direct and/or proximate result of Defendant USOC's actions and/or inactions, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

V.    **COUNT NINETEEN**

**NEGLIGENCE**
**ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC AND DEFENDANT NASSAR**

1318. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1319. Defendant USOC owed the USOC Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while being treated by their employees, representatives, and agents.

1320. The USOC Plaintiffs as amateur athletes as defined by 36 U.S.C. § 220501(b)(1) had a reasonable expectation that the USOC was recommending competent and ethical physicians and trainers for medical treatment who would carry out said treatment without sexual assault, abuse, and molestation.

1321. As amateur athletes as defined by 36 U.S.C. § 220501(b)(1), and by seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USOC, a special, confidential, and fiduciary relationship between the USOC Plaintiffs and Defendant USOC, and the USOC Plaintiffs and Defendant Nassar was created, resulting in Defendants USOC and Nassar owing the aforementioned Plaintiffs a duty to use ordinary care.

1322. Defendant Nassar owed the USOC Plaintiffs a duty of ordinary care in carrying out medical treatment.

1323. Defendant USOC's failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

1324. Defendant USOC's failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

1325. Defendant USOC's failure to inform the USOC Plaintiffs and the public of the allegations and concerns leading to Defendant Nassar's separation from USOC was a breach of ordinary care.

1326.  Defendant Nassar's conduct in sexually assaulting, abusing, and molesting the USOC Plaintiffs was a breach of the duty to use ordinary care.

1327.  As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## W.  COUNT TWENTY

### VICARIOUS LIABILITY
### ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC

1328.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1329.  Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

1330.  Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

1331.  Defendant was an employee, agent, and/or servant of USOC or was under their complete control or active supervision at all relevant times alleged above.

1332.  Defendant USOC is vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, or agency with Defendant USOC and while he had unfettered access to young female athletes.

1333.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USOC Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## X.   COUNT TWENTY-ONE

### EXPRESS/IMPLIED AGENCY
### ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC

1334.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1335.   An agent is a person who is authorized by another to act on its behalf.

1336.   Defendant USOC intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

1337.   On the basis of those representations, Plaintiffs reasonably believed and relied upon the belief that Defendant Nassar was acting as an employee, agent, and/or representation of Defendant USOC.

1338.   Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above carried out through his employment, agency, and/or representation with Defendant USOC.

1339.   Plaintiffs were injured because they relied on Defendant USOC to provide employees or agents

who would exercise reasonable skill and care.

1340.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USOC Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

Y.      **COUNT TWENTY-TWO**

**NEGLIGENT SUPERVISION**
**ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC**

1341.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1342.   Defendant USOC had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency and/or representation of Defendant USOC and while he interacted with young female athletes including Plaintiffs.

1343.   It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiffs, unless properly supervised.

1344.   Defendant USOC by and through their employees, agents, managers and/or assigns knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar

was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

1345. Defendant USOC breached its duty to provide reasonable supervision of Defendant Nassar, and its failure permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against Plaintiffs.

1346. The aforementioned sexual abuse occurred while Defendant Nassar was acting in the course of his employment, agency and/or representation of Defendant USOC.

1347. Defendant USOC tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the rights of persons such as the USOC Plaintiffs with impunity.

1348. As a direct and/or proximate result of Defendant USOC's negligent supervision, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

Z.  **COUNT TWENTY-THREE**

**NEGLIGENT FAILURE TO WARN OR PROTECT
ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC**

1349. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1350. Given the direct or indirect knowledge of sexual abuse in youth sports and in particular gymnastics, it was reasonably foreseeable that sexual abuse of minors may occur if proper procedures were not taken by Defendant USOC.

1351. Defendant USOC knew or should have known that Defendant Nassar posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

1352. Defendant USOC had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

1353. Defendant USOC knew or should have known that Defendant Nassar previously committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

1354. Defendant USOC had a duty to warn or protect the USOC Plaintiffs (its members) and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

1355. The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar in his capacity as employee, agent, and/or representative of Defendant USOC and the USOC Plaintiffs.

1356. Defendant USOC breached said duty by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect the USOC Plaintiffs from Defendant Nassar.

1357. Defendant USOC failed to warn its members about prior complaints regarding Defendant Nassar.

1358. Defendant USOC breached its duties to protect Plaintiffs by failing to detect and/or uncover evidence of sexual abuse and sexual assault, investigate Defendant Nassar, adjudicate and suspend and/or ban Defendant Nassar from USOC affiliation and USOC sanctioned events.

1359. Defendant USOC failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative

of Defendant USOC, resulting in violations of the USOC Plaintiffs.

1360.   Defendant USOC willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Nassar's conduct.

1361.   As a direct and/or proximate result of Defendant USOC's negligent failure to warn or protect, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

AA.   **COUNT TWENTY-FOUR**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE**
**ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC**

1362.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1363.   Defendant USOC breached its duty to take reasonable protective measures to protect the USOC Plaintiffs and other individuals from the risk of childhood sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiffs and other individuals (including minors) about how to avoid such a risk.

1364.   Defendant USOC failed to implement reasonable safeguards to:

a.   Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar;

b.   Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiffs and other young athletes.

1365. Defendant USOC failed to train or educate their members regarding the foreseeability and danger of sexual abuse by adults in authority positions.

1366. As a direct and/or proximate result of Defendant USOC's negligent failure to train or educate, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**BB.** **COUNT TWENTY-FIVE**

**NEGLIGENT RETENTION**
**ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC**

1367. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1368. Defendant USOC had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

1369. Defendant USOC was negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in their failure to adequately investigate, report, and address complaints about his conduct of which they knew or should have known.

1370. Defendant USOC was negligent in the retention of Defendant Nassar when after they discovered, or reasonably should have discovered Defendant Nassar's conduct which reflected a propensity for sexual misconduct.

1371. Defendant USOC's failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually assaulting the USOC Plaintiffs as well as an unknown number of other individuals.

1372. The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to the USOC Plaintiffs as well as other minors and young adults.

1373. As a direct and/or proximate result of Defendant USOC's negligent retention, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## CC. COUNT TWENTY-SIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC

1374. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1375. Defendant USOC allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults.

1376. A reasonable person would not expect Defendant USOC to tolerate or permit their employee, agent, or representative to carry out sexual assault, abuse, or molestation.

1377. Defendants USOC held Defendant Nassar in high esteem and acclaim which in turn encouraged

Plaintiffs and others to respect and trust Defendant Nassar and seek out his services and to not question his methods or motives.

1378.  Defendants USOC protected Defendant Nassar in part to bolster its national and international reputation in the gymnastics community.

1379.  A reasonable person would not expect Defendant USOC to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of sexual assault, abuse and molestation.

1380.  Defendant USOC's conduct as described above was intentional and/or reckless.

1381.  As a direct and/or proximate result of Defendant USOC's conduct, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## DD.    COUNT TWENTY-SEVEN

### FRAUD AND MISREPRESENTATION
### ALL USOC PLAINTIFFS AGAINST DEFENDANT USOC

1382.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1383.  From approximately 1996 to summer 2015, and thereafter Defendant USOC represented to Plaintiffs and the public that Defendant Nassar was a competent, ethical, and safe physician.

1384.  By representing that Defendant Nassar was a team physician and athletic physician at MSU and

a National Team Physician with Defendant USAG, Defendant USOC represented to Plaintiffs and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

1385. The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

1386. Additionally, complaints were made to Defendant USOC, either directly or through its agents, such as Defendant Geddert, yet Defendant USOC did not contact their members, including USOC Plaintiffs, or MSU, or any other clubs, or organizations affiliated with Defendant Nassar to inform them of the allegations and potential harm to Plaintiffs and others.

1387. Plaintiffs relied on the assertions of Defendant USOC and several Plaintiffs continued to seek treatment of Defendant Nassar in the wake of known concerns and dangers.

1388. Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendant USOC's fraudulent misrepresentations regarding Defendant Nassar.

1389. As a direct and/or proximate result of Defendant USOC's fraudulent misrepresentations, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## VIII.    CLAIMS AGAINST NASSAR

EE.      COUNT TWENTY-EIGHT

ASSAULT & BATTERY
ALL PLAINTIFFS AGAINST DEFENDANT LAWRENCE NASSAR

1390.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1391.   The acts committed by Defendant Nassar against Plaintiffs described herein constitute assault and battery, actionable under the laws of Michigan.

1392.   Defendant Nassar committed nonconsensual sexual acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.

1393.   Specifically, Defendant Nassar committed acts which caused injury to Plaintiffs by subjecting them to an imminent battery and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Plaintiffs to an immediate, intentional, offensive and harmful touching.

1394.   Defendant Nassar assaulted and battered Plaintiffs by nonconsensual and unwanted digital vaginal penetration, digital anal penetration, and touching some of Plaintiffs' breasts without notice or explanation of the "treatment."

1395.   Plaintiffs did not consent to the contact, which caused injury, damage, loss, and/or harm.

1396.   As a direct and/or proximate result of Defendant Nassar's assault and battery, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by

Defendants' actions.

**FF.**       **COUNT TWENTY-NINE**

<u>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>
<u>**ALL PLAINTIFFS AGAINST DEFENDANT LAWRENCE NASSAR**</u>

1397. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1398. Defendant Nassar used his authority and position with Defendants MSU and USAG to sexually assault, abuse, and molest Plaintiffs, and an unknown number of other individuals, minors, and young adults.

1399. Defendant Nassar in committing acts of sexual assault, abuse, and molestation as described above under the guise of medical "treatment" exhibited conduct that is extreme, outrageous and/or reckless in nature.

1400. A reasonable person would not expect their physician to sexually assault, abuse, or molest them, and to do so under the guise of medical "treatment" without proper notice or explanation, and without giving the patient the opportunity to refuse "treatment" of that nature.

1401. Defendant Nassar's conduct was intentional and reckless as he repeatedly sexually assaulted, abused, and molested Plaintiffs over several years, from approximately 1996 to 2016.

1402. Defendant Nassar's conduct has caused and continues to cause Plaintiffs to suffer emotional and psychological distress.

1403. As a direct and/or proximate result of Defendant Nassar's outrageous conduct Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain

loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**GG.**     **COUNT THIRTY**

### FRAUD AND MISREPRESENTATION
### ALL PLAINTIFFS AGAINST DEFENDANT LAWRENCE NASSAR

1404.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

1405.   Specifically, Plaintiffs incorporate the allegations contained in §§VI.A. - VI.D., Fraudulent Concealment.

1406.   From approximately 1996 to September 2016, Defendant Nassar represented to Plaintiffs and the public that he was a competent, ethical, and safe physician.

1407.   By representing that he was a team physician and athletic physician at MSU and a National Team Physician with Defendant USAG, Defendant Nassar represented to Plaintiffs and the public that he was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by him.

1408.   The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of individuals at MSU, Twistars' facilities, USAG meets, Defendant Nassar's home, and other locations.

1409.   Specifically, Defendant Nassar's false representations included but were not limited to the following:

    a.     making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b.     making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c.     making the statement, explaining, that his acts and/or conduct was "checking your

sternum;"

d.      making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.      making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.      making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.      making a statement, explaining to a plaintiff and another medical professional that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating the plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

1410.   The material representation(s) to Plaintiffs were false, in that Defendant Nassar was actually engaging in conduct for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

1411.   Plaintiffs relied on the assertions of Defendant Nassar and several Plaintiffs continued to seek treatment of Defendant Nassar even after Defendant Nassar became aware of concerns and complaints of his "treatment."

1412.   When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

1413.   Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted and/or relied upon by Plaintiffs, in that Plaintiffs:

a.      would believe that the "treatments" were in fact "treatments,";

b.      would believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.      would not believe that they had been sexually assaulted;

d.      would not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults; should continue the "treatment[s]" so that he could continue to

sexually assault them;

e.      would not question and/or report the conduct to appropriate authorities; and,

f.      would not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or MSU.

1414.   Defendant Nassar concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.      positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.      dismissed a medical professional from the room, during an examination of a plaintiff of whom he was digitally penetrating, who questioned the placement of his hands;

c.      prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during some examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.      did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.      did not abide by or follow restrictions that had been put into place in 2014 by MSU restricting his examination and treatment of patients only with another person in the room; and,

f.      gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

1415.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted fraud.

1416.   Between the times of the 1997 complaint to Defendant Klages, the 1998 complaint to Defendant Twistars, the 1999, 2000 complaint to Defendants Teachnor-Hauk, other MSU coaches and trainers, the 2000 complaint and complaint between 2000 and 2002 to MSU trainers, the 2004 complaint to Meridian Township Police, the 2004 to Defendant Stollak, and the 2014 Complaint to Defendant Kovan and other MSU officials, and September 2016 when he was fired, Defendant Nassar continued to hold himself out as a competent and safe physician.

1417.   Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendant Nassar's fraudulent misrepresentations.

1418.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of MSU, USAG, and Twistars, and operated within the scope of his employment and agency, and thus and his negligence is imputed to all Defendants.

1419.   At all material times, Plaintiffs were entirely free of any negligence contributing to the injuries and damages alleged.

1420.   As a direct and/or proximate result of Defendant Nassar's fraudulent misrepresentations, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## IX.    DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION

1421.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous

paragraphs.

1422. As a direct and/or proximate result of Defendants' actions and/or inactions stated above, Plaintiffs suffered discomfort, bleeding, urinary tract infections, bacterial infections, and continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and continue to sustain loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

1423. The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiffs' Constitutional and Federal rights as well as the common and/or statutory laws of the State of Michigan, and the United States District Court has jurisdiction to hear and adjudicate said claims.

1424. In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of the violations.

1425. The amount in controversy for each Plaintiff exceeds the jurisdictional minimum of $75,000.00.

**WHEREFORE**, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiffs all applicable damages, including but not limited to compensatory, special, exemplary and/or punitive damages, in whatever amount the Plaintiffs are

entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a)   Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b)   Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c)   Reasonable attorney fees, interest, and costs; and,

d)   Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

**Respectfully Submitted,**

Dated: September 7, 2018

for: /s/ Bob Niel (P81900)
w/ permission
**James White (P56946)**
White Law PLLC
Attorneys for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: jameswhite@whitelawpllc.com
E: discovery@whitelawpllc.com

Dated: September 7, 2018

for: /s/ Bob Niel (P81900)
w/ permission
**Alexander S. Rusek (P77581)**
White Law PLLC
Attorney for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: alexrusek@whitelawpllc.com
E: discovery@whitelawpllc.com

**Dated:** September 7, 2018

/s/ _Brittany Nichol_

**Brittany Nichol (P81900)**
White Law PLLC
Attorney for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: brittanynichol@whitelawpllc.com
E: discovery@whitelawpllc.com

## JURY DEMAND

Plaintiffs, by and through their attorneys, White Law PLLC, hereby demand a trial by jury on all claims set forth above.

**Respectfully Submitted,**

**Dated:** September 7, 2018

/s/ *Boot Nirl (P81900)*
for James White (P56946)
White Law PLLC
Attorneys for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: jameswhite@whitelawpllc.com
E: discovery@whitelawpllc.com

**Dated:** September 7, 2018

/s/ *Boot Nirl (P81900)*
for Alexander S. Rusek (P77581)
White Law PLLC
Attorney for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: alexrusek@whitelawpllc.com
E: discovery@whitelawpllc.com

**Dated:** September 7, 2018

/s/ *[signature]*

**Brittany Nichol (P81900)**
White Law PLLC
Attorney for Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: brittanynichol@whitelawpllc.com
E: discovery@whitelawpllc.com